UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Application of FRANCK BERLAMONT for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in Foreign Proceedings. | Case No. 15 Misc. 0058 |

### DECLARATION OF SAMUEL SHAPIRO IN SUPPORT OF APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 TO CONDUCT DISCOVERY FOR USE IN FOREIGN PROCEEDINGS

SAMUEL SHAPIRO declares, under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I am an attorney licensed to practice law in the State of New York and before this Court. I am an associate in the law firm Emery Celli Brinckerhoff & Abady LLP, attorneys for Petitioner, Franck Berlamont. I make this declaration in support of Petitioner's application for an order pursuant to 28 U.S.C. § 1782 to conduct discovery for use in foreign proceedings. If called as a witness, I could and would testify to the same as stated herein.

2.      On March 5, 2015, O. Andrew F. Wilson, a partner in the law firm Emery Celli Brinckerhoff & Abady LLP, emailed counsel for Hunton & Williams LLP to inform them that we intended to appear at the Clerk's Office of the United States District Court for the Southern District of New York at approximately 2:00 p.m. on March 6, 2015 to present Petitioner's application for discovery pursuant to 28 U.S.C. § 1782 by order to show cause.

3.      Attached hereto as **Exhibit A** is a true and complete copy of the Proposed Order granting Petitioner's application.

4.      Attached hereto as **Exhibit B** is a true and complete copy of the Subpoena to Produce Documents to be served on Hunton & Williams LLP.

1

5.     Attached hereto as **Exhibit C** is a true and complete copy of the complaint in *Rembaum, et al. v. Banco Santander S.A., et al.*, No. 10 Civ. 4095 (S.D.N.Y.), filed on May 18, 2010.

6.     Attached hereto as **Exhibit D** is a true and complete copy of the deposition transcript of Rajiv Jaitly, dated July 16, 2012.

7.     Attached hereto as **Exhibit E** is a true and complete copy of the report from Optimal Investment Services titled "Madoff Securities," filed in *Rembaum v. Banco Santander*, Dkt. 46-1, dated July 2006.

8.     Attached hereto as **Exhibit F** is a true and complete copy of the Opinion and Order filed in *Rembaum, et al. v. Banco Santander, SA., et al.*, No. 10 Civ. 4095 (S.D.N.Y.), Dkt. 167, on August 10, 2012.

9.     Attached hereto as **Exhibit G** is a true and complete copy of the Order filed in *In re Berlamont*, No. 14-M-00190 (S.D.N.Y.), on June 20, 2014.

10.     Attached hereto as **Exhibit H** is a true and complete copy of the "About Us: Offices" page from the Hunton & Williams LLP website.

11.     Attached hereto as **Exhibit I** is a true and complete copy of an excerpt from the docket sheet in *Rembaum, et al. v. Banco Santander, SA., et al.*, No. 10 Civ. 4095 (S.D.N.Y.).

12.     Attached hereto as **Exhibit J** is a true and complete copy of an article from Bloomberg News entitled "Geneva Proves Santander Madoff Links as Investor Alleges Scam," dated June 18, 2009.

13.     Attached hereto as **Exhibit K** is a true and complete copy of Defendants' Memorandum of Law in Support of Their Motion to Dismiss Fourth Amended Class Action

Complaint filed in *Rembaum, et al. v. Banco Santander, S.A., et al.*, No. 10 Civ. 4095

(S.D.N.Y.), Dkt. 67, on Sept. 16, 2011.

    14.    Attached hereto as **Exhibit L** is a true and complete copy of a letter from the

*Rembaum* plaintiffs to the Court, dated May 23, 2012, which was So-Ordered by the Court on

May 24, 2012.

    I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 6, 2015
      New York, New York

                                 SAMUEL SHAPIRO

# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re Application of FRANCK BERLAMONT for an
Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery
for Use in Foreign Proceedings.

Case No. 15 Misc. _____

**[PROPOSED] ORDER**

The Court, having reviewed the Application for an Order Pursuant to 28 U.S.C. § 1782 to

Conduct Discovery for Use in Foreign Proceedings, the Memorandum of Law in support thereof,

and the Declaration of O. Andrew F. Wilson and the exhibits thereto, finds that (1) the statutory

requirements of 28 U.S.C. § 1782 are satisfied, and (2) the factors identified by the United States

Supreme Court in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004), weigh in

favor of granting Petitioner's application.

It is therefore ORDERED that Petitioner is granted leave to serve the subpoena annexed

as Exhibit B to the Declaration of Samuel Shapiro on Hunton & Williams LLP.

SO ORDERED.

Dated: _____, 2015

_____
United States District Judge

# Exhibit B

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

In re Application of Franck Berlamont for an Order Pursuant to 28
U.S.C. § 1782 to Conduct Discovery for Use in Foreign Proceedings

| | |
|---|---|
| *Plaintiff* )<br>v. )<br>)<br>)<br>*Defendant* ) | Civil Action No.  15 Misc. _____ |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                                         Hunton & Williams LLP
                                   200 Park Avenue, New York, NY 10166
                              *(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

The transcripts and all exhibits introduced in the (3) depositions of Bernard Madoff, Hugh Burnaby-Atkins and Jonathan Clark, taken in the case Rembaum, et al. v. Banco Santander, S.A., et al., 10 Civ. 4095 (S.D.N.Y.).

| Place: Emery Celli Brinckerhoff & Abady LLP<br>600 Fifth Avenue, 10th Floor<br>New York, NY 10020 | Date and Time: |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

CLERK OF COURT

                                                            OR

_____              _____
    *Signature of Clerk or Deputy Clerk*                              *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Petitioner,
Franck Berlamont_____, who issues or requests this subpoena, are:

O. Andrew F. Wilson (awilson@ecbalaw.com) and Samuel Shapiro (sshapiro@ecbalaw.com) Emery Celli Brinckerhoff
& Abady LLP, 600 Fifth Avenue, 10th Floor, New York, NY 10020, (212) 763-5000

**Notice to the person who issues or requests this subpoena**
A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  15 Misc. _____

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

    ❐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

    ❐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00     .

I declare under penalty of perjury that this information is true.

Date: _____

                                                _____

                                                   *Server's signature*

                                              _____

                                                  *Printed name and title*

                                              _____

                                                   *Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SCHEINDLIN

| | |
|---|---|
| Abraham and Mina Rembaum, Alberto and Angela Bellow, AM Pharmatec Planning and Engineering, Anvey Zion Holdings 1999, Bayshore 11B S.A., Catherine Irit Geron, Catherine Said, Turtlecreek, David and Naomi Noam, Dov Goldwyn, FTC as Trustees of 18 Trust, Adelaide Trust, Matilde Trust, Buds Trust, Judge Trust, Man on the Moon Trust, Max 2 Trust, Mazal Trust, Mirage Trust, Nifla Trust, Posp Trust, Sonia Trust, Vivien Trust, FTC Rosslina Properties, Gal and Michal Nachson, Giftline Operations Inc. Ltd., Gloria Arredondo, Gohan Investments Ltd., Jacqueline Taub, Investec Trust as Trustees of the Flamenco Trust, Meir Feder, Michal Tulpan, Moshe Scheuer, NIG Engineers Ltd, Nili Gold, Rami and Yael Lipman, Robin Sand, Ruth Tamir, Stuart and Jean Lipman, Wine Divine C.V., Yair and Channa Sharef, Zeev and Yafa Mark, Panacota, Dipreca, Penseys Limited, Kittlebrook Ltd and Ana Stroh, and Pioneer International Services Ltd., <br><br> Plaintiffs, <br><br> vs. <br><br> BANCO SANTANDER, S.A., OPTIMAL INVESTMENT SERVICES, S.A. and JONATHAN CLARK, <br><br> Defendants. |  <br> **10 CIV 4095** <br><br> Civil Action No. <br><br><br><br> **COMPLAINT** <br><br> JURY TRIAL DEMANDED |

Plaintiffs, by and through their attorney, allege the following for their Complaint.

## I.    INTRODUCTION

1.    This case arises from Plaintiffs' investment with Bernard L. Madoff ("Madoff") and his investment firm Bernard L. Madoff Investment Securities LLC ("BMIS").[1]

---

[1]    "Plaintiffs" refers to all plaintiffs except Pioneer International Services Ltd. ("Pioneer").

1

2.      Plaintiffs invested in a so-called Madoff feeder fund named Optimal Strategic U.S. Equity Fund ("U.S. Fund") in 2007 and 2008.  The U.S. Fund was nothing more than a pass-through vehicle which invested one-hundred percent of its assets with Madoff.  It had no employees, offices or operations of its own.  By the time Madoff's Ponzi scheme unraveled, the U.S. Fund had lost $3.2 billion with Madoff.

3.      The U.S. Fund was created, controlled and managed by subsidiaries of Defendant BANCO SANTANDER, S.A. ("BANCO SANTANDER").  Defendant BANCO SANTANDER is the parent company of one of the largest financial conglomerates in the world ("Grupo Santander") which, with over 132,000 employees, conducts its vast international business through subsidiaries which it completely controls and directs by selecting their officers, appointing their directors and owning all voting shares.  Profits from its subsidiaries flow upstream to BANCO SANTANDER.

4.      The subsidiary at BANCO SANTANDER which handled the monies in dispute in the present case was Defendant OPTIMAL INVESTMENT SERVICES, S.A. ("OIS," which together with BANCO SANTANDER is referred to as the "SANTANDER DEFENDANTS" or "DEFENDANTS," herein).  OIS totally controlled disposition of all assets of the U.S. Fund.

5.      The U.S. Fund's investment in Madoff dated back to the mid 1990's and was initiated by Manuel Echeverría ("Echeverría") back when the investment was made directly by BANCO SANTANDER and not through the vehicle of a subsidiary.  Echeverría at the time was the head of BANCO SANTANDER's International Private Banking Division's Portfolio Management and Fund Management Group.  Echeverría is currently facing criminal charges in Switzerland for "criminal mismanagement" in connection with the U.S. Fund's investment with Madoff.

2

6.      In 2001, BANCO SANTANDER'S International Private Banking Division was renamed OIS, and given subsidiary status, rather than being an unincorporated division. Echeverria received the new title of "Chief Executive Officer of Optimal Investment Services." Nevertheless, the investment with Madoff through the U.S. Fund continued to be handled just as it always had been. The same few employees continued to perform the same limited functions necessary to raise money and transfer it to Madoff. Besides a new name and titles, functionally little, if anything, changed.

7.      During the life of its Madoff investment, the SANTANDER DEFENDANTS abdicated all investment management functions over their clients' money while charging full management fees of tens of millions of dollars per year. Suspiciously, Madoff did not charge any fee for managing the $3 billion U.S. Fund.

8.      Driven by greed to preserve this suspicious self serving arrangement, the SANTANDER DEFENDANTS ignored multiple indications that Madoff was a fraud. The SANTANDER DEFENDANTS engaged in an egregious refusal to see the obvious or investigate the doubtful, not the least of which was Madoff's willingness to forego hundreds of millions of dollars in investment advisory fees. Instead of asking questions and demanding answers regarding Madoff's irregular practices, the SANTANDER DEFENDANTS turned a blind eye for over a decade.

9.      Madoff's crime went undetected for so many years in part due to his successful evasion of the Securities and Exchange Commission ("SEC") reporting requirements for "investment advisors." Madoff lied to the SEC for years by altogether denying he controlled the investment of the funds of others and claiming that he was merely a "broker" who gave investment advice "solely incidental to the conduct of his business as a broker."

3

10.    The SANTANDER DEFENDANTS had actual knowledge that Madoff lied to the SEC by denying he was an investment advisor and claiming he was only a broker (thereby evading the filing of quarterly reports of holdings). (Memorandum from Attorney Karine Courvoisier to Mr. Manuel Echeverría Falla, Chief Executive Officer and Chief Investment Officer of Defendant OIS, titled "Meetings with Bernard Madoff: September 18 and 19, 2002," Exhibit A, pg. 1, referred to as "September, 2002 Attorney Courvoisier Memoranda," herein).

11.    The SANTANDER DEFENDANTS, coached by Madoff himself, misled their investors in the same vein that Madoff misled the SEC. The offering documents for the U.S. Fund falsely represented that Madoff was a "Broker-Dealer" with "limited discretion" over investment decisions, and that Defendant OIS was the "Investment Manager" who "effected all investment decisions." (October, 2006 U.S. Fund Explanatory Memorandum, the "2006 EM," pg 31, Exhibit B; and, January 7, 2008 U.S. Fund Explanatory Memorandum, the "2008 EM," at 28, Exhibit C). This was false.

12.    Plaintiffs and Pioneer relied on false statements in the offering documents described herein. In addition, and as set forth in further detail below, Plaintiffs and Pioneer relied on verbal representations made by OIS representatives in New York concerning their supposed careful due diligence and close supervision of Madoff's operation. Because of these false statements and wrongful conduct, Plaintiffs have lost their entire investments in the U.S. Fund. Pioneer, as the investment advisor who recommended that Plaintiffs invest in the U.S. Fund based on DEFENDANTS' misrepresentations and wrongful conduct, suffered reputation damage and loss of business. Accordingly, Plaintiffs and Pioneer sue Defendants here for the breach of their obligations under the federal securities and state common laws.

4

## II.    PLAINTIFFS

13.    **Pioneer International Services Ltd.** ("Pioneer") is incorporated in British Virgin Islands and its principal headquarters are located at Hertzlia, Israel.   Each of the individual Plaintiffs invested in the U.S. Fund pursuant to an investment advisory agreement with Pioneer. Pursuant to the advice provided by Pioneer, which was based on DEFENDANTS' misrepresentations to Pioneer, Plaintiffs invested an amount in excess of $75,000 in the U.S. Fund.  These investments were made from bank accounts at Banc Julius Baer ("Julius Baer"), Credit Agricole, Pictet and Compagnie Bancaire Helvetique, which are banks and investment firms located in Switzerland.  While Plaintiffs have standing to bring direct claims as the ultimate parties in interest who bore the ultimate loss, Plaintiffs have also obtained assignments of all claims from Julius Baer, Credit Agricole, Pictet and Compagnie Bancaire Helvetique to avoid any doubt that they, collectively and individually, are entitled to bring this action.

14.    Plaintiffs **Abraham and Mina Rembaum** are residents of Colombia and invested in the U.S. Fund on or about July 23, 2008.

15.    Plaintiffs **Alberto and Angela Bellow** are residents of Colombia and invested in the U.S. Fund on or about January 29, 2008.

16.    Plaintiff **AM Pharmatec Planning and Engineering** is a resident of Israel and invested in the U.S. Fund on or about November 30, 2007.

17.    Plaintiff **Anvey Zion Holdings 1999** is a resident of Israel and invested in the U.S. Fund on or about November 28, 2007.

18.    Plaintiff **Bayshore 11B S.A.** is a resident of Panama and invested in the U.S. Fund on or about July 26, 2007.

5

19.    Plaintiff **Catherine Irit Geron** is a resident of Israel and invested in the U.S. Fund on or about November 20, 2007.

20.    Plaintiff **Catherine Said** is a resident of Israel and invested in the U.S. Fund on or about December 1, 2008.

21.    Plaintiff **Turtlecreek** is a resident of British Virgin Islands and invested in the U.S. Fund on or about August 27, 2008.

22.    Plaintiffs **David and Naomi Noam** are residents of Israel and invested in the U.S. Fund on or about August 27, 2008.

23.    Plaintiff **Dov Goldwyn** is a resident of Israel and invested in the U.S. Fund on or about April 28, 2008.

24.    Plaintiff **FTC as Trustees of 18 Trust** is a resident of the Island of Guernsey and invested in the U.S. Fund on or about January 29, 2008.

25.    Plaintiff **Adelaide Trust** is a resident of the Island of Guernsey and invested in the U.S. Fund on or about June 26, 2008.

26.    Plaintiff **Matilde Trust** is a resident of the Island of Guernsey and invested in the U.S. Fund on or about July 27, 2007.

27.    Plaintiff **Buds Trust** is a resident of the Island of Guernsey and invested in the U.S. Fund on or about June 26, 2008.

28.    Plaintiff **Judge Trust** is a resident of the Island of Guernsey and invested in the U.S. Fund on or about August 27, 2008.

29.    Plaintiff **Man on the Moon Trust** is a resident of the Island of Guernsey and invested in the U.S. Fund on or about December 27, 2007.

6

30.    Plaintiff **Max 2 Trust** is a resident of the Island of Guernsey and invested in the U.S. Fund on or about October 29, 2007 and February 27, 2008.

31.    Plaintiff **Mazal Trust** is a resident of the Island of Guernsey and invested in the U.S. Fund on or about April 16, 2008.

32.    Plaintiff **Mirage Trust** is a resident of the Island of Guernsey and invested in the U.S. Fund on or about October 29, 2007.

33.    Plaintiff **Nifla Trust** is a resident of the Island of Guernsey and invested in the U.S. Fund on or about October 29, 2007.

34.    Plaintiff **Posp Trust** is a resident of the Island of Guernsey and invested in the U.S. Fund on or about December 27, 2007.

35.    Plaintiff **Sonia Trust** is a resident of the Island of Guernsey and invested in the U.S. Fund on or about March 27, 2008.

36.    Plaintiff **Vivien Trust** is a resident of the Island of Guernsey and invested in the U.S. Fund on or about January 29, 2008.

37.    Plaintiff **FTC Rosslina Properties** is a resident of British Virgin Islands and invested in the U.S. Fund on or about April 26, 2007.

38.    Plaintiffs **Gal and Michal Nachson** are residents of Israel and invested in the U.S. Fund on or about April 28, 2008.

39.    Plaintiff **Giftline Operations Inc. Ltd.** is a resident of British Virgin Islands and invested in the U.S. Fund on or about November 30, 2007.

40.    Plaintiff **Gloria Arredondo** is a resident of Mexico and invested in the U.S. Fund on or about April 28, 2008.

7

41.    Plaintiff **Gohan Investments Ltd.** is a resident of Israel and invested in the U.S. Fund on or about July 27, 2007.

42.    Plaintiff **Jacqueline Taub** is a resident of Israel and invested in the U.S. Fund on or about August 27, 2008.

43.    Plaintiff **Investec Trust as Trustees of the Flamenco Trust** is a resident of Switzerland and invested in the U.S. Fund on or about March 28, 2007.

44.    Plaintiff **Meir Feder** is a resident of Israel and invested in the U.S. Fund on or about September 26, 2008.

45.    Plaintiff **Michal Tulpan** is a resident of Israel and invested in the U.S. Fund on or about July 28, 2008.

46.    Plaintiff **Moshe Scheuer** is a resident of Israel and invested in the U.S. Fund on or about July 25, 2008.

47.    Plaintiff **NIG Engineers Ltd.** is a resident of Israel and invested in the U.S. Fund on or about November 30, 2007.

48.    Plaintiff **Nili Gold** is a resident of Israel and invested in the U.S. Fund on or about June 26, 2008.

49.    Plaintiffs **Rami and Yael Lipman** are residents of Israel and invested in the U.S. Fund on or about July 27, 2007 and June 26, 2008.

50.    Plaintiff **Robin Sand** is a resident of Israel and invested in the U.S. Fund on or about December 24, 2007.

51.    Plaintiff **Ruth Tamir** is a resident of Israel and invested in the U.S. Fund on or about August 13, 2008.

8

52.     Plaintiffs **Stuart and Jean Lipman** are residents of Israel and invested in the U.S. Fund on or about January 29, 2008.

53.     Plaintiff **Wine Divine C.V.** is a resident of The Netherlands and invested in the U.S. Fund on or about August 27, 2008.

54.     Plaintiffs **Yair and Channa Sharef** are residents of Israel and invested in the U.S. Fund on or about August 27, 2008.

55.     Plaintiffs **Zeev and Yafa Mark** are residents of Israel and invested in the U.S. Fund on or about August 27, 2008.

56.     Plaintiff **Panacota** is a resident of Colombia and invested in the U.S. Fund on or about September 3, 2008.

57.     Plaintiff **Dipreca** is a resident of Colombia and invested in the U.S. Fund on or about May 3, 2008.

58.     Plaintiff **Penseys Limited** is a resident of the Island of Jersey and invested in the U.S. Fund on or about June 26, 2008.

59.     Plaintiff **Kittlebrook Ltd.** is a resident of British Virgin Islands and invested in the U.S. Fund on or about December 27, 2007.

60.     Plaintiff **Ana Stroh** is a resident of Israel and invested in the U.S. Fund on or about May 28, 2008.

61.     Plaintiff **Pimos** is a resident of British Virgin Islands and invested in the U.S. Fund on or about July 28, 2008.

**III.     DEFENDANTS**

62.     Defendant BANCO SANTANDER is the parent bank of Grupo Santander, the leading financial institution in Spain, and one of the largest financial conglomerates in the world.  As of

9

the end of the second quarter 2009, Santander had total assets exceeding $1.5 trillion dollars, more than 132,000 employees, and the largest market capitalization of any bank in continental Europe. Through wholly-owned subsidiaries, Santander has hundreds of offices in the United States, including Miami, New York, Houston, Los Angeles, San Diego and Seattle.

(a)     BANCO SANTANDER has submitted annual reports to the SEC pursuant to the Exchange Act since 1999 by filing Forms 20-F. As set forth in the Form 20-F filed on June 30, 2009, for the annual period ending December 31, 2008, Santander had three different securities registered with the SEC: (i) American Depositary Receipts, each representing the right to receive one Share of Capital Stock of Santander ("ADRs"), (ii) shares of Capital Stock, and (iii) Non-cumulative guaranteed preferred stock of Santander Finance. The ADRs trade on the New York Stock Exchange. There were 8.0 billion shares of capital stock outstanding as of December 31, 2008.

(b)     BANCO SANTANDER has permanent offices located at 45 East 53rd Street, New York, New York 10022, and according to its Form 20-F for the period ending December 31, 2007 and filed June 30, 2008, has "significant operations in New York."

(c)     An SEC No Action Letter, dated August 18, 2008, states that BANCO SANTANDER also conducts securities business in the continental U.S. through Santander Investment Securities Inc., Banesto Securities, Inc., and Abbey National Securities, Inc.

(d)     BANCO SANTANDER has at least 28 different subsidiaries in the United States, as set forth in its 2007 Form 20-F.

(e)     On January 30, 2009, BANCO SANTANDER acquired Sovereign Bank. Sovereign Bank was the 19th largest financial institution in the Unites States, by assets, as of December 31, 2007, per its last annual report. Its current home page on the Internet states, at the

top and in bold red letters, "Santander, Sovereign is now part of one of the world's largest and safest banks." Sovereign has 750 branches and 2,300 ATMs in the United States.

63.    Defendant OIS is an investment management company, incorporated in Switzerland in July 2001, with almost $10 billion in assets under management as of January 7, 2008. OIS is a wholly-owned subsidiary of BANCO SANTANDER. OIS completely controlled the investment of all assets of U.S. Fund.

64.    Defendant OIS operated and operates out of BANCO SANTANDER offices including SANTANDER offices located at 5-7 Rue Ami-Lévrier, CH-1201, Geneva, Switzerland, New York, Miami, and Madrid. OIS was, and continues to be, in complete control of the U.S. Fund.

65.    Defendant JONATHAN CLARK ("CLARK") was employed by OIS in New York from mid-2003 until mid-2008. Part of Clark's purported job duties included monitoring Madoff. CLARK reported to Hugh-Burnaby Atkins ("Atkins") and Echeverría. Atkins was the head of OIS's New York office. CLARK, together with Atkins and the rest of the New York office, handled the U.S. Fund day-to-day. Upon information and belief, CLARK carries a United States passport, is currently employed in New York City, and resides in New Jersey.

## IV.   DEFENDANTS' MATERIAL MISREPRESENTATIONS

66.    As a longstanding practice, Pioneer did not invest in single manager hedge funds (such as Madoff). Such hedge funds require ongoing due diligence oversight in light of the largely unregulated nature of the hedge fund industry and the corresponding risk and potential for abuse. Though Pioneer was equipped to perform due diligence, it was not equipped to perform ongoing due diligence oversight of hedge funds. Accordingly, Pioneer never invested in single manager hedge funds other than in rare instances where a desirable consistent performing single manager hedge fund had ongoing due diligence performed upon it by a known and responsible third party.

11

67.     In late 2007, Pioneer learned of a desirable single manager hedge fund for which Pioneer would not have to perform ongoing due diligence oversight since the fund was overseen by the SANTANDER DEFENDANTS who claimed to perform the due diligence function on an ongoing basis. It was for this reason alone - that an established and respected large financial institution had performed and would continue to perform ongoing due diligence and oversee the investment - that Pioneer considered investing in the U.S. Fund at all.

### A.     The Critical Conversation with CLARK in New York.

68.     Pioneer first met with the SANTANDER DEFENDANTS on October 29, 2007, in the offices of Julius Baer in Geneva, Switzerland. The OIS representative was Vice President of Business Development, Ayca Pars ("Pars"). The representatives of Pioneer at the meeting were Chief Investment Officer David Tamir ("Tamir"), Chief Operations Officer Dafna Gonen ("Gonen"), and Chief Executive Officer of Pioneer Global Funds Mark Goldblatt ("Goldblatt"). Pioneer's main goals at the October 29, 2007, meeting were: (1) to learn more about the U.S. Fund and, if the fund was found to be a desirable investment, (2) to determine whether DEFENDANTS were performing meaningful ongoing due diligence oversight and were sufficiently involved in the underlying fund's operations (i.e., Madoff). Accordingly, Pioneer representatives Tamir and Gonen asked Pars numerous questions concerning how DEFENDANTS performed ongoing due diligence on Madoff.

69.     Pars indicated, however, that she was unable to answer Pioneer's questions about due diligence since those functions were performed by DEFENDANTS' staff in New York City. Accordingly, Pars offered to get a New York based employee on the phone in order to respond to Pioneer's questions about the U.S. Fund and due diligence on Madoff. Pars telephoned BANCO SANTANDER's offices in New York to have a conference call with Defendant CLARK.

70.    In the conference call, CLARK stated that he worked out of the SANTANDER

DEFENDANTS' New York City office where he maintained regular daily contact with the

Madoff operation and monitored Madoff.  CLARK explained that although Madoff managed the

account, the U.S. Fund was fully controlled and "monitored" by DEFENDANTS in New York.

CLARK assured Pioneer that Madoff provided "full transparency" to DEFENDANTS who

monitored Madoff's trading on a "segregated account" for the U.S. Fund on a daily basis.  All of

this was untrue.

71.    According to CLARK, DEFENDANTS worked together with Madoff and were far from

being passive investors in Madoff.  DEFENDANTS were supposedly fully informed and actively

involved participants in Madoff's investment of their monies.  Madoff's discretion over the U.S.

Fund, CLARK claimed, was limited because DEFENDANTS played an active and ongoing

decision making role in the investment.  DEFENDANTS had given Madoff an investment

"mandate" and Madoff executed the mandate under their control and daily monitoring.

DEFENDANTS supposedly determined the stocks and equities that were to be traded by Madoff

who executed the trades and exercised limited judgment within defined guidelines.

72.    As set forth below, the truth about the SANTANDER DEFENDANTS' due diligence on

Madoff was far different than CLARK represented it to Pioneer on October 29, 2007: (a)

DEFENDANTS performed no meaningful due diligence on Madoff; and, (b) DEFENDANTS

were well aware of numerous red flags of fraud detailed below (including Madoff's lying to the

SEC by falsely denying that he was controlling the investment of billions of dollars of other

people's money, ie. that he was an investment manager who should have been filing quarterly

reports with the SEC) which were highly material facts which CLARK and the SANTANDER

DEFENDANTS withheld from the Pioneer representatives.

13

73.    Each and every one of the above misrepresentations and failures to divulge material facts were made in New York City on October 29, 2007, at the offices of BANCO SANTANDER and OIS.

**B.    The October 2006 and January 2008 Explanatory Memorandum.**

74.    In October 2006 and January 2008, Pioneer received and reviewed Explanatory Memorandums dated October 2006 and January 7, 2008. (Exhibits B and C, collectively referred to as "the 2006 and 2008 EMs"). Pioneer relied on upon the 2006 and 2008 EMs which contained the identical material misrepresentations detailed herein in making the decision to recommend that Plaintiffs invest in the U.S. Fund , both after October 2006 and January 2008.

75.    The 2006 and 2008 EMs falsely reassured investors about the high quality of the due diligence OIS had purportedly performed and the care that OIS had taken in selecting third parties participating in the investment and handling of the funds:

> (a) "[OIS] bases its investment decisions on a *careful analysis* of many investment managers," (2006 EM, at 12; and, 2008 EM, at 11, Exhibits B and C);
>
> (b) "[OIS] shall select managers with varied investment styles who have established records of success or who [OIS] believes demonstrate the potential to become outstanding investment managers," (2006 EM, at 12; and, 2008 EM, at 11, Exhibits B and C); and,
>
> (c) "Custodial risk . . . . [the U.S. Fund] must satisfy itself to ensure that such third party [such as Madoff] has and maintains the necessary competence, standing and expertise appropriate to hold the assets concerned." (2006 EM, at 22; and, 2008 EM at 22, Exhibits B and C).

14

76.     The 2006 and 2008 EMs further misrepresented the relationship with Madoff in the very

first paragraph describing the U.S. Fund by stating that the "Broker-Dealer" (*i.e.* Madoff) has

*"limited investment discretion as to the selection of securities and other property purchased or*

*sold for the fund's account,"* and that it was OIS who was the "Investment Manager" and

*"effected all investment decisions in the account at the Broker-Dealer."*

> "Although the ***Broker-Dealer has limited***
> ***investment discretion*** as to the selection of
> securities or other property purchased or sold by
> or for the fund's account, the Broker-Dealer has
> discretion with respect to the timing and size of
> transactions and to the extent described in the
> agreement entered in between the Broker-
> Dealer, the Fund and [the U.S. Fund]."
>
> *"The Broker-Dealer is responsible for the*
> *execution of the fund's trading strategies and*
> *all investment decisions in the account at the*
> *Broker-Dealer are effected by the Investment*
> *Manager."*
>
> (2006 EM, at 31 and 33; and 2008 EM, at 28
> and 32; emphasis added, Exhibits B and C).

77.     Critically, substantial portions of the misleading language of the 2006 and 2008 EMs

came directly from Madoff himself.  On September 18 and 19, 2002, at a meeting in Madoff's

offices in New York, Madoff explained to OIS attorney Karine Courvoisier ("Courvoisier") that

if the SANTANDER DEFENDANTS told Madoff to trade only S&P 100 stocks (which is what

he supposedly was trading anyway): (a) it would then be literally true for the SANTANDER

DEFENDANTS to represent to clients that "the ***Broker-Dealer has limited investment***

***discretion***;" (b) that trading S&P 100 stocks could be characterized as a "trading strategy," and

(c) that by telling Madoff to trade S&P 100 stocks the SANTANDER DEFENDANTS could

then represent that the third party broker was merely *"executing the Investment Manager's*

*(OIS's) trading strategy.*" Madoff's words were recorded in notes from the meeting by

Courvoisier and included in a memorandum she sent to OIS's CEO Echeverría (the "Courvoisier

Memorandum"):

> "Madoff explains that it is not correct to say that
> [the fund] has a "discretionary account" at [BMIS],
> as stated under the "Investment Policies" of this
> document. If this was the case, Madoff/[BMIS]
> would choose what security to buy (as an
> investment advisor would do). However, if he only
> chooses the time when he trades, then he has no
> "discretion." The only decision/discretion he
> makes/has is on the timing and the price. In other
> words, Madoff/[BMIS] only executes the
> investment strategy that the investment adviser
> gives him to implement."
>
> Memorandum from Attorney Karine Courvoisier to
> Mr. Manuel Echeverría Falla, Chief Executive
> Officer and Chief Investment Officer of Defendant
> OIS, titled "Meetings with Bernard Madoff:
> September 18 and 19, 2002," Exhibit A, pg. 2.

78.     Madoff was clearly the teacher and the SANTANDER DEFENDANTS the willing

students in the art of deception.   The SANTANDER DEFENDANTS adopted Madoff's bogus

"limited discretion" verbiage and accompanying rationale directly from Madoff's mouth into the

U.S. Fund's explanatory memoranda (as set forth above).

79.     The SANTANDER DEFENDANTS understood that Madoff's "limited discretion"

verbiage was misleading.   In an effort to create a defense to cover their misrepresentation that

Madoff had limited discretion, the SANTANDER DEFENDANTS tried to paper over reality by

executing an "additional letter" incorporating Madoff's misleading language indicating that he

was merely "executing the Investment Manager's strategy" and had "limited discretion."

80.     At the New York City meetings on September 18 and 19, 2002, Madoff participated in

the creation of the above referenced false statements and explanatory memorandum terminology

for the purpose of aiding the SANTANDER DEFENDANTS in deceiving investors into trusting the investment and investing their money.

81.     The 2006 and 2008 Explanatory Memorandums' repeated references to "*the fund's trading strategy*" which was merely "executed" under their supervision by the "Broker-Dealer" was a misstatement designed to create the impression that the SANTANDER DEFENDANTS and U.S. Fund had control, a trading strategy, and were actively involved in overseeing the investment.

82.     In truth, the U.S. Fund and the SANTANDER DEFENDANTS had neither control nor any "trading strategy" other than to funnel billions of dollars of clients' money to Madoff in return for tens of millions in unearned investment management fees.

83.     The 2006 and 2008 EMs further stated that the SANTANDER DEFENDANTS were performing meaningful monitoring services.  In a section titled "Dependence on the Investment Manager" (*i.e.*, OIS), the 2006 and 2008 EMs stated that the success of the investment is dependent upon the performance of the Investment Manager:

> "**The success of the fund for the foreseeable future will depend largely upon the ability of the Investment Manager.**"
>
> 2006 EM, at 33; and, 2008 EM at 30, Exhibits B and C.

84.     Because the entire decision making activity of the SANTANDER DEFENDANTS in connection with the U.S. Fund consisted of their decision to give the money to Madoff's total unfettered control, it was a misrepresentation of fact to state that the success of the fund for the foreseeable future depended largely upon the ability of the SANTANDER DEFENDANTS.

85.     The 2006 and 2008 EMs further indicated that the SANTANDER DEFENDANTS were performing meaningful investment management services for the U.S. Fund in a section titled

"Management Fees." That section explained that OIS charged between 1.15% and 2.15% of assets as a "management fee," *i.e.* tens of millions of dollars a year. (2006 EM, pg. 32; and, 2008 EM, pg. 29, Exhibits B and C). There is no clearer statement that a party is providing investment management services than billing for them.

86.     On the basis of the above described misrepresentations, (a) contained in the 2006 and 2008 EMs which were jointly conceived by Madoff and the SANTANDER DEFENDANTS in New York City on September 18 and 19, 2002, and (b) CLARK's October 29, 2007 communications from New York City (falsely indicating that DEFENDANTS had conducted, were presently conducting, and would continue to conduct meaningful ongoing due diligence oversight on Madoff) Pioneer advised Plaintiffs to invest millions of dollars in the U.S. Fund during the course of 2007 and 2008. Pioneer would never have advised Plaintiffs to invest in the U.S. Fund had they known the truth that DEFENDANTS were not performing meaningful ongoing due diligence, Madoff did not have a segregated account for the U.S. Fund, and that the DEFENDANTS had, for many years, ignored multiple red flags of fraud.

87.     Plaintiffs, in reliance upon Pioneer's advice and the 2006 and 2008 EMs, invested millions of dollars in the U.S. Fund.

        C.     **Additional False Statements and Misrepresentations**

88.     The SANTANDER website represented that the SANTANDER DEFENDANTS would perform due diligence and exercise care in the investment of its clients' monies including the statement on the SANTANDER website:

> "intensive due diligence is vital to ensuring the integrity and sustainability of the investment process. Each investment undergoes lengthy and detailed scrutiny according to clearly defined manager selection criteria."

18

89.    The SANTANDER DEFENDANTS' representations to Plaintiffs that the "World's Best Bank" was conducting due diligence on the "Broker-Dealer" (i.e. Madoff) for the U.S. Fund was false.  In fact, the SANTANDER DEFENDANTS turned the funds over to Madoff without ever asking the basic questions and demanding the simple answers and information constituting reasonable due diligence.

90.    The SANTANDER DEFENDANTS knew that a person who advises others "as to the advisability of investing in, purchasing, or selling securities" with $25 million or more under management is required to register as an "investment advisor" with the SEC and file quarterly "F-13" reports listing all securities owned by the investment advisor, pursuant to the Investor Advisors Act of 1940, 15 U.S. Code, Sec. 80a-1, *et seq.* (September, 2002 Attorney Courvoisier Memoranda, Exhibit A at 1).  Despite this knowledge, and the fact that Madoff was completely controlling billions of dollars DEFENDANTS had invested with him, DEFENDANTS falsely represented in the 2006 and 2008 EMs that "while the Broker Dealer may be considered similar to an investment company, it is not required and does not intend to register as such under the US Investment Company Act of 1940, and, accordingly, the provision of that Act.....will not be applicable.

91.    Had the SANTANDER DEFENDANTS honestly informed Plaintiffs of the fact that Madoff was clearly an "investment advisor" who was lying the SEC in order to conceal his status as such and avoid SEC oversight and reporting requirements, Plaintiffs would have never invested in U.S. Fund.

92.    In October, 2008 the SANTANDER DEFENDANTS made E-mail and face to face verbal representations to Pioneer, in response to Pioneer's expression of concerns about the safety of their money invested in U.S. Fund and upon which Pioneer relied in leaving the funds

invested in the U.S. Fund, to the effect that the SANTANDER DEFENDANTS had been monitoring and "could see" Madoff's trades and performed due diligence and confirmed that the U.S. Fund "is invested in treasuries" and "the money is currently 100% in Treasury Bills."

## V.   THE SANTANDER DEFENDANTS FAILED TO CONDUCT BASIC DUE DILIGENCE AND IGNORED RED FLAGS.

93.     By the following specified failures to conduct basic due diligence oversight and ignoring obvious red flags of fraud, DEFENDANTS violated their own internal due diligence standards and policies and the common sense standards of investment oversight of which DEFENDANTS were well aware.

### A.   Madoff's False Representations to SEC that he was not an Investment Advisor.

94.     DEFENDANTS knew for years prior to soliciting, accepting, and transferring Plaintiff's investment to Madoff that Madoff had deceived the SEC by concealing the existence of his investment advisory business.

95.     A person who advises others "as to the advisability of investing in, purchasing, or selling securities" with $25 million or more under management is required to register as an "investment advisor" with the SEC and file quarterly "F-13" reports listing all securities owned by the investment advisor, pursuant to the Investor Advisors Act of 1940, 15 U.S. Code, Sec. 80a-1, *et seq.* DEFENDANTS were aware of the SEC reporting requirements for investor advisors, as evidenced by the Courvoisier memorandum of September 2002. (September, 2002 Attorney Courvoisier Memoranda, Exhibit A at 1).

96.     To avoid SEC reporting requirements for investment advisors, Madoff for years concealed the existence of his multi-billion dollar fund from the SEC by claiming that he operated exclusively a "securities brokerage business" and any investment advice given to clients

was "solely incidental to the conduct of his business as a broker." (September, 2002 Attorney Courvoisier Memoranda, Exhibit A at 1).

97.     DEFENDANTS knew Madoff was denying the existence of his fund to the SEC and falsely claiming to merely be a broker and that any investment advice he gave to clients was "solely incidental to the conduct of his business as a broker," and were explicitly informed of the same by their lawyer:

> **"Madoff insists he does not act as an investment adviser and therefore he/[BMIS] is not a registered investment adviser with the SEC."**
>
> September, 2002 Attorney Courvoisier Memoranda, Exhibit A, pg. 1.

It was obvious to DEFENDANTS that Madoff was not merely giving them investment "advice solely incidental to the conduct of his business as a broker" in connection with their $3.2 billion investment. DEFENDANTS never utilized Madoff as a broker or directed him to make a single trade, never made a suggestion to Madoff about how to invest nor disagreed with an investment decision Madoff claimed to have made, and were never informed in real time of the trades Madoff was supposedly making.

98.     Madoff obviously and without any iota of a doubt to SANTANDER had complete control over their money and was therefore an investment advisor and was lying to the SEC by denying the same. DEFENDANTS understood that Madoff was illegally and fraudulently concealing the existence of his activities from the SEC by denying he was operating as an investor advisor. (September, 2002 Attorney Courvoisier Memoranda, Exhibit A, at 1).

### B.     Madoff's Suspicious Secrecy

99.     Madoff's secrecy manifested itself in multiple fashions.  As set forth above, Madoff kept

the true nature of his activities secret from the U.S. government until 2006 when the SEC forced

him to register as an investment advisor and file SEC reports.

100.     Madoff insisted that the feeder funds, including the U.S. Fund, not reveal their

investments with him to the outside world and insisted that DEFENDANTS not disclose his

name in any prospectus or other document.  (September, 2002 Attorney Courvoisier Memoranda,

Exhibit A at 3; "Madoff does not permit any customer, including us, to disclose his/[BMIS's]

name").

101.     There are few, if any, plausible legitimate reason for an investment advisor with $17

billion under management to have no website or written promotional materials whatsoever and to

insist that investors keep the fact of their investment with him secret.

102.     Knowing Madoff deceived the SEC by denying he was acting as an investment advisor at

all, common sense would have told DEFENDANTS that Madoff wanted to keep the fact they

and many others invested huge amounts of monies with him secret because Madoff did not want

the SEC to find out that he was an investment advisor and not merely a broker.

### C.     Madoff Did Not Charge an Investment Management Fee, Implausibly Foregoing Millions In Advisory Fees.

103.     Madoff did not charge lucrative investment advisory fees.  Whereas investment managers

in hedge funds typically charge a fee based on a percentage of assets managed and a percentage

of profits, Madoff charged neither.  These fees are commonly referred as to 2/20 -- 2% of assets

under management and 20% of profits.  On the U.S. Fund's $3.2 billion investment alone

Madoff was relinquishing $64 million annually, simply counting the 2% assets under

22

management fee.   On his supposedly $17 billion in assets, Madoff was foregoing an incredible

$340 million annually.  And this, in a privately held company.

104.   Even DEFENDANTS' understanding of how Madoff made money was not credible.

DEFENDANTS understood that Madoff charged the U.S. Fund a brokerage fee of four cents per

share per trade for supposedly executing trades, a typical charge for brokerage services.

Although Madoff purported to provide both investment management services and brokerage

services (by self-executing the trades he directed), Madoff charged only for the lesser of the two

services giving up hundreds of millions of dollars of annual fees which he would have been

expected to charge.  Such non-billing for investment advisor-management services is unheard of

in the industry.

105.   DEFENDANTS knew that managing billions for no fee was highly irregular and took

note of this shocking fact in an internal Memorandum:

> **"Madoff is not paid any kind of advisory,**
> **management or performance fee."**
>
> September, 2002 Attorney Courvoisier
> Memoranda, pg. 1, Exhibit A (emphasis added).

106.   DEFENDANTS knew there was no investment advisor in the world besides Madoff

managing billions of dollars without charging any fee for said services and therefore understood

that they were engaged in a highly unusual and suspicious arrangement with Madoff.

107.   DEFENDANTS further understood that one reason Madoff did not charge an investment

advisory fee was as a SEC reporting dodge in order to technically meet one of the two prongs of

an exemption from SEC registration and reporting requirements. (September, 2002 Attorney

Courvoisier Memoranda, Exhibit A at 1).

108.    Madoff's not charging any investment management fee was a red flag that something was seriously amiss with the Madoff operation. However, it was at the same time a powerful inducement for DEFENDANTS to remain silent since the arrangement enabled DEFENDANTS to collect tens of millions of dollars a year (in management fees which Madoff did not charge) for doing next to nothing.

### D.    Madoff Did Not Have Non-Brokerage Related Operations

109.    Madoff claimed to hold massive stock positions while simultaneously selling and buying calls and puts on the S&P Index, funding the puts in large part by sales of the calls (the so called "split strike conversion strategy"). Execution of such a labor intensive strategy for a fund of billions of dollars would have required a sizable skilled and experienced staff engaged in extensive research, analysis and trading activity.

110.    DEFENDANTS understood that Madoff would have required a large skilled and experienced staff to execute such a trading strategy for a fund of billions of dollars.

111.    DEFENDANTS failed to meet or interact with the large highly skilled and experienced staff supposedly managing their $3.2 billion. Despite their visits to Madoff's New York stock brokerage operation, DEFENDANTS did not interact with the supposed investment management staff handling the management and investment of the split strike conversion strategy for the U.S. Fund.

112.    Had DEFENDANTS made an effort to interact with the personnel supposedly managing their clients' money, they would have noticed that there was none and discovered Madoff was a fraud. CLARK met with Madoff regularly, but never saw the investment management operation.

113.    Had DEFENDANTS checked a single SEC Form ADV (the annual filing containing the most information about a registered investment advisor which the SEC finally forced Madoff to start filing in 2006), DEFENDANTS would have seen that Madoff reported that his firm employed a total of "1 to 5 employees performing investment advisory functions (including research)." One to five employees is obviously insufficient to handle the investing and hedging of billions of dollars.  The SANTANDER DEFENDANTS employed at least two persons (CLARK and Atkins) merely to supervise Madoff.

### E.    The Segregated Accounts Did Not Exist

114.    Madoff claimed to maintain a segregated account for the U.S. Fund and represented to DEFENDANTS that their account was at the Depository Trust Company.

115.    In 2002 the U.S. law firm of Katten Muchin Rosenman LLP ("KMR law firm"), with whom the SANTANDER DEFENDANTS consulted about its Madoff investment, advised them to "clarify if the Funds [were] held in a segregated omnibus account or if they are commingled with securities held for others." (September, 2002 Attorney Courvoisier Memoranda, Exhibit A at 5).

116.    Despite the advice of the KMR law firm, DEFENDANTS never once attempted to confirm the existence of a segregated U.S. Fund-Madoff account.  Had DEFENDANTS taken the few minutes necessary to telephone the Depository Trust Company to check on their segregated account supposedly holding billions of dollars or whether Madoff held any segregated accounts at all, or had DEFENDANTS requested from Madoff the number of the supposed account, they would have discovered that there was no account and Madoff had long ago stolen the money.

25

## A-56

F.      **Madoff Acted as Investment Advisor, Broker, and Custodian**

117.      Madoff's operating structure was highly irregular in that a single party purportedly played all three primary financial and fiduciary roles involved in investments.  Madoff claimed to direct the investment of the monies, execute trades, <u>and</u> act as custodian of monies and assets of the fund, leaving the fund with no third party oversight.

118.      Though the investment advisor-management and broker-dealer functions are combined in a single party in some instances, it is unheard of and a profound departure from generally accepted industry standards of care for an investment advisor-manager to serve as its own broker-dealer <u>and</u> custodian of funds (with no third party oversight).

119.      A basic requirement for fund of funds such as the U.S. Fund which invests in other funds is third party oversight and cross-checks and avoidance in the significant reliance upon the honesty of a single person.  Permitting Madoff to serve in all three capacities and act as his own custodian did just this.

120.      DEFENDANTS were specifically warned about this by Courvoisier in her September 2002 memorandum :

> "Madoff <u>manages</u> the portfolio and controls it at the same time as he has the custody of the assets.  It has to be noted that broker dealers can have custody of assets as opposed to investment advisors."
>
> September, 2002 Attorney Courvoisier Memoranda, Exhibit A, pg. 3).

121.      DEFENDANTS ignored common sense and their attorney's advice and continued to permit Madoff to direct the investment of the monies <u>and</u> act as custodian of assets, leaving the U.S. Fund with no third party oversight.

122.    Had DEFENDANTS followed the dictates of common sense, applied the most basic

principles of due diligence and listened to their lawyer and required a third party custodian of

assets, they would have discovered that Madoff was a fraud long before they solicited Plaintiffs'

investments in 2007 and 2008.

### G.    Madoff's Trading Information Was Woefully Inadequate

123.    A precondition for conducting ongoing due diligence of stock and option trading on the

scale claimed by Madoff is the ability to "see the trades." That refers to the ability to see the

name of the stock traded, the number of shares or options purchased or sold, the price paid or

received, the date, time and the exchange or counterparty with whom the trade took place

("trading reports").

124.    Trading reports are electronically generated upon execution of trades via order

management or trade settlement computer software systems utilized by virtually all investment

management or brokerage firms.  Order management and trade settlement software programs are

the informational core of any significant investment management or brokerage operation.

125.    The only information which Madoff sent to DEFENDANTS consisted of non-

electronically generated summaries (self-generated) of average trade prices rather than actual

trading reports generated from an order management and/or trade settlement computer software

program.

126.    Unlike most investment managers, even those much smaller than Madoff held himself

out to be, Madoff did not provide DEFENDANTS with electronic access to real time information

about their $3.2 billion account.  The limited trading information Madoff purported to reveal to

DEFENDANTS was only released non-electronically (via facsimile to "Banco Santander" in

New York) a day or two after the day reported.