127.    Since reporting trading immediately upon the close of trading rather than a day or two later would make no difference to Madoff's supposed desire for secrecy, the only plausible explanation for the day to two day delay was that Madoff needed sufficient time to fabricate the information. DEFENDANTS ignored this obvious warning sign as well.

128.    In an age where funds far smaller than Madoff's routinely provided electronic access to accounts for clients, Madoff used exclusively mailed paper statements and communications.

129.    In all its years of dealing with Madoff DEFENDANTS never received any evidence that either an order management or trade settlement software program was actually being utilized by Madoff and never received or demanded a single report of an actual trade.

130.    Despite Madoff's suspicious failure to report any actual trades (with times, prices, amount, etc.) and the absence of any evidence that order management and trade settlement software was being utilized by the Madoff Fund at all, DEFENDANTS for over a decade blithely accepted as truth Madoff's self generated summaries of average prices and never asked for reports of actual trades, let alone verifiable confirmations of the execution of actual trades (despite the advice of counsel to do so; See Exhibit A, pgs. 4 and 5). Had they done so, DEFENDANTS would have learned that Madoff was a fraud.

131.    Madoff's technological lack of sophistication did not comport with his reputation in the industry. He was known as the "father" of computerized trading. Yet, the absence of electronic reporting in his communications with clients, in favor of fax and mail, was highly irregular. DEFENDANTS never questioned this irregularity.

**H.    DEFENDANTS Failed to View Securities Madoff Claimed to be Trading**

132.    Madoff represented that he traded as a fund rather than on an individualized basis. In other words, Madoff represented that his purported trades were the same for all clients, differing

only in the number of shares traded. DEFENDANTS therefore understood that Madoff was investing tens of billions of dollars (his total supposed fund) in precisely the same securities as Madoff reported to be trading on the U.S. Fund's account.

133.   Madoff routinely reported (in his facsimiled summaries) trades at average prices outside the range of prices at which the securities had traded on the day reported. Upon information and belief, Madoff reported such verifiably fictitious trading to DEFENDANTS, on over five hundred separate occasions. (*Irving H. Picard v. J. Ezra Merkin et al*, No. 08-01789, S.D.N.Y., Complaint, at 16).

134.   Madoff claimed to be routinely trading billions of dollars in option contracts with private parties outside of the markets. Such trading is referred to as "over the counter" trading and is conducted between private parties such as investment firms and banks referred to as "counterparties." Madoff claimed to be routinely trading - exclusively in the private over the counter market - billions of dollars in S&P Index option contracts as an integral element of his strategy of buying stocks and hedging them with puts and calls (the so called "split strike conversion strategy").

I.   **DEFENDANTS Failed to Ascertain The Existence of Trading Counterparties**

135.   A major difference between trading options in the stock exchanges and with private counterparties is that there is a risk that a private party will default upon the trading obligation whereas there is virtually no default risk in the exchanges. Thus, Madoff's claimed practice of trading hundreds of millions of dollars in options contracts exclusively outside of the exchanges and with private parties exposed Madoff to a risk of total loss.

136.   Madoff's daily trading summaries did not list counterparties with whom he supposedly traded options and Madoff refused to identify these supposed counterparties.

137.    Without knowing the identities of the supposed counterparties, DEFENDANTS (in the words of OIS's former Chief Investment Officer Terrence Owen Jones) **"could not see the other side of the trades,"** and therefore had no way of knowing if reported trades were taking place at all, let alone assessing the level of risk of counterparty default.

138.    The KMR law firm advised the SANTANDER DEFENDANTS to "review a transaction confirmation ticket for option transactions regarding the counterparty risk issue." (Exhibit A at 4). This was one of only two suggestions the law firm made concerning the SANTANDER DEFENDANTS' handling of its Madoff investment.

139.    The simple step which their attorneys advised them to take, to confirm over the counter options trading by Madoff, was a step which the SANTANDER DEFENDANTS' own due diligence guidelines anyway required, common sense dictated and industry standards demanded.

140.    DEFENDANTS ignored the legal advice to perform due diligence and "review a transaction confirmation ticket for option transactions." Had DEFENDANTS demanded a transaction confirmation ticket for an over the counter options trade by Madoff, they would have discovered that there were no counterparties and Madoff was a fraud.

### J.    Madoff's Suspicious Refusal to Identify Options Counterparties

141.    Madoff's refusal to identify the private counterparties with whom he claimed to be regularly engaged in multi-billion dollar option trading lent itself to no reasonable explanation absent fraud and was yet another clear red flag of fraud. The only plausible reason for Madoff's refusal to identify counterparties was that there were none.

### K.    Madoff's Returns Could Not Be Replicated And Were Mathematically Implausible

142.    Madoff claimed to produce unprecedented, regular positive returns utilizing his rather common strategy of buying stocks and hedging them with puts and calls. Madoff claimed to

have produced positive returns in approximately 97% of the months for nearly two decades (with

only miniscule declines during the few other months).

143.    DEFENDANTS knew that hedging puts against calls protects against large losses at the

cost of capping gains, but by no means increases the regularity of gains (and the added cost of

hedging acts to decrease the regularity of gains). Also, while option hedging reduces the amount

of losses, it cannot generate positive returns when stocks decline in value. DEFENDANTS

therefore understood that it was extremely unlikely for Madoff's rather common hedging

strategy to produce gains in virtually every single declining market -- any more than it would be

plausible for a regular stock investor to virtually always win.

144.    No other investment firm utilizing this strategy had produced returns approaching

Madoff's claimed regularity of gains.  As reported in two highly reputable financial publications,

traders who were interviewed were incredulous that Madoff had 72 consecutive gaining months,

a highly unlikely possibility which financial experts found absolutely bewildering.

> "Some on Wall Street remain skeptical about how
> Madoff achieves such stunning double-digit returns
> using options alone.  The recent MAR Hedge
> report, for example, cited more than a dozen hedge
> fund professionals, including current and former
> Madoff traders, who questioned why no one had
> been able to duplicate Madoff's returns using this
> strategy."

> May 2001, MAR/Hedge, No. 89, May, 2001,
> "Madoff tops charts; skeptics ask how," as quoted
> in *Barron's*, May 2001, "Don't Ask, Don't Tell."

145.    Accordingly, DEFENDANTS recognized in their own Explanatory Memorandum that

Madoff's ability to generate profits depended upon his ability to correctly predict the general

movement of the stock market. (2006 and 2008 EMs, at 32, Exhibits B and C).  In effect, the

consistency of his returns, which was the basis for the U.S. Fund's investment with Madoff, was

therefore predicated on nothing more than the belief that Madoff had a superior ability than any investor in the history of finance.

146.    DEFENDANTS understood that Madoff's claim to virtually always correctly predict the general movement of the stock market and make money whether the market went up or down for two decades, was baffling and extremely unlikely.

147.    The most elementary rule of risk assessment is that "if it's too good to be true, it probably isn't." One need not be an investment professional to know that the promise of unprecedented returns is a classic sign of fraud.

148.    DEFENDANTS, however, in their rush to collect tens of millions of dollars in unearned investment management fees, invested $3.2 billion of their clients' money into something too good to be true without even taking the few simple steps that would have readily determined whether or not it was a fraud.

149.    DEFENDANTS' internal due diligence guidelines required use of quantitative replication software programs to test the plausibility of an investment firm's claimed results.

150.    Upon information and belief, DEFENDANTS ran its quantitative replication programs (including the FOFIX statistical model program) on Madoff's reported returns and trading strategy and discovered that it was not possible to replicate the consistency of Madoff's gains utilizing such programs.

151.    Because the regularity of Madoff's reported gains were highly unlikely for his stated strategy, never replicated by any other investment advisors and un-replicable with any quantitative replication model, DEFENDANTS had actual knowledge that there was a serious danger that Madoff was a fraud and his reported returns fictitious.

152.    Despite the knowledge that Madoff was reporting results that were highly implausible by any measure, DEFENDANTS never requested or received from Madoff any explanation for these implausible results and ignored this red flag of fraud.

### L.    DEFENDANTS Failed to Confirm any Information Provided by Madoff

153.    DEFENDANTS never verified any of the information they received from Madoff. They never independently verified account balances and trade activity included in Madoff's statements, never verified Madoff's possession of any assets, and never confirmed Madoff's execution of a single trade.

154.    DEFENDANTS handled $3.2 billion dollars of their clients' money by totally relying upon the word of a single man - Madoff - with absolutely no oversight, checks, third party controls or independent verification contrary to basic industry standards of due diligence.

155.    According to Madoff, his fund was audited by an outside accounting firm. The supposed auditor of the tens of billions of dollar fund was a single accountant who in fact never conducted an audit of Madoff. DEFENDANTS never once attempted to review one of Madoff's supposed audits or identify his supposed auditor.

156.    Had DEFENDANTS checked any of the information Madoff provided them, DEFENDANTS would have discovered that Madoff was a fraud long before they solicited Plaintiffs' investments in 2007 and 2008.

## VI.    ADDITIONAL ALLEGATIONS OF SCIENTER

157.    The SANTANDER DEFENDANTS' reckless or knowing conduct is further reflected by their response to Madoff's September 2002 refusal to have an external custodian and the SANTANDER DEFENDANTS' realization that there was nothing preventing Madoff from absconding with the assets. Rather than redeeming the investment with Madoff and closing the

U.S. Fund, demanding that Madoff take an external custodian or taking any step to protect their clients, the SANTANDER DEFENDANTS' entire response was to add a disclaimer to protect themselves:

> "Possibility of Fraud or Misappropriation: Neither the Fund, [the U.S. Fund] nor the Custodian has actual custody of the assets. Such actual custody rests with the Broker-Dealer [Madoff] and/or its affiliated broker-dealer. Therefore, there is the risk that the Broker-Dealer could abscond with those assets. There is always the risk that the assets with the Broker-Dealer could be misappropriated. In addition, information supplied by the Broker-Dealer may be inaccurate or even fraudulent. The Investment Manager [OIS] and the Administrator are entitled to rely on such information (provided they do so in good faith) and are not required to undertake any due diligence to confirm the accuracy thereof."

> June, 2004 Explanatory Memorandum, pg. 35, Exhibit F.[2]

158.   The identification of the risk that Madoff could abscond with the assets because he was the custodian establishes a strong inference of scienter, especially when combined with the fact that DEFENDANTS never contacted DTC to confirm the existence of a segregated account. If the risk was sufficiently important to disclose in the offering documents it certainly warranted due diligence procedures to ensure that the risk had not come to pass. This inconsistency establishes that DEFENDANTS acted recklessly or knowingly.

---

[2]   The disclaimer is ineffective since it speaks only of a possibility of theft in the future and refers to existing assets thereby affirming that the assets had not been stolen at the time of the representation (which they had been). Further, by limiting the disclaimer to "good faith" conduct, the SANTANDER DEFENDANTS buttressed their contractual assumption of a duty of good faith and fair dealing asserted as a cause of action below.

34

159.   The SANTANDER DEFENDANTS' culpable state of mind was further reflected by their reaction to Madoff's arrest on December 10, 2008.  Rather than utilizing their website to promptly provide their devastated investors with information, OIS cut off public access to its website.  The sole reason for doing so was in order to delete any incriminating evidence on the website in connection with the Madoff fraud.  Before re-opening its website OIS removed the following language from the website:

> "Intensive due diligence is vital to ensuring the integrity and sustainability of the investment process.  Each investment undergoes lengthy and detailed scrutiny according to clearly defined manager selection criteria."

160.   The SANTANDER DEFENDANTS' intent to deceive investors is further supported by a comparison between the language Courvoisier suggested be added to the U.S. Fund Explanatory Memorandum and the very different words actually added.  Courvoisier suggested adding the following truthful disclosure to the first paragraph of the Explanatory Memorandum's description of the U.S. Fund,

> ***"All investment decisions in the account at BLM are effected by persons associated with BLM."***

> Memorandum from Attorney Karine Courvoisier to Optimal Investment Services CEO Manuel Echeverria titled "Issues related to Optimal Strategic U.S. Equity Ltd. and Optimal Arbitrage Ltd.," Exhibit G, pg. 3.

161.   The above words were clearly intended by the attorney to disclose the truth of the complete control Madoff had over all aspects of the investment.  Instead, the SANTANDER DEFENDANTS printed just the opposite in their Explanatory Memorandums (in the very first paragraph describing U.S. Fund:

*"All investment decisions in the account at the Broker-Dealer are effected by the Investment-Manager (i.e. Optimal Investment Services)."*

2006 EM, pgs. 31 and 33, Exhibit B; 2008 EM, pgs. 32 and 28, Exhibit C; June 2004 EM, pg. 30, Exhibit F, pg.; and, October 2008 EM, pgs. 31-32, ExhibitE. (emphasis added).

162.    The statement that OIS "effected" all investment decisions when, in fact, neither OIS nor BANCO SANTANDER had any control or input and Madoff would not even tell them what investment decisions he was making until one or two days after he had supposedly completed the trade was false.

163.    The SANTANDER DEFENDANTS' intent to deceive investors is also made clear from the drastic changes it made from its original 2001 EM to later EMs.  A comparison between the language of the first paragraph of the original 2001 U.S. Fund Explanatory Memorandum and the later 2006 and 2008 Explanatory Memorandums upon which Plaintiffs relied:

(a)      In the 2001 Explanatory Memorandum DEFENDANTS identified  Madoff as the "Fund Manager" throughout the document (including three times in the first paragraph alone) and never referred to Madoff as a mere "Broker-Dealer" anywhere in the 2001 EM. (Exhibit D). In the 2004, 2006 and 2008 EMs however, DEFENDANTS switched the terminology so as to present Madoff as merely a "Broker-Dealer" and present themselves (OIS) as the investment decision making "Investment Manager." (Exhibits B, C and F).  In fact, Madoff was far more than a "Broker-Dealer" and had total control over the fund and DEFENDANTS, who had totally abdicated control or influence over the handling of the funds, could not honestly be said to be actively playing the role of an "investment manager."

(b)      The first paragraph of the 2001 EM stated, "Optimal Strategic US Equity Series invests its assets with a single fund manager," without obfuscation of the fact that SANTANDER

had passed decision making control over the investment of the funds to another party. (Exhibit

D). The 2006 and 2008 EMs upon which Plaintiffs relied, however, represented that the third

party "Broker-Dealer" executed "the fund's trading strategy" and that "all investment decisions

in the account at the Broker-Dealer are effected by the Investment Manager [*i.e.*, OIS]."

(Exhibits B and C. Yet, nothing had changed operationally.

    (c)    The 2001 EM stated that, "the independent fund manager (Madoff) will make all

decisions with respect to the investments of the Series. The success of the Series for the

foreseeable future may depend largely upon the ability of the manager to continue to oversee the

implementation of the investment strategy." (Exhibit D). The 2004, 2006 and 2008 EMs state

just the opposite (having now identified OIS as the "Investment Manager") representing that the

success of the fund depends upon OIS' decision making:

> "Successful use of options will depend upon the
> ability of the investment manager (OIS) to predict
> correctly movements in the direction of the market
> of the underlying securities generally."

> "The success of the fund for the foreseeable future
> will depend largely upon the ability of the
> Investment Manager (identified therein as OIS)."

> (Exhibit B, pgs. 22 and 33, Exhibit C, pgs 22 and
> 30; and, Exhibit F, pgs. 22 and 32.

This was all of course not merely a total lie (since OIS had nothing to do with the

decision making about how to invest the money they had handed over to Madoff) but a clearly

intentional lie since it involved dramatically altering the language of the existing EM in order to

alter the meaning 180 degrees.

In a word, the SANTANDER DEFENDANTS drastically altered the U.S. Fund

Explanatory Memorandums after 2001 so as to misrepresent the relationship between the parties

37

in order to falsely represent that OIS played an active ongoing role in the management of the fund.

164.   The SANTANDER DEFENDANTS motivated its CEO in charge of the U.S. Fund to also turn a blind eye by tying his salary to one thing only – keeping the funds with Madoff. CEO Echeverría was paid a percentage of assets which he kept invested with Madoff (.015% of total assets, i.e. over $4 million per year) for little more than having lunch with Madoff in New York three or four times a year and keeping the money in Madoff's fund. Thus, CEO Echeverría had a built in four million dollar a year incentive to see no evil in Madoff and to make sure others did not either.

165.   The above described disincentive to due diligence is the only plausible reason for Mr. Echeverría to have refused to perform any due diligence on Madoff even when three different law firms suggested simple steps to check on Madoff.

## VIII.   JURISDICTION AND VENUE

166.   The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331, as the Complaint pleads claims arising under the Securities Exchange Act of 1934, 15 U.S.C. §78, et seq., and pursuant to 28 U.S.C. §1367 with respect to the pendant state law causes of action also asserted in the Complaint.

167.   The offending false communications giving rise to the present claim arose in New York City in that: (a) On October 27, 2007, CLARK spoke to Plaintiffs' investment representatives by phone from BANCO SANTANDER's New York City headquarters at 45 East 53rd Street and made false statements (detailed below) upon which Plaintiffs relied in making their decision to invest in the U.S. Fund; (b) the false representations contained in U.S. Fund's January 2008 EM consisting of the representations that Madoff was a "Broker-Dealer" with only "limited

discretion" over the assets entrusted to him by the U.S. Fund and that the SANTANDER

DEFENDANTS were actively involved "Investment Managers" who "effected all investment

decisions" was jointly conceived and first communicated by the SANTANDER DEFENDANTS

together with Bernard Madoff during meetings in New York City at Madoff's offices on

September 18 and 19, 2002. (September, 2002 Courvoisier Memo, pg. 1, "Madoff and his

Regulatory Status," Exhibit A); and (c) at all times relevant to the facts alleged in this Complaint,

CLARK was employed in New York and, upon information and belief, CLARK continues to be

employed in New York.

168.    The U.S. Fund was devoted to investments in United States equities (as conveyed by its

name, "Optimal Strategic U.S. Equity Fund") and the SANTANDER DEFENDANTS

represented to Plaintiffs that their primary employees working with Madoff worked out of the

BANCO SANTANDER New York headquarters at 45 East 53rd Street in New York City.  OIS

listed BANCO SANTANDER's New York and Miami offices as two of its four locations.  The

vast majority of DEFENDANTS' verbal and written communications with Madoff took place in

New York City as did virtually all meetings with Madoff.  BANCO SANTANDER's Private

Banking Division which handled the Madoff investment both before and after the 2001 creation

of OIS had six of its twelve offices in the United States.

169.    For all of the above reasons, venue in the Southern District of New York is proper

pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78a, and 28 U.S.C. §1391(b).

170.    DEFENDANTS are subject to personal jurisdiction pursuant to their continuous and

systematic contacts with New York and the United States.  Alternatively, DEFENDANTS are

also subject to personal jurisdiction pursuant to New York's long-arm statute, N.Y. C.P.L.R. §

302.

171.   The SANTANDER DEFENDANTS are also subject to personal jurisdiction pursuant to Federal Rule Of Civil Procedure 4(k)(2), commonly referred to as the federal long-arm statute.

## CAUSES OF ACTION

### COUNT I
### COMMON LAW FRAUD

172.   Plaintiffs and Pioneer repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.  This Count is asserted against all DEFENDANTS by Plaintiffs and Pioneer.

173.   OIS in the January 2006 and 2008 EMs falsely represented that Madoff was not required to submit to SEC registration and regulation when in truth Madoff was an investment advisor who was required to do so and by 2008 had been required and forced by the SEC to register as investment advisor.

174.   OIS in the January 2008 EM failed to divulge the material facts that Madoff's latest SEC Form ADV claimed to have $17 billion under management, while Madoff's SEC F-13 quarterly reports showed he only had approximately $250 million is equities.

175.   As detailed in this Complaint, OIS in the 2006 and 2008 EMs and the BANCO SANTANDER website, made misleading statements that OIS had an ongoing active involvement in decision making and management of the investment of assets of the U.S. Fund and had performed initial due diligence on Madoff and was continuing to perform ongoing due diligence oversight on the Madoff:

> "intensive due diligence is vital to ensuring the integrity and sustainability of the investment process.  Each investment undergoes lengthy and detailed scrutiny according to clearly defined manager selection criteria."

40

"[OIS] bases its investment decisions on a *careful analysis* of many investment managers,"

"[OIS] shall select managers with varied investment styles who have established records of success or who [OIS] believes demonstrate the potential to become outstanding investment managers,"

"Custodial risk . . . . [the U.S. Fund] must satisfy itself to ensure that such third party [such as Madoff] has and maintains the necessary competence, standing and expertise appropriate to hold the assets concerned."

"Although the *Broker-Dealer has limited investment discretion* as to the selection of securities or other property purchased or sold by or for the fund's account, the Broker-Dealer has discretion with respect to the timing and size of transactions and to the extent described in the agreement entered in between the Broker-Dealer, the Fund and [the U.S. Fund]."

"*The Dealer-Broker is responsible for the execution of the fund's trading strategies and all investment decisions in the account at the Broker-Dealer are effected by the Investment-Manager.*" (emphasis added).

repeated references to "*the fund's trading strategy*" which was merely "executed" under their supervision by the "Dealer-Broker"

"**The success of the fund for the foreseeable future will depend largely upon the ability of the Investment Manager.**"

"Management Fees" (in which OPTIMAL INVESTMENT SERVICES charges between approximately 1.5% and 2% of

41

money under their management as a
management fee, i.e. tens of millions of
dollars a year).

176.    OIS omitted material facts from the 2006 and 2008 EMs  (Exhibits B and C) by failing to

inform potential investors (a) of the numerous red flags of fraud in the Madoff Fund of which the

OIS had become aware; (b) that the OIS had not investigated these various indications that

Madoff was a fraud and had instead ignored them; and, (c) that OIS had never conducted

adequate due diligence, were not performing any meaningful ongoing due diligence on the

Madoff Fund and had no intention of doing so, (d) that OIS had never confirmed that any assets

existed or any trades were actually made; (e) that once the SEC forced Madoff to register as an

investment advisor and file quarterly reports, OIS did not even bother to review the quarterly

reports.

177.    The red flags of fraud that OIS knew of and should have divulged included the facts that

Madoff (a) had for years evaded registering with the SEC as an "investment advisor" by falsely

representing that he was only giving investment advice "solely incidental to the conduct of his

business as a broker;" (b) demanded that his name not be publicly divulged by those who

invested with him in as part of his scheme to keep his fund secret from the SEC; and, (c) that it

was so important to Madoff to keep his fund secret from the SEC that Madoff forfeited the tens

of millions of dollars of investment management fees to which he was entitled in order to meet

one prong of a SEC registration exemption from investment advisor public reporting

requirements. CLARK made false representations to Pioneer on October 29, 2007, including that

he was personally a participant in and a witness to the ongoing due diligence oversight on

Madoff in a relationship he characterized by "full transparency."

178.    Contrary to the October 29, 2007, verbal representations made by CLARK and the written representations contained in the January 2008 EM, there was absolutely no transparency as OIS and CLARK (a) never participated in any fashion in any investment decision or were informed of any decision until a minimum of a day or two after it had supposedly been made and executed, (b) utterly failed to ever conduct meaningful initial or ongoing due diligence on Madoff, and, (c) ignored the multiple obvious indications of fraud of which they had actual knowledge and concealed the existence of these indications of fraud from investors.

179.    At the time CLARK communicated the false statements on October 29, 2007, and the SANTANDER DEFENDANTS communicated the misrepresentations contained in the 2006 and 2008 EMs, CLARK and the SANTANDER DEFENDANTS knew them to be false and misleading or were reckless in not knowing them to be false and misleading and intended to deceive Plaintiffs and Pioneer by making these false statements and misrepresentations.

180.    The SANTANDER DEFENDANTS and CLARK intended Plaintiffs and Pioneer to act on the basis of the misrepresentations and omissions contained in the 2006 and 2008 EMs and verbal misrepresentations made by CLARK in determining whether to invest in the U.S. Fund.

181.    Plaintiffs, in reasonable and justifiable reliance upon the SANTANDER DEFENDANTS' misrepresentations, invested in the U.S. Fund.

182.    Plaintiffs, in reasonable and justifiable reliance upon the misrepresentations made by CLARK to Pioneer (which induced Pioneer to recommend investing in the U.S. Fund), invested in the U.S. Fund.

183.    Plaintiffs would not have invested in the U.S. Fund except for their reliance upon the misrepresentations in the 2006 and 2008 EMs and verbal representations made by CLARK to Pioneer which induced Pioneer to recommend investing in the U.S. Fund. Plaintiffs would not

43

have invested in the U.S. Fund had they been aware of the misrepresentations, material

omissions and concealment by the SANTANDER DEFENDANTS and CLARK of the facts that:

(a) there existed numerous red flags indicating fraud in the Madoff operation which OIS and

CLARK ignored (other than to take several legalistic steps in an attempt to shield themselves

from liability); (b) despite multiple indications that the monies had been stolen by Madoff OIS

and CLARK never made any effort to confirm the existence of the monies or reviewed Madoff's

SEC quarterly reports showing the assets were gone; and, (c) OIS and CLARK never conducted

and were not conducting due diligence on Madoff and had long ago abdicated all investment

management duties, responsibilities and functions over the U.S. Fund and simply given it over to

Madoff with no third party oversight, participation or control by OIS or CLARK or anyone else.

184.    Plaintiffs, as a result of their investment in the U.S. Fund and by reason of OIS's and

CLARK'S wrongful concealments and misrepresentations, have sustained damages, and lost

their entire investment in the U.S. Fund in amounts to be proven at trial.

185.    Pioneer in reasonable and justifiable reliance upon the misrepresentations made by

CLARK recommended to Plaintiffs to invest in the U.S. Fund.  As a result of Pioneer's

recommendation of the U.S. Fund, Pioneer has suffered damage to its reputation, loss of

business, loss of income, and additional expenses relating to addressing Plaintiffs' losses in the

U.S. Fund in amounts to be proven at trial.

186.    BANCO SANTANDER is also liable for the conduct of OIS and CLARK pursuant to the

doctrine of *respondeat superior* based on Santander's ability and authority (as the parent of

wholly-owned OIS) to control and direct OIS and CLARK and by virtue of having controlled

and directed OIS and CLARK.

187.    By reason of the foregoing, Defendants are jointly and severally liable to Plaintiffs and Pioneer.

## COUNT II
## COMMON LAW CONSTRUCTIVE FRAUD

188.    Plaintiffs and Pioneer repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.  This Count is asserted against all DEFENDANTS by Plaintiffs and Pioneer.

189.    OIS and CLARK in their capacity as investment managers of the U.S. Fund had a fiduciary and confidential relationship with Plaintiffs and Pioneer.  This relationship was one warranting Plaintiffs and Pioneer to repose their confidence on OIS and CLARK.

190.    BANCO SANTANDER represented that it oversaw the due diligence conducted by OIS and CLARK as the parent-company and ultimate control entity, and as a result had a fiduciary and confidential relationship with Plaintiffs and Pioneer.  This relationship was one warranting Plaintiffs and Pioneer to repose their confidence on BANCO SANTANDER.

191.    This special relationship arose from, among other things, the fact that DEFENDANTS agreed that they would exercise the requisite level of care in selecting and monitoring investment managers to whom DEFENDANTS entrusted the investment assets of the U.S. Fund, stating, for example:

> (a) "It is the [U.S.] Fund's task to select and diversify among the distinctive investment techniques and strategies of each portfolio manager to achieve the Fund's investment objectives;" (2006 and 2008s EM, pg. 8, Exhibits B and C);
>
> (b) "[OIS] specializes in advising multi-manager and multi-strategy portfolios;" (2006 and 2008 EMs, pg. 10, Exhibits B and C);
>
> (c) "The Investment Manager [OIS] shall select managers with varied investment styles who have established records of success or who the Investment Manager believes demonstrate the potential to become outstanding investment managers;" (2006 EM, pg. 12, 2008 EM at 11, Exhibits B and C);

45

**A-76**

(d) "The investment Manager [OIS] bases its investment decisions on a careful analysis of many investment managers;" (2006 EM, pg. 12, 2008 EM, pg. 11, Exhibits B and C); and,

(e) "The [U.S.] Fund must satisfy itself to ensure that such third party has and maintains the necessary competence, standing and expertise appropriate to hold the assets concerned." (2006 and 2008 EMs, pg. 22, Exhibits B and C).

192.    BANCO SANTANDER is also liable for the conduct of OIS and CLARK pursuant to the doctrine of *respondeat superior* based on Santander's ability and authority (as the parent of wholly-owned OIS) to control and direct OIS and CLARK and by virtue of having controlled and directed OIS and CLARK.

193.    By reason of the foregoing, DEFENDANTS are jointly and severally liable to Plaintiffs and Pioneer.

**COUNT III**
**VIOLATION OF SECURITIES LAWS**
**Violation of Section 10(b) of the Exchange Act**
**and Rule 10b-5 of the Securities and Exchange Commission**
**Against OIS and CLARK**

194.    Plaintiffs repeat and reallege the foregoing allegations as if fully set herein.  This Count is asserted against OIS and CLARK by Plaintiffs.

195.    This Count is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder.  OIS and CLARK knowingly and recklessly made various deceptive and untrue statements of material fact and omitted to state material facts in order to mislead Plaintiffs and through these misstatements and withholding of material facts engaged in acts which operated as a fraud and deceit upon Plaintiffs.  To wit, OIS and CLARK knowingly and recklessly issued, caused to be issued, participated in the issuance of, the preparation and issuance of deceptive and materially false and misleading statements to Plaintiffs to the effect that OIS had conducted due diligence on Madoff and was continuing to engage in ongoing due

diligence oversight of Madoff, that OIS and CLARK were actively involved in the management

of the U.S. Fund and that the historic returns of the U.S. Fund were as represented and assets

existed as stated.

196.    The purpose and effect of the misrepresentations by OIS and CLARK was to induce

Plaintiffs to invest in the U.S. Fund.

197.    In ignorance of the false and misleading nature of the statements described above and the

deceptive and manipulative devices and contrivances employed by OIS and CLARK, Plaintiffs

relied, to their detriment, on such misleading statements and omissions in investing in the U.S.

Fund.  Plaintiffs have suffered substantial damages as a result of the wrongs alleged herein in an

amount to be proven at trial.

198.    By reason of the foregoing, OIS and CLARK violated Section 10(b) of the Exchange Act

and Rule 10b-5 and made untrue statements of material facts or omitted to state material facts

and engaged in acts, practices, and a course of business which operated as a fraud and deceit

upon Plaintiffs in connection with their investment in the U.S. Fund.

### COUNT IV
### VIOLATION OF SECURITIES LAWS
#### Violation of Section 20(a) of the Exchange Act
#### Against BANCO SANTANDER

199.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing

paragraphs as if fully set forth herein.  This Count is asserted against BANCO SANTANDER by

Plaintiffs.

200.    OIS was a wholly-owned subsidiary of BANCO SANTANDER at all relevant times.

BANCO SANTANDER had day-to-day control and exercised day-to-day control of OIS.

Accordingly,  BANCO SANTANDER had (i) the power to control the general business affairs of

OIS, and (ii) the power to directly or indirectly control or influence the specific corporate policy

(e.g., the failure to conduct due diligence) at OIS which resulted in primary liability and as such constitutes a Section 20(a) control person for purposes of the Exchange Act.

201.    As a direct and proximate result of the wrongful conduct alleged in this Count, the Plaintiffs suffered an economic loss and damages in connection with their purchases of shares in the U.S. Fund an amount to be proven at trial.

## COUNT V
## NEGLIGENT MISREPRESENTATION

202.    Plaintiffs and Pioneer repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.  This Count is asserted against all DEFENDANTS by Plaintiffs and Pioneer.

203.    DEFENDANTS owed Plaintiffs a duty: (a) to act with reasonable care in preparing and disseminating information, statements and representations made to, and relied upon by, Plaintiffs in deciding to invest and retain their investment in the U.S. Fund, and, (b) to use reasonable diligence in determining the accuracy and truthfulness of the information, statements and representations made to and relied upon by Plaintiffs and in deciding to invest and retain their investment in U.S. Fund.

204.    DEFENDANTS owed Pioneer a duty: (a) to act with reasonable care in preparing and disseminating information, statements and representations made to, and relied upon by, Pioneer in deciding to recommend to Plaintiffs to invest and to retain their investment in the U.S. Fund, and, (b) to use reasonable diligence in determining the accuracy and truthfulness of the information, statements and representations made to and relied upon by Pioneer and in deciding to recommend to Plaintiffs to invest and to retain their investment in the U.S. Fund.

205.    DEFENDANTS negligently reported assets that did not exist in monthly statements sent to Plaintiffs and Pioneer, reported historic returns that did not exist in their sales communications

48

with Plaintiffs and Pioneer at the outset of the investment and reported in the Explanatory

Memorandum the execution of a trading strategy that was never executed. In a word,

Defendants negligently sold Plaintiffs shares in a fund that had long since been stolen by

negligently representing to Plaintiffs and Pioneer that it existed.

206.    DEFENDANTS breached their duty to Plaintiff and Pioneer by failing to properly

investigate, confirm and review with reasonable care the information contained in their written

materials and above detailed verbal representations and by failing to disclose to Plaintiffs and

Pioneer the material facts consisting of the many irregularities and warning signs of fraud in the

Madoff operations of which Defendants were aware.

207.    Plaintiffs foreseeably relied upon the representations of DEFENDANTS. As a direct,

foreseeable, and proximate result of this negligence, Plaintiffs have sustained damages and lost

their investments.

208.    Pioneer foreseeably relied upon the representations of DEFENDANTS. As a direct,

foreseeable, and proximate result of this negligence, Pioneer has suffered damage to its

reputation, loss of business, loss of income, and additional expenses relating to addressing

Plaintiffs' losses in the U.S. Fund in amounts to be proven at trial.

209.    By reason of the foregoing, DEFENDANTS are jointly and severally liable to Plaintiffs

and Pioneer for negligent misrepresentation.

## COUNT VI
## GROSS NEGLIGENCE

210.    Plaintiffs and Pioneer repeat and reallege all the allegations in this Complaint. This

Count is asserted against the all DEFENDANTS by Plaintiffs and Pioneer.

49

211.   DEFENDANTS had a special relationship with Plaintiffs and Pioneer that gave rise to a duty to exercise due care in the management of Plaintiffs' assets invested in the U.S. Fund and in the selection and monitoring of Madoff.

212.   This special relationship arose from, among other things, the fact that DEFENDANTS agreed that they would exercise the requisite level of care in selecting and monitoring investment managers to whom DEFENDANTS entrusted the investment assets of the U.S. Fund, stating, for example:

    (a)   "It is the [U.S.] Fund's task to select and diversify among the distinctive investment techniques and strategies of each portfolio manager to achieve the Fund's investment objectives;" (2008 EM, pg. 8).

    (b)   "[OIS] specialises in advising multi-manager and multi-strategy portfolios;" (2008 EM, pg. 10).

    (c)   "The Investment Manager [OIS] shall select managers with varied investment styles who have established records of success or who the Investment Manager believes demonstrate the potential to become outstanding investment managers;" (January 2008 EM, pg. 11).

    (d)   "The Investment Manager [OIS] bases its investment decisions on a careful analysis of many investment managers;" (2008 EM, pg. 11).

    (e)   "The [U.S.] Fund must satisfy itself to ensure that such third party has and maintains the necessary competence, standing and expertise appropriate to hold the assets concerned." (2008 EM, pg. 22).

213.   DEFENDANTS grossly failed to exercise due care, and acted in disregard of their duties, and thereby injured Plaintiffs and Pioneer.

214.   DEFENDANTS grossly failed to exercise the degree of prudence, caution, and good business practice that would be expected of any reasonable investment professional.

215.   DEFENDANTS grossly failed to:

    (a)   perform necessary and adequate due diligence, before allowing Madoff to serve as the Broker-Dealer for the U.S. Fund;

(b)    monitor Madoff on an ongoing basis to any reasonable degree;

(c)    take adequate steps to confirm Madoff's purported account statements, transactions and holdings of the U.S. Funds' assets;

(d)    take reasonable steps to ensure that Plaintiffs' investment was made and maintained in a prudent and professional manner;

(e)    take reasonable steps to preserve the value of Plaintiffs' investments; and

(f)    exercise generally the degree of prudence, caution, and good business practices that would be expected of any reasonable investment professional.

216.    If DEFENDANTS had not been grossly negligent with respect to Plaintiffs' assets invested in the U.S. Fund, DEFENDANTS would not have entrusted Plaintiffs' assets invested in the U.S. Fund to Madoff.

217.    As a direct and proximate result of DEFENDANTS' gross negligence with respect to Plaintiffs' assets invested in the U.S. Fund, Plaintiffs have lost all, or substantially all, their investment in the U.S. Fund.

218.    As a direct and proximate result of DEFENDANTS' gross negligence, Pioneer has suffered damage to its reputation, loss of business, loss of income, and additional expenses relating to addressing Plaintiffs' losses in the U.S. Fund in amounts to be proven at trial.

219.    BANCO SANTANDER is also liable for the gross negligence of OIS pursuant to the doctrine of *respondeat superior* based on BANCO SANTANDER's ability and authority (as the parent of wholly-owned OIS) to control and direct OIS and by virtue of having controlled and directed OIS.

220.    By reason of the foregoing, the DEFENDANTS are jointly and severally liable to Plaintiffs and Pioneer in an amount to be determined at trial.

**A-82**

## COUNT VII
## BREACH OF FIDUCIARY DUTY

221.    Plaintiffs and Pioneer repeat and re-allege each and every allegation contained in the

foregoing paragraphs as if fully set forth herein.  This Count is asserted against all

DEFENDANTS by Plaintiffs and Pioneer.

222.    Plaintiffs and Pioneer entrusted Plaintiffs' assets to OIS as investment manager and

DEFENDANTS were in a position of trust, vis-à-vis Plaintiffs and Pioneer.

223.    DEFENDANTS had a fiduciary duty to Plaintiffs and Pioneer to discharge their duties

with the degree of diligence, care and skill that an ordinarily prudent investment manager would

exercise in similar circumstances in a like position.

224.    DEFENDANTS' fiduciary duty to Plaintiffs and Pioneer included:

    (a)    the duty to perform an initial due diligence and to utilize reasonable care when performing initial due diligence upon Madoff, rather than simply relying upon their perception of Madoff's reputation;

    (b)    the duty to perform ongoing due diligence and to utilize reasonable care in performing ongoing due diligence upon Madoff after investing their client's money with him;

    (c)    the duty to utilize reasonable care in responding to red flags of fraud of which Defendants were fully aware and had identified in the Madoff operation;

    (d)    the duty to utilize reasonable care in informing Plaintiffs of red flags of fraud in Madoff's operation of which Defendants were fully aware (and had specifically identified in writing, discussed and ignored), such that Plaintiffs could reasonably be informed of and evaluate the level of risk to which Defendants were exposing Plaintiffs' assets;

    (e)    the duty to utilize reasonable care in disseminating account statements representing that assets existed;

    (f)    the duty to warn Plaintiffs when Defendants discovered that their assets had been placed at an unacceptable risk of loss;

    (g)    the duty to utilize reasonable care in investigating information in response to Plaintiffs' questions and to utilize reasonable care in responding thereto; and,

52

(h)     the duty to participate in the management of Plaintiffs' monies rather than totally abdicating all management duties, responsibilities and functions to a third party.

225.    DEFENDANTS breached their fiduciary duties to Plaintiffs and Pioneer by:

(a) utterly failing to conduct reasonable initial due diligence upon Madoff and instead relied entirely upon their perception of Madoff's reputation;

(b) utterly failing to conduct reasonable ongoing due diligence oversight of Madoff, including a total failure to ever (1) check for fraud; (2) review a single audit or confirm that an audit had ever been conducted; (3) confirm the existence of a segregated account for the U.S. Fund and claimed by Madoff; (4) confirm a single trade had actually been conducted; (5) confirm a single claimed counterparty existed; (6) follow the securities and options in which Madoff claimed to be trading to ascertain if the quantities or prices he reported bore any relation to reality and reported in the newspapers and financial reporting services; or (7) interact with any person on Madoff's supposed large investment management staff; and,

(c) completely ignoring obvious red flags of fraud of which Defendants had actual knowledge including: (1) Madoff's refusal to allow third party custody of the monies; (2) the mathematically implausibility and un-replicability of Madoff's reported returns; (3) Madoff's willingness to provide hundreds of millions of dollars worth of investment management services without charging an investment advisory fee; (4) Madoff's insistence on only providing trading summaries, but never reporting an actual trade; (5) Madoff's refusal to report trading summaries until 24 to 48 hours after the close of trading; and (6) Madoff's refusal to identify counterparties.

226.    DEFENDANTS' breach of fiduciary duties caused Plaintiffs to lose their entire investments.

227.   DEFENDANTS' breach of fiduciary duties also caused Pioneer to suffer damage to its reputation, loss of business, loss of income, and additional expenses relating to addressing Plaintiffs' losses in the U.S. Fund in amounts to be proven at trial.

### COUNT VIII
### THIRD PARTY BENEFICIARY
### CLAIM FOR BREACH OF CONTRACT

228.   Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.  This Count is asserted against OIS by Plaintiffs.

229.   OIS entered into an Investment Manager contract with U.S. Fund to manage the fund for the benefit of Plaintiffs in which OIS agreed to accept liability for losses resulting from the misconduct of a third party into whose hands OIS might entrust the invested funds, "to the extent caused by OIS's negligence, willful default or fraud or that of any of its employees or where they did not act honestly, in good faith and with a view to the best interests of the Fund." (2006 EM, pg. 11; and 2008 EM, pgs. 10-11, Exhibits B and C).

230.   OIS wrongfully breached the above specified terms of the Investment Management Agreement in the above specified fashions involving negligence, willful default, lack of good faith, fraud and dishonest conduct in which OIS placed its own interests in pocketing tens of millions of dollars in unearned investment management fees over the best interests of Plaintiffs.

231.   These contractual breaches resulted in significant losses to Plaintiffs as described in this Complaint.

232.   OIS's breach of the Investment Management Agreement injured Plaintiffs as third-party beneficiaries to that contract in an amount to be determined at trial.

233.   OIS' specified breach of its written contract was the proximate cause of Plaintiffs' losses.

management services including conducting ongoing due diligence oversight when they were in fact not providing such services.

241.   OIS collected its fees on a percentage of assets under management when in fact there were no assets under management since Madoff - unnoticed by OIS - had long ago stolen them.

242.

243.   Because OIS charged investment management fees for services it did not provide for managing assets that did not exist, OIS is not entitled to the investment management fees collected from Plaintiffs.

244.   In light of the fictitious nature of both the supposed assets and OIS's supposed ongoing due diligence and investment management work, OIS has been unjustly enriched.  Equity, good conscience and public policy require that OIS rescind and disgorge back to Plaintiffs all monies they took as payment for management they did not perform over assets that did not exist.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

1.   Under all counts, compensatory damages for each Plaintiff in the amount of their lost investments, with interest, in an amount greater than $75,000 to be determined at trial.

2.   Under Counts One, Two, Three and Five, Attorney Fees;

3.   Under Count One, punitive damages;

4.   Under all counts, costs and disbursements; and,

5.   Other such relief as the Court may deem just and proper.

**A-86**

JURY TRIAL DEMAND

Plaintiffs demand a trial by jury.

Dated: New York, New York
       May 18, 2010

By: EDWARD W. MILLER [8489]
350 Fifth Avenue, Suite 7610
New York, New York  10118
Tel: (212) 758-1625

*Attorney for Plaintiffs*

57

# Exhibit D

Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -
)
)
)
)
IN RE OPTIMAL U.S. LITIGATION    )    CIVIL ACTION NO:
)    10-CV-4095 (SAS)
)
)
)
)
)
- - - - - - - - - - - - - - - - -

CONFIDENTIAL VIDEOTAPED DEPOSITION OF
MR. RAJIV JAITLY
BEFORE THE EXAMINER MR. ALLEN DYER
VOLUME I

Monday, July 16, 2012
AT:   10:29 a.m.

Taken at:

Merrill Corporation
Level 2
101 Finsbury Pavement
London, EC2A 1ER

Court Reporter:
JUDITH WHITE

OPTIMAL_BERLAMONT-000001

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

---

**Page 2**

1   APPEARANCES
2
3   Appearing on behalf of the Plaintiffs:
4
5   JAVIER BLEICHMAR
    LABATON SUCHAROW
6   140 Broadway
    New York, NY 10005
7   Telephone: 212.907.0887
    Email:   jbleichmar@labaton.com
8
9   ALAN I. ELLMAN
    LABATON SUCHAROW
10  140 Broadway
    New York, NY 10005
11  Telephone: 212.907.0877
    Email:   aellman@labaton.com
12
13  MICHAEL L. GREENWALD
    GREENWALD DAVIDSON PLLC
14  5550 Glades Road
    Suite 500
15  Boca Raton, FL 33431
    Telephone: 561.826.5477
16  Email:   mgreenwald@mgjdlaw.com
17
    RICHARD HOMEWOOD
18  RICHARD SLADE AND COMPANY SOLICITORS
    Ground Floor East
19  9 Gray's Inn Square
    London WC1R 5JD
20  Telephone: +44.(0)20.3330.0900
    Email:   richard.homewood@erichardslade.com
21
22  EMILY BETTS
    HARDWICKE CHAMBERS
23  Hardwicke Building
    New Square, Lincoln's Inn
24  London WC2A 3SB
    Telephone: +44.(0)20.7400.2381
25  Email:   emily.betts@hardwicke.co.uk

---

**Page 3**

1   Appearing on behalf the Defendants:
2
3   SAMUEL A. DANON
    HUNTON & WILLIAMS LLP
4   1111 Brickell Avenue
    Suite 2500
5   Miami, FL 33131
    Telephone: 305.810.2510
6   Email:   sdanon@hunton.com
7
8   GUSTAVO J. MEMBIELA
    HUNTON & WILLIAMS LLP
9   1111 Brickell Avenue
    Suite 2500
10  Miami, FL 33131
    Telephone: 305.536.2688
11  Email:   gmembiela@hunton.com
12  MAX BUTTINGER
    CLIFFORD CHANCE
13  10 Upper Bank Street
    City of London
14  Greater London E14 5JJ
    Telephone: +44.(0)20.7006.1373
15  Email:   max.buttinger@cliffordchance.com
16
17
18
19
20
21
22
23
24
25

---

**Page 4**

1   Appearing on behalf of the witness:
2
    BERNARD CAULFIELD
3   DECHERT LLP
    160 Queen Victoria Street
4   London EC4V 4QQ
    Telephone: +44.(0)20.7184.7533
5   Email:   bernard.caulfield@dechert.com
6
    ABDUL AZEEM ABDUL SAMAD
7   DECHERT LLP
    160 Queen Victoria Street
8   London EC4V 4QQ
    Telephone: +44.(0)20.7184.7436
9   Email:   abdulazeem.abdulsamad@dechert.com
10
11
12  THE EXAMINER:
13  MR. ALLEN DYER
    4 Pump Court
14  Temple, London EC4Y 7AN
    Telephone: +44.(0)20.7842.5555
15  Email:   adyer@4pumpcourt.com
16
17
18  THE VIDEO OPERATOR:
19  MR. PHILLIP HILL
    Video Operator
20
21
22
23
24
25

---

**Page 5**

1
2                WITNESS INDEX
    Witness                              Page
3   Rajiv Jaitly (sworn). . . . . . . . . . . . . . . . . 12
4      Examination by Mr. Bleichmar . . . . . . . . . . 12
5      Cross-examination by Mr. Danon. . . . . . . . .210
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

2 (Pages 2 to 5)

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 6

1  EXHIBIT NO.    DESCRIPTION              PAGE
2  Exhibit 1       Email from.........................47
3                  Jonathan Clark to Rajiv Jaitly,
4                  dated July 28, 2005, with attachments,
5                  Bates stamped OPTIMAL-00406681-6700
6  Exhibit 2       Email from.........................97
7                  Jonathan Clark to Hugh Burnaby-Atkins,
8                  copied to others, dated
9                  March 29, 2006, with attachments,
10                 Bates stamped OPTIMAL-03128584-8587
11 Exhibit 3       Email from.........................101
12                 Hugh Burnaby-Atkins to Jonathan Clark,
13                 copied to others, dated
14                 March 29, 2006, with attachments,
15                 Bates stamped OPTIMAL-00826891-6920
16 Exhibit 4       Nine-Page report..................112
17                 entitled "Madoff Securities", bearing
18                 the headline "Page 14 of 133",
19                 filed with the court in the
20                 United States as docket number 46-1
21 Exhibit 5       Document headed...................123
22                 "Optimal Investment Services", bearing
23                 the headline "Page 24 of 133",
24                 filed with the court in the
25                 United States as docket number 46-1

Page 7

1  Exhibit 6       Email chain........................145
2                  with the email at the top of the
3                  first page being from Rajiv Jaitly
4                  to Jonathan Clark, dated
5                  May 17, 2006, Bates stamped
6                  OPTIMAL-00490570-0571
7  Exhibit 7       Email chain........................147
8                  with the email at the top of the
9                  first page being from Rajiv Jaitly
10                 to Manuel Echeverria, dated
11                 July 10, 2006, Bates stamped
12                 OPTIMAL-03144197-4198
13 Exhibit 8       Email chain........................150
14                 with the email at the top
15                 of the page being from
16                 Rajiv Jaitly to Manuel Echeverria,
17                 dated July 11, 2006, Bates stamped
18                 OPTIMAL-03130940
19 Exhibit 9       Email chain........................156
20                 with the top portion of the first page
21                 being redacted, and the email under
22                 the redacted portion being from
23                 Rajiv Jaitly to Manuel Echeverria,
24                 dated September 25, 2006,
25                 Bates stamped OPTIMAL-00267596-7601

Page 8

1  Exhibit 10      Email chain........................176
2                  with the email at the top of the
3                  first page being from Rajiv Jaitly
4                  to Michelle Hughes and others,
5                  dated April 20, 2007, Bates
6                  stamped OPTIMAL-03972069-2071
7  Exhibit 11      Optimal document:..................182
8                  headed "Investment Process Handbook.
9                  October 2007", Bates stamped
10                 OPTIMAL-01804843-4891
11 Exhibit 12      Document headed...................185
12                 "Draft Operational Risk Due
13                 Diligence Manual", Bates stamped
14                 OPTIMAL-03742549-2672
15 Exhibit 13      Document headed...................196
16                 "Policies/Procedures Manual.
17                 Due Diligence Procedures",
18                 dated 11/5/03, Bates stamped
19                 OPTIMAL-03702345-2360
20 Exhibit 14      Email chain........................199
21                 with the email at the top of the
22                 first page being from Michelle Perry
23                 to Bernardo Espinosa, copied to
24                 Rajiv Jaitly, dated September 24, 2007,
25                 Bates stamped OPTIMAL-03742547-2548

Page 9

1  Exhibit 15      Email chain........................208
2                  with the email at the top of the
3                  first page being from Rajiv Jaitly
4                  to Hugh Burnaby-Atkins, copied to
5                  others, dated June 12, 2006, Bates
6                  stamped OPTIMAL-00213095-3100
7  Exhibit 16      Email chain........................209
8                  with the email at the top of the
9                  page being from Rajiv Jaitly
10                 to Manuel Echeverria,
11                 dated October 19, 2006,
12                 Bates stamped OPTIMAL-03755329

Merrill Corporation - New York
1-800-325-3376                    www.merrillcorp.com/law
                                 OPTIMAL_BERLAMONT-000003

CONFIDENTIAL
MR. RAJIV JAITLY — 7/16/2012

Page 10

```
1           PROCEEDINGS
2    (10:29 a.m.)
3         THE VIDEO OPERATOR:  This is
4    the beginning of videotape number 1, volume I.
5    This is the video operator speaking,
6    Phillip Hill, of Merrill Legal Solutions'
7    New York office, at 225 Varick Street, New York,
8    New York 10014.
9         Today's date is June 16, 2012.
10        THE EXAMINER:  July.
11        THE VIDEO OPERATOR:  The time -- sorry,
12   I beg your pardon. I'm sorry. Thank you very
13   much. June the 16th --
14        THE EXAMINER:  July.
15        THE VIDEO OPERATOR:  July 16th, sorry --
16        THE EXAMINER:  That's all right.
17        THE VIDEO OPERATOR:  -- 2012. The time
18   on the video screen is 10.29 a.m., London time.
19        We are at the London office of
20   Merrill Corporation to take the videotaped
21   deposition of Rajiv Jaitly.
22        This is taken in the matter Re Optimal
23   U.S. Litigation. This is being heard in the
24   United States District Court, Southern District of
25   New York, case number 10-CV-4095 (SAS).
```

Page 11

```
1         The court reporter today is
2    Ms. Judith White of Merrill Legal Solutions.
3         Please will counsel introduce themselves
4    and state whom they represent?
5         MR. BLEICHMAR:  Javier Bleichmar from
6    Labaton Sucharow on behalf of the plaintiffs.
7    With me is my colleague Alan Ellman.
8         MR. GREENWALD:  Michael Greenwald, from
9    the law firm of Greenwald Davidson, on behalf of
10   the plaintiffs.
11        THE EXAMINER:  Richard?
12        MR. HOMEWOOD:  Richard Homewood from
13   Richard Slade and Company on behalf of the
14   plaintiffs.
15        MS BETTS:  Emily Betts, Hardwicke
16   Chambers, for the plaintiffs.
17        MR. DANON:  Sam Danon from Hunton &
18   Williams on behalf of the defendants. With me is
19   my colleague Gus Membiela.
20        MR. BUTTINGER:  Max Buttinger,
21   Clifford Chance, for the defendants.
22        MR. CAULFIELD:  Bernard Caulfield of
23   Dechert. I'm here with my colleague Abdul Azeem,
24   and we are representing Mr. Jaitly.
25        THE EXAMINER:  And my name is
```

Page 12

```
1    Allen Dyer, and I'm the examiner for this
2    deposition.
3              MR. RAJIV JAITLY,
4              having been duly sworn,
5              testified as follows:
6         THE EXAMINER:  And can we have your full
7    names and your professional address?
8         THE WITNESS:  Yes. My full name is
9    Rajiv Jaitly, and my professional address is
10   5 Wighton Mews, Isleworth TW7 4DZ.
11        THE EXAMINER:  Thank you very much.
12   Yes, Mr. Bleichmar?
13   EXAMINATION BY MR. BLEICHMAR:
14   BY MR. BLEICHMAR:
15        Q.  Good morning, Mr. Jaitly. Have you
16   been -- ever been deposed before?
17        A.  No.
18        Q.  Just some basic ground rules, so
19   that we can manage this process as smoothly as
20   possible: if you could please make sure that all
21   your responses are verbal responses. Sometimes
22   one gets inclined to nod the head or shake your
23   head, and the court reporter cannot take that
24   answer. Do you understand?
25        A.  Yep.
```

Page 13

```
1         Q.  Is there anything that would limit
2    your ability to testify truthfully today?
3         A.  Not that I'm aware of.
4         Q.  Any agreements that you have entered
5    with either the defendants or any third party that
6    would limit your ability to provide any
7    information here today?
8         A.  No.
9         Q.  Could you tell me your educational
10   background, starting with your college degree?
11        THE EXAMINER:  Mr. Bleichmar, just
12   before the witness embarks on that.
13        I'm sorry, Mr. Jaitly, I should have said
14   that there may be objections taken to some of the
15   questions, by Mr. Danon, and that's an objection
16   that will be put on the record for the attorneys
17   to argue about later in America.
18        If it's possible, if you can try and
19   pause before starting your answer, to give them a
20   chance to register any objection, that would be
21   helpful.
22        THE WITNESS:  Of course.
23        THE EXAMINER:  And I should have said,
24   if you want to take a break at any time, please
25   do.
```

4  (Pages 10 to 13)