CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 14

1       THE WITNESS:  Thank you.
2       THE EXAMINER:  Okay.  Yes, now, your
3   education?
4       THE WITNESS:  Right.  So you'd like me
5   to start with my university degree?
6   BY MR. BLEICHMAR:
7       Q.  Please.
8       A.  My first degree is a bachelor of
9   science in agriculture with honors in plant
10  protection from the Punjab Agricultural University
11  in India.  I then have a masters in agricultural
12  economics from the University of London, which is
13  a -- a now defunct college called Wye College.
14      I -- do you want me to go into
15  professional qualifications as well?
16      Q.  Yes, please.
17      A.  I'm a chartered accountant and a
18  fellow of the Institute of Chartered Accountants
19  in England and Wales.  I'm a licensed insolvency
20  practitioner.  I'm a fellow of the
21  Securities Institute.
22      I think that probably -- oh, and I'm also
23  a fellow of the Association of Business Recovery
24  Professionals, and I think that probably covers
25  the -- the lot.

Page 15

1       Q.  When did you receive your degree
2   from the university in -- in India?
3       A.  I --
4       Q.  The year.
5       A.  I graduated in 1982, I believe.
6       Q.  And when did you receive your degree
7   from the University of London?
8       A.  That was the end of '83.
9       Q.  You also mentioned that you are a
10  chartered accountant.  Is there a license that
11  accompanies that -- that charter?
12      A.  Well, I'm a chartered accountant,
13  and I passed exams to attain the charter.
14      Q.  When did you take those exams?
15      A.  I mean, I -- I have a practising
16  certificate as well, not that I actually use it,
17  but I do have one.
18      Q.  So you could actually work as an
19  accountant; is -- is that correct?
20      A.  Oh, yes.  Yes.
21      Q.  And when did you obtain that
22  charter?
23      A.  I obtained that charter in '88,
24  if I recall correctly -- or it might have been
25  '87, I'm not quite sure, but --

Page 16

1       Q.  Late '80s, roughly?
2       A.  -- around then, yes.
3       Q.  When did -- tell me about your
4   professional career, in general terms, prior to
5   arriving to Optimal, or Santander?
6       A.  That's quite easy.  I spent almost
7   16 years at Deloittes.  I did my training with --
8   with Deloittes -- it was Touche Ross at the time.
9   I was in the -- the audit division, to start off
10  with.  I then moved over to the insolvency
11  practice, which, within Touche Ross, was called
12  corporate recovery.
13      I was involved with a number of blow-ups
14  in the '80s, insolvency problems -- Maxwell,
15  Polly Peck, BCCI, to name a few.
16      I then became the national insolvency
17  technical manager for Deloittes, so I looked at
18  technical issues, and if there were problems or
19  risk management issues, I was involved with that.
20      I then transferred over to the practice
21  protection team for Deloittes.  So when Deloittes
22  were sued or had a problem or a risk issue, then
23  I was part of the team that helped resolve those
24  particular issues.
25      Towards the end of '99, I met somebody

Page 17

1   who suggested -- I think I should also, just to
2   put in context, I'm an Indian national, so I was
3   here primarily on a work permit, and by then,
4   of course, I had become a resident in the UK.
5       And somebody suggested that it might be
6   time for me to look outside Deloittes, having
7   spent 16 years there, and I got talking to an
8   organization that had just been bought by UBS
9   called Global Asset Management, and I joined them
10  to develop what at that time was a fairly
11  fledgling area, which was operational due
12  diligence, and I was probably one of the first
13  practitioners in developing operational due
14  diligence in hedge funds.
15      And we then created a fairly large team,
16  I think it's probably -- probably still is one of
17  the largest teams of independent due diligence
18  experts as part of a fund-of-funds team, and I was
19  then approached by Optimal, Santander, to really
20  sort of recreate something similar with them.
21      Q.  There was a lot there in your
22  answer.  Let me try to break it up into smaller
23  pieces.
24      You mentioned that you worked for
25  16 years at Deloitte; correct?

5 (Pages 14 to 17)

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

| Page 18 | Page 20 |
|---|---|

**Page 18**

1   A.  Yes.
2   Q.  Is that approximately from 1983,
3   mid 1980s, through 1999?
4   A.  So it was February 1984 to
5   February 2000.  And the only reason I remember the
6   February is just the -- the coincidence of the
7   month.
8   Q.  And you first started working in the
9   audit division; is that right?
10  A.  Yes, that's right.
11  Q.  At -- at one point, if I understood
12  you correctly, you moved to the practice
13  protection team?
14  A.  Yes.
15  Q.  Was that considered an elite team,
16  a -- was that considered a promotion for you?
17  A.  Yes.  The practice protection team
18  was three people: it was headed up by a partner
19  who was on the executive board; there was a
20  director; and there was myself.  So we were the
21  UK practice protection team.  There were other
22  people who were involved internationally.  But we
23  basically looked after problems as and when they
24  arose.
25  So, I mean, as an example, when the

**Page 19**

1   decision was made to sue the Bank of England on
2   BCCI, some of the issues around that were issues
3   that came to our team, we would have looked at
4   that, and then determined sort of how we
5   proceeded.
6   Q.  Do you -- and why were you selected,
7   or what is your understanding as to why you were
8   selected to join the practice protection team?
9   A.  Well, I guess most people who get to
10  know me -- and I -- I always feel it's unmerited,
11  but they always comment about my attention to
12  detail, and -- and also the fact that, generally,
13  once I tend to get my teeth into something, I tend
14  not to let go.
15  Q.  What was your final position when
16  you left Deloitte, your --
17  A.  I was a senior manager.
18  Q.  After Deloitte, you -- you said you
19  went to Global Asset Management; correct?
20  A.  Yes.
21  Q.  And you were there from 1999 until
22  when?  Excuse me, from February 2000 until when?
23  A.  I was there until July 2005.
24  Q.  And what was your position at
25  Global Asset Management?

**Page 20**

1   A.  I was head of operational
2   due diligence.
3   Q.  And could you tell me a little bit
4   about what that entailed?
5   A.  Well, essentially, it was creating a
6   team to implement procedures around operational
7   due diligence for investments into hedge funds,
8   and that was a -- a procedure that had not -- it
9   was an area that GAM wished to develop, and that's
10  what they hired me to do.
11  Q.  And you were based out of London;
12  is that correct?
13  A.  That's correct.
14  Q.  And what was your title at GAM?
15  A.  I was head of operational
16  due diligence.
17  Q.  Head of operational -- all right.
18  After July 2005, where did you go?
19  A.  I went to Banco Santander, the
20  London branch.  They were my employer.  But my
21  responsibilities were in relation to Optimal
22  Investment Services, OIS, which is a Geneva-based
23  organization, which is a subsidiary of
24  Santander's.
25  Q.  So, today, if we refer to Optimal

**Page 21**

1   Investment Services as -- as "OIS", we both know
2   what we're referring to; is that fair?
3   A.  Yes.
4   Q.  And what was your -- what was the
5   title of your position when you began working at
6   Banco Santander?
7   A.  Well, when I started, I think I was
8   called senior vice-president, and I think --
9   I mean, it wasn't a promotion, it was just a
10  redesignation of everyone's titles, but -- so
11  I was senior vice-president and chief risk
12  officer, I think is the -- the way I was sort of
13  brought in.
14  And I think, during the course of that
15  year, or maybe it was the following year, I can't
16  quite remember which, the "senior vice-president"
17  dropped and the -- the SVPs, as they were called,
18  became managing directors, so it was a sort of
19  redesignation.  But my primary function was as
20  chief risk officer.
21  Q.  And who hired you at -- from
22  Banco Santander?
23  A.  Manuel Echeverria.
24  Q.  And how did you meet
25  Manuel Echeverria?

Merrill Corporation - New York

1-800-325-3376                                    www.merrillcorp.com/law

OPTIMAL_BERLAMONT-000006

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 22

1    A.  Well, actually, through Heidrick &
2  Struggles.  They were the headhunters who
3  approached me, and they set up a meeting.
4  So I had dinner with him, and that's how the
5  conversation started.
6    Q.  And how did -- what did he say to
7  you at that meeting?  What did you discuss?
8    A.  What did we discuss?  Well, he said
9  that Optimal didn't really have a very strong
10 operational due diligence capability; that is
11 something that Santander were looking to develop;
12 that they had heard about what I had done at
13 Global Asset Management, and that that is
14 something that they would like to recreate at --
15 at Optimal.
16    Q.  Did he explain -- or do you have an
17 understanding what he meant by the fact that
18 Optimal didn't have a very strong operational
19 due diligence capability?
20    A.  Yes.
21    MR. DANON:  Object to the form of the
22 question.
23    THE EXAMINER:  You answered.
24    THE WITNESS:  Sorry, I should have
25 waited, shouldn't I?

Page 23

1    THE EXAMINER:  That's -- that's all
2  right.
3    THE WITNESS:  Sorry, do you mind just
4  repeating that again?
5  BY MR. BLEICHMAR:
6    Q.  Sure.  Did he explain or do you have
7  an understanding about what Manuel meant by the
8  fact that Optimal didn't have a very strong
9  operational due diligence capability?
10   A.  I mean, essentially, the operational
11 due diligence that happened at OIS was something
12 that the investment analysts did, and they
13 obviously were specialists in investments,
14 rather than in operations.  So that was something
15 that they covered as part of their analysis, but
16 it wasn't a dedicated team.
17   So what he wished to do was create a
18 dedicated team with sort of appropriately
19 qualified professionals in it.
20   Q.  And what is -- you -- you -- strike
21 that.
22   What is the difference between a
23 specialist in investments and a professional that
24 specializes in operations?
25   A.  Well, it's -- it's really somebody

Page 24

1  who understands the structure of the business, so
2  it's looking at the detail of how, for example,
3  trades are processed, how they're recorded,
4  who's involved in the processes, how they're
5  reported, who assesses them, and to form a view on
6  the risks that might be associated with it.
7    Q.  The meeting with -- with Manuel,
8  when did that take place, approximately?
9    A.  Gosh.  Well, I joined them in July,
10 so it was probably April or May.  It might have
11 been a bit earlier, but 2005.  Sort of early 2005
12 is probably the best I can put on it as a date.
13    Q.  And the meeting was here in London?
14    A.  Yes.
15    Q.  And what was your impression of the
16 proposal at the time?
17    A.  Well, it was an attractive proposal.
18 It was an opportunity to create something that I'd
19 done at -- at GAM again, and it was a promotion,
20 in effect, so it was career enhancing, and
21 attractive as a consequence.
22    Q.  Did you have any general
23 expectations at the time of what your employment
24 would be like?
25    A.  Yes.

Page 25

1    Q.  And what were those?
2    A.  Well, what -- what any employee
3  moving into new employment would expect.
4  You know, it was an opportunity to create
5  something new.  I was hoping I would be given a
6  fairly free hand in doing it, and -- yes, so it
7  was -- it was an exciting prospect.
8    Q.  Was there a long period of
9  negotiations, in terms of your employment, after
10 that meeting?
11    A.  I don't know what is -- what is
12 "long".  I mean, there was obviously a process of
13 negotiation.
14   I think the -- the main issue, actually,
15 was that -- I think Optimal had originally
16 envisaged that I would be based in Geneva.
17 That is not something I was prepared to do.
18    THE EXAMINER:  Sorry.  I -- I missed
19 your answer.  Optimal were initially?
20    THE WITNESS:  Optimal wished that I was
21 based out of Geneva, but that was not something
22 that I wished.
23   So we -- we reached an arrangement
24 whereby I would typically fly out on a Tuesday
25 morning and spend Tuesday, Wednesday, Thursday

7 (Pages 22 to 25)

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 26

1  at -- in Geneva, and then fly back on a Thursday,
2  and the idea was that Mondays and Tuesdays would
3  be spent, effectively, establishing a London
4  office and a London presence for OIS through the
5  Santander branch.
6  BY MR. BLEICHMAR:
7      Q.  Did you have an understanding as
8  to -- let me strike that.
9          Who did you report to when you first
10 started in July of 2005 at Banco Santander?
11     A.  Well, my direct report was to
12 Manuel Echeverria, as the CEO.
13     Q.  Did you have any other reports?
14 Anybody at Banco Santander?
15     A.  Well, there was a dotted line report
16 to -- I think the gentleman's name -- I'm not
17 quite sure of this -- is Pepe Mercado, who was
18 Amadeo Reynes' -- Pascual Reynes' boss, and he was
19 head of -- he was head of group risk.
20         And I say it was a dotted line report
21 because -- I mean, if I recall correctly,
22 certainly there is nothing in my -- my contract in
23 terms of a reporting line there, but it was always
24 understood that I would have conversations with
25 the group on -- on risk issues, and I -- I mean,

Page 27

1  I think, to a large extent, my appointment had
2  been driven by group risk having concerns that
3  the -- the risk management function wasn't strong
4  enough at Optimal and that it really needed
5  enhancing and developing.
6          So I think they had a -- an interest
7  because of that as well.
8      Q.  How did you come to understand that
9  group risk had concerns about the risk
10 management -- that the risk management function
11 wasn't strong enough?
12     A.  I think Manuel told me.
13     Q.  Did he give you any more details on
14 that?
15     A.  Well, yes.  I mean, it -- it was
16 fairly common knowledge at -- I mean, when you
17 look back to 2005, there were very few people who
18 actually did operational due diligence.  It was
19 a -- if you like, a unique selling point for a
20 fund-of-fund business.
21         So -- you know, GAM had done -- done it,
22 and I think Santander wanted to do something
23 similar.
24         So I think they recognized the fact
25 that -- that that was an area that they wished to

Page 28

1  strengthen and develop, so the discussions were
2  really in that context.
3      Q.  You mentioned that you had a -- a
4  contract with Banco Santander when you started
5  working?
6      A.  Yes.
7      Q.  Do you have a copy of that contract?
8      A.  Yes.
9      Q.  Would you be willing to provide us a
10 copy of that contract?
11     A.  I think that's for --
12     THE EXAMINER:  Can't that --
13     MR. CAULFIELD:  Might I interject?
14     THE EXAMINER:  -- be sorted out directly
15 between you and the defendant?
16     MR. BLEICHMAR:  Sure.
17     THE EXAMINER:  Yes.
18 BY MR. BLEICHMAR:
19     Q.  Was that contract ever amended?
20     A.  Actually, I think it was, because
21 there was a -- there was an incentive plan,
22 a compensation incentive plan, that was added
23 2006, maybe.  Again, I can't quite remember the
24 dates, but I think that was the only sort of
25 additional variation that there might have been to

Page 29

1  the contract.
2      Q.  A little while before you mentioned
3  group risk.
4      A.  Yes.
5      Q.  Could you describe what you meant by
6  group risk?
7      A.  Well, Santander had -- had its own
8  risk team, and they were obviously looking at
9  various subsidiaries and -- and risk across those
10 subsidiaries, of which Optimal was one.
11     Q.  And the risk team that Santander
12 had, where was it based?
13     A.  It was based in Madrid.
14     Q.  So Pepe Mercado was based in Madrid?
15     A.  That's right.
16     Q.  And did you travel to Madrid to meet
17 with Pepe Mercado?
18     A.  Yes, I met him twice.
19     Q.  When did you meet him?
20     A.  I think both meetings were in 2006.
21 One meeting might have been in 2007.  I can't
22 quite remember the dates now.
23     Q.  And what was the purpose of those
24 meetings?
25     A.  Well, (a) to meet him; (b) to talk

8 (Pages 26 to 29)

CONFIDENTIAL
MR. RAJIV JAITLY — 7/16/2012

Page 30

1  about sort of what was happening on operational
2  risk and what we were doing on the risk side and
3  to develop that a little bit more.
4      Q.  Going back to your contract for a
5  moment, did — does your contract generally
6  specify your areas of responsibility and duties at
7  Banco Santander?
8      A.  I think it did, yes.
9      Q.  And what did it say, to the best of
10 your recollection?
11     A.  I think, essentially, that I was
12 responsible for operational risk and -- and that
13 I reported in to Manuel.
14     Q.  Did you have an understanding as to
15 whether, as head of operational risk, you had the
16 power to veto an investment?
17     A.  I knew I didn't have the power to
18 veto. That is something that came with my
19 subsequent job.
20     Q.  Did you discuss that with Manuel
21 prior to your employment?
22     A.  Yes.
23     Q.  And what did you discuss?
24     A.  Well, we talked about sort of how it
25 would operate, because even at GAM I didn't have

Page 31

1  the power of veto there, I just had an extremely
2  loud voice, and -- and I made sure that people
3  heard it.
4      I guess I was more relaxed about it,
5  in the context of Optimal, because I was a member
6  of the management committee, and, as part of that,
7  obviously, I had a say and I could reflect
8  concerns there.
9      So, yes, you know, we talked about it,
10 but I accepted the fact that I wouldn't have the
11 power of veto.
12     Q.  Did you ask to have the power to
13 veto?
14     A.  Well, I said that that would be my
15 preference. That is something that an operational
16 due diligence person would always want to keep.
17 But it was something that he felt wouldn't be
18 appropriate, and it was something I was prepared
19 to accept at the time, given that it was actually
20 no different to what I'd already experienced.
21     Q.  You said you were a member of the
22 management committee; correct?
23     A.  Yes.
24     Q.  What was the management committee?
25     A.  The management committee was,

Page 32

1  essentially, the senior people at -- at Optimal.
2  So it was Manuel; Hugh Burnaby-Atkins;
3  Caron Bastianpillai; Amit Popat, who was, again,
4  a marketing person based out of London;
5  Toby Gauvain, who was head of marketing, generally
6  based out of Geneva; Tasneem Jeevanjee, who was
7  the COO; and Esteban Estevez, who was, again, a
8  marketing person.
9      Q.  And did the management committee
10 have veto power over investments?
11     A.  I don't think in the way that
12 you're thinking. I mean, obviously, as a
13 management committee, it had a veto power of
14 what it thought -- you know, it thought was not
15 acceptable.
16     So, as a committee, it could determine
17 how we carried out certain things, but I don't
18 think in terms of the -- in terms of the formal
19 veto power, I don't believe that that was
20 necessarily what it had.
21     I think that would be more sort of
22 investment committee that would have exercised the
23 veto.
24     Q.  What is the difference between
25 the management committee and the investment

Page 33

1  committee?
2      A.  Well, the investment committee was
3  composed of the investment analysts, so they were
4  looking at investment decisions, and that was
5  their role.
6      Q.  Were you a member of the investment
7  committee?
8      A.  Yes, I attended those.
9      Q.  Who — who were the members of the
10 investment committee?
11     A.  The analysts, so the investment
12 analysts. Do you want me to go through the names
13 that I can remember, or --
14     Q.  Well, let's narrow it down.
15 You're obviously familiar with a fund called
16 Optimal SUS; correct?
17     A.  Yes.
18     Q.  With respect to Optimal SUS, who
19 were the members of the investment committee?
20     A.  Well, Optimal SUS was quite a narrow
21 area, in terms of the analysts, so that was
22 Hugh Burnaby-Atkins, Jonathan Clark,
23 Manuel Echeverria, myself.
24     So, I mean, you know, other people got
25 involved, but it was really peripheral, so you

9 (Pages 30 to 33)

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 34

1  would have people like Cecilia Alvarez -- I hope
2  I've got her name -- her surname correctly, but --
3  but Cecilia would sometimes get involved. But,
4  I mean, the hats were slightly different, so she
5  would have more of a wealth management hat. So
6  she would -- she would be looking in terms of
7  client relationships, so she might sort of come in
8  and say -- maybe somebody was looking for capacity
9  within SUS, so she might come in at the request
10 and then get involved in some of the discussions
11 there.
12       But, primarily, in terms of the -- the
13 investment rationale, that was Hugh Burnaby-Atkins
14 and Jonathan Clark.
15       Q.  Was the investment committee a
16 formal committee that actually voted on -- on its
17 decisions?
18       A.  Yes.
19       Q.  And how often did it --
20       A.  I don't -- let me just make sure,
21 again, we are clear on that. I don't think it
22 sort of formally necessarily voted, because
23 I don't believe -- I certainly can't recall it.
24 It might have been the case. But I don't recall,
25 for example, you know, formal minutes of -- of a

Page 35

1  vote being taken.
2       Q.  But your understanding is that the
3  investment committee had veto power over the
4  investment in Optimal SUS?
5       A.  Yes, and -- and ultimately the
6  management committee as well, but it was not a
7  formal -- so they wouldn't have looked at every
8  investment decision, for example, but if something
9  had been escalated, and typically it would be
10 somebody like me who would escalate it, then, yes,
11 it would get discussed there and, if necessary,
12 they would then have the power to -- to say no.
13       Q.  In your experience, did the
14 investment committee ever veto an investment?
15       A.  Well, yes, they did, because there
16 were investments that I said no to. So, in -- in
17 that respect, yes, they did veto.
18       Was it a straight cut-and-dried,
19 you know, "No, we will not do it", or, "Yes, we
20 will do it"? It tended not to be.
21       I think the way it -- it worked was,
22 essentially, that if we had concerns, the -- the
23 investment would get cut short before it even got
24 to the stage of a vote, unless the analysts were
25 absolutely hell-bent on a particular investment,

Page 36

1  at which point I then had to -- if I had concerns
2  that weren't being addressed, then I dug my toes
3  in, and it did happen.
4       Q.  Which investments specifically
5  did -- did you say no to?
6       A.  Is that all right for me to answer?
7       Q.  Yes.
8       THE EXAMINER:  Does anyone have any
9  problems with that?
10      MR. DANON:  No.
11      THE WITNESS:  Okay. Well, there was
12 MotherRock that I said no to.
13      THE EXAMINER:  Sorry?
14      THE WITNESS:  MotherRock.  "Mother" and
15 then "Rock", together. That is an investment
16 which we said no to.
17      UBS Dillon Read was another investment
18 where we said no. That is one that probably gave
19 me an extremely hard time, in terms of my
20 relationship with the investment analysts, because
21 what they were saying was, effectively, that I was
22 saying no to the number one money manager in the
23 world, but I didn't feel that it looked after the
24 interests of our -- our clients, and so I didn't
25 believe that it was an acceptable investment to

Page 37

1  make.
2       So they're two examples. There were
3  probably more, but I cannot remember them now.
4  BY MR. BLEICHMAR:
5       Q.  Without remembering specific names,
6  generally, do you have a recollection of how many
7  investments you said no to while you were employed
8  at Banco Santander?
9       A.  Well, as I explained to you,
10 in terms of the process, most of these would fall
11 away as the concerns came out, so it was very rare
12 that you actually got to a -- a position.
13      I mean, MotherRock, actually, if you
14 think about it, never really proceeded right to
15 the very end, because what had happened was --
16 I think the analysts had prepared a recommendation
17 on it. I had just got back from New York on a
18 visit, if I remember correctly, and MotherRock had
19 their COO, I think, who was in the -- in the -- in
20 the UK, and one of the analysts called me and
21 said, "Look, this chap is in London. Can you go
22 and meet him and -- and talk to him and see what
23 you think?", and I then had that conversation.
24 I went and met him somewhere in the afternoon for
25 a couple of hours, and off the back of that, we

10 (Pages 34 to 37)

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 38

1  basically said no.
2      I mean, I -- I then did go -- because
3  the -- again, the analysts weren't going to quite
4  let go of it completely.  So I then got sent off.
5  So when I was -- I think they were Houston-based.
6  So I'd gone to see a couple of other managers in
7  Houston, so I went to see them again, but it was
8  the same issues.
9      Q.  And why did you say no to
10  MotherRock?
11      A.  Well, again, there were issues,
12  if I remember correctly -- and this is not
13  something that I -- I haven't had -- I could well
14  be confusing it with other things, but one of the
15  issues was the way they actually handled the
16  trading, and there were also issues around
17  leverage and the extent to which they could
18  actually control the trading and know their total
19  exposure, and I was concerned about that.
20      And, as you will probably know, history
21  tells that that assessment was correct.
22      Q.  I am not familiar with MotherRock.
23  Why does history tell that that assessment was
24  correct?
25      A.  Well, they failed.

Page 39

1      Q.  And how did they fail?
2      A.  For those reasons.
3      Q.  Can you describe them in a little
4  more detail?
5      A.  Well, I mean, essentially, they --
6  they weren't able to keep on top of the trades, as
7  I understand it, and so eventually the -- the
8  operation closed down, so the fund closed down.
9      Q.  When you say they couldn't keep on
10  top of the trades, for us non-financial
11  professionals --
12      A.  Well, it was -- it was tracking the
13  exposure --
14      Q.  -- if you could explain that?
15      A.  It was tracking the exposure and
16  tracking the extent to which they were leveraged,
17  and I think there was an overexposure, so they
18  made huge losses, and as a result of those losses
19  they closed down.
20      Q.  And when did this approximately
21  happen?  When did they close down?
22      A.  It must have been during my time
23  when I was at Optimal, but I can't remember the
24  date.
25      Q.  And approximately when did you

Page 40

1  conduct operational due diligence on MotherRock?
2      A.  Well, this would have been in 2005,
3  I -- I suspect.
4      Q.  With respect to UBS Dillon Read,
5  could you tell me about why you said no to the
6  investment in UBS Dillon Read?
7      A.  Yes.  Again, we'd -- in fact, the --
8  the operational due diligence review on that
9  was done by a colleague of mine, and -- I mean,
10  the system that I've always used on operational
11  risk is that, regardless of whether it's me or
12  somebody else, when we do a report, you always
13  peer review it, so you always get somebody else to
14  read it and tell you what they think, and the
15  approach that I've always taken is that -- that,
16  essentially, any member of the operational
17  due diligence team should be able to turn around
18  and say, "That's a load of rubbish.  I don't
19  agree, for X, Y, Z reason", and then we would
20  debate it through, because -- and it is one of the
21  reasons why it is important, in terms of having
22  a -- an operational due diligence team, to have
23  people with different types of experience on that
24  team.
25      And so it -- so it was done by somebody

Page 41

1  else.  Just -- that was nothing sort of
2  intentional, it was just a quirk of the
3  allegations.  And when I reviewed that report, one
4  of the things that struck me on it was that there
5  was an intermediate master fund.
6      So -- so, generally, in funds you've got
7  a feeder fund which then feeds into a master fund
8  where all the assets are held, generally offshore,
9  and the manager then manages the master fund.
10      Now, what had -- what had happened here
11  was that there was a structure, and in that
12  structure there was a -- a mini master that was
13  sort of sitting in between the feeder and the
14  master, and this particular master held the --
15      THE EXAMINER:  Which one?  The mini
16  master or --
17      THE WITNESS:  The mini master.  So the
18  mini master basically held the investments that
19  UBS were making into the fund.
20      Now, essentially, what happened was, the
21  reason why they'd decided to launch this fund --
22  and, again, on the basis that I actually recall
23  this correctly, and I -- I may have got certain --
24  some of the facts not entirely right here, but,
25  if I remember correctly, the reason that UBS

11 (Pages 38 to 41)

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

## Page 42

1  decided that they wanted another fund was because
2  they wanted to take some of the risk off balance
3  sheet, but they still wanted to have their own
4  proprietary trading and interest and proprietary
5  exposure to that particular strategy.
6      So what I was concerned about was that
7  this mini master would not only be prime broking
8  for that particular investment, but would also
9  have first sight of all the trading that was going
10 on, and I just felt that there was a major
11 conflict of interest there and that it didn't
12 really look after our interests as investors, and,
13 therefore, I was not happy with it.
14     But that was -- that was a battle that
15 I had to fight, because the investment analysts
16 were not happy about it.
17 BY MR. BLEICHMAR:
18     Q.  What do you mean by "prime broking"?
19     A.  Well, a prime broker is primarily a
20 broker who handles trades on behalf of a hedge
21 fund, and, typically, a prime broker is the broker
22 that will settle and clear the trades that other
23 executing brokers may be executing on behalf of
24 the fund, but there is a central party that
25 effectively acts for clearing and settlement,

## Page 43

1  so the executing brokers will give up the trade to
2  the prime broker, and so the prime broker would
3  then essentially know what trades had occurred.
4      Q.  And why was it a concern of yours
5  that the mini master was doing -- was the prime
6  broker?
7      A.  Because there's a conflict of
8  interest.
9      Q.  In what sense?
10     A.  Well, the prime broker was trading
11 as an investor in the fund, but was also
12 prime broker.  Well, if you are looking at things
13 like credit risk, you're going to be looking after
14 your interests first.
15     Q.  You mentioned that the investment
16 analysts very much wanted to invest in the
17 UBS Dillon Read fund; correct?
18     A.  Sorry?
19     Q.  You mentioned that the investment
20 analysts were very interested in -- in investing
21 in UBS Dillon Read; correct?
22     A.  Yes.
23     Q.  And who were those investment
24 analysts?
25     A.  Hugh Burnaby-Atkins; I think

## Page 44

1  probably Sebastien Poiret, he was involved;
2  probably Jonathan as well.  But I -- I can't
3  really remember.  It's a possibility.
4      Q.  And did they fight your decision to
5  say no to that fund?
6      A.  Hugh certainly did, yes.
7      Q.  In what way?
8      A.  Well, as I've just told you, he said
9  I couldn't expect to have any credibility with the
10 investment analysts if I was saying no to
11 investing with the number one money manager in the
12 world.
13     Q.  And what was -- who made the final
14 decision?
15     A.  Manuel Echeverria.
16     Q.  And what did he decide to do?
17     A.  Not to invest.
18     Q.  And what is your understanding as to
19 why Manuel made that decision?
20     A.  Well, because of my concerns --
21     MR. DANON:  Object to the form of the
22 question.
23     THE WITNESS:  Sorry.
24     MR. DANON:  Go ahead.
25     THE EXAMINER:  Go ahead.

## Page 45

1      THE WITNESS:  Because of my concerns.
2  He was very unhappy about it, about having to take
3  that decision, that he decided that he wasn't
4  going to go against it.
5  BY MR. BLEICHMAR:
6      Q.  What type of fund specifically
7  was -- was this UBS Dillon Read fund?
8      A.  I think it might have gone into the
9  arbitrage fund, but, again, I'm not sure.
10     Q.  And could you describe generally
11 what that means, "into the arbitrage fund"?
12     A.  Well, it was just -- it was a
13 trading strategy.  An arbitrage was one of the
14 trading strategies.
15     Q.  Do you recall which specific trading
16 strategy that fund employed?
17     A.  Arbitrage.
18     Q.  What type of arbitrage?
19     A.  The whole range: so you could have
20 convertible arbitrage, stat arb.
21     Q.  Are you familiar with the term
22 "split strike conversion strategy"?
23     A.  I am, yes.
24     Q.  I need to ask those questions for
25 evidentiary reasons.

12 (Pages 42 to 45)

CONFIDENTIAL
MR. RAJIV JAITLY – 7/16/2012

Page 46

1    A.  Yes.  Yes, that's fine.
2        Q.  Is it your understanding that the
3    split strike conversion strategy is a type of
4    arbitrage?
5        MR. DANON:  Objection to the form of the
6    question.
7        THE WITNESS:  Do I go ahead and answer?
8        THE EXAMINER:  You can answer.
9        THE WITNESS:  Well, I don't know
10   specifically whether it's a form of arbitrage.
11   I don't know.
12   BY MR. BLEICHMAR:
13       Q.  How would you characterize the
14   split strike conversion strategy, in terms of
15   general investment strategy?
16       THE EXAMINER:  You mean put it into --
17   put it into a category of investment decisions?
18       MR. BLEICHMAR:  Correct.
19       THE WITNESS:  U.S. equity, probably,
20   because all that -- all that was happening was
21   that it was -- they were hedging it.  So they were
22   just hedging U.S. equity exposure.
23   BY MR. BLEICHMAR:
24       Q.  Would the description of
25   "relative value" also be appropriate for the

Page 47

1    split strike conversion strategy?
2        A.  Possibly, yes.
3        Q.  And -- and why would that be?
4        A.  Well, again, because the manager was
5    taking decisions as to when he entered and -- and
6    left the market.
7        Q.  And why is making decisions as to
8    when he entered and left the market be -- could be
9    described as a relative value strategy?
10       A.  Because he was looking at the value
11   of the index at that particular point in time.
12       MR. BLEICHMAR:  I'm going to mark as
13   exhibit number 1 a document bearing Bates stamps
14   406681 through 6700.
15   (Exhibit 1 marked for identification.)
16   BY MR. BLEICHMAR:
17       Q.  Mr. Jaitly, I'm going to ask you a
18   series of questions that are just for the purposes
19   of establishing the authenticity of the document.
20   We may go through them quite a bit today, and they
21   may seem very obvious to you, but --
22       A.  No, that's fine.
23       Q.  -- they may be necessary.  Do you
24   recognize this document?
25       A.  I've seen many like it.

Page 48

1        Q.  Do you see that the cover page
2    appears to be an email from Jonathan Clark to you,
3    dated July 28, 2005?
4        A.  Yes.
5        Q.  And do you see that it includes a
6    number of attachments?
7        A.  Yes.
8        Q.  Do you have any reason to believe
9    that you did not receive this document?
10       A.  No.  I'm -- I'm pretty sure I did.
11       Q.  And does this document generally
12   appear to be in the same condition as when you
13   first received it?
14       A.  I really wouldn't have a clue.
15   I can't remember.
16       Q.  Any reason to dispute the
17   authenticity of this document?
18       A.  No.
19       Q.  Do you have a specific recollection
20   whether you received this document?
21       A.  No.
22       Q.  But this is the type of document
23   that you generally would have received while you
24   were employed at Banco Santander; correct?
25       A.  Yes.

Page 49

1        Q.  July 28, 2005.  Is that
2    approximately the time when you first became
3    employed by Banco Santander?
4        A.  Yes.
5        Q.  And do you have a recollection or an
6    understanding as to why Jonathan Clark sent you
7    this email?
8        A.  Well, really to update me on —
9    on Optimal SUS.
10       Q.  And what was your understanding
11   about Optimal SUS at that time?
12       A.  Well, that it was invested in --
13   in Madoff.
14       I mean, I -- I think it's also -- I mean,
15   some of the context of this is that Hugh and
16   Jonathan Clark, I think, were quite keen that
17   I got up to speed quickly on Madoff, given the
18   exposure that -- that Optimal had to it.  But
19   I think there were different views elsewhere
20   within Optimal about whether I should get involved
21   or not within this particular entity.
22       And at the time when I joined, I think
23   the view that was taken by some -- and I think
24   Manuel was one of them -- was that Madoff was not
25   actually part of my bailiwick, and I essentially

13 (Pages 46 to 49)

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 50

1  wasn't going to have that because, you know, here
2  was something that was a significant portion of
3  the portfolio that OIS was managing, and
4  I basically said no; you know, this was something
5  that I did need to look at.
6        And -- I mean, this is part of the
7  arguments that were going on at the time,
8  because -- I think Hugh and Jonathan at that
9  particular point were quite keen that I came along
10 and -- and met this -- this chap, and there were
11 others in the organization who were quite keen
12 that I didn't.
13       So -- so there was an argument going on
14 at that particular point as to whether Madoff
15 formed part of my bailiwick or not.
16       Q.  You mentioned that Manuel did
17 not want Madoff to be part of your bailiwick.
18 Who else in the organization, in your view, had
19 that position?
20       A.  I think it was primarily Manuel.
21 I don't know what the others -- what views the
22 others had.
23       I mean, with Hugh, when I was
24 interviewed -- I met him prior to the -- prior to
25 joining, and one of the questions he asked me,

Page 51

1  in fact, was, what did I think of -- of Madoff,
2  to which my response was, "Well, no more than what
3  I've read in the press, so I don't really know",
4  and he said, "Well, you know, that's something
5  we'd like you to look at when you -- when you
6  join, and to help us with".
7        So, you know, on the one hand, I was
8  expecting to -- to get involved with it, so this
9  was -- it would have been perfectly natural and
10 something that I would have expected to receive,
11 but also, at that time, there were discussions
12 going on to say that that was not part of my
13 bailiwick, which I thought was a bit strange,
14 so ...
15       Q.  Who did you have those discussions
16 with?
17       A.  Manuel.
18       Q.  And what did you say to him and what
19 did he say to you?
20       A.  Well, I said to him, "As chief risk
21 officer, if I'm meeting investors, and I haven't
22 met the guy who's managing the largest portion of
23 money that -- that Optimal have, it doesn't give
24 me much credibility", so it was important that
25 I -- I did meet him.

Page 52

1        But, you see, again, I think -- I think
2  there was a difference in perception as to what
3  was meant by meeting him, because I -- I think
4  Hugh and Jonathan wanted me to come along for a --
5  you know, a sort of "Hello, how do you do?"
6  meeting and I wanted to go into a lot more detail,
7  and I think that was part of the issue, was the
8  concern of how that would come across if I was
9  sitting down, rolling up my sleeves, asking
10 questions.
11       Q.  Did Manuel tell you he didn't want
12 you involved in Madoff, specifically?
13       A.  I think that the way I heard it
14 originally was via Tasneem, who was the COO, but,
15 again, I can't swear to that.  I can't really
16 recall.
17       What I can recall is having a discussion
18 with him saying that I needed to go and see him,
19 see Madoff.
20       Q.  And when you say "him", are you
21 referring to Manuel?
22       A.  No, when I was saying, "I wanted to
23 see him", I was referring to Madoff.
24       Q.  I think you said, "What I can recall
25 is having a discussion with him saying that

Page 53

1  I needed to go and see him"?
2        A.  Oh, I see, I'm sorry.
3        Q.  So I was referring to the wrong him?
4        A.  So the first "him" is Manuel, and
5  the second "him" is Madoff.
6        Q.  So just so the record is clear, you
7  were having a discussion with Manuel saying that
8  you needed to go see Madoff; correct?
9        A.  That's right.
10       Q.  And what did Manuel say?
11       A.  Well, Manuel never gave direct
12 answers if he -- if he was not -- it was something
13 that he was not happy about, and if he was giving
14 an instruction that he was not happy about it,
15 even though he may not have said it directly to
16 me, because I can't remember now, he would have
17 basically avoided giving me a straight answer on
18 it at that particular point.
19       So it was just something that I needed to
20 keep plugging away at, which is what I did.
21       Q.  And when did this discussion more or
22 less happen?
23       A.  I really can't recall.  It was early
24 on.
25       Q.  Early on in your employment —

14  (Pages 50 to 53)

CONFIDENTIAL
MR. RAJIV JAITLY — 7/16/2012

## Page 54

1    A.  Yes.

2    Q.  — at Banco Santander?

3    A.  Yes.  I mean, again, to put it in

4 context, I eventually met Bernie Madoff in

5 February 2006, so that will give you an idea of

6 the -- the length of time and, yes, you know, they

7 tried to organize meetings in between, but they

8 got canceled and then, you know -- but I was still

9 trying to push to say, "I need to go and meet

10 him".

11    Q.  Going back to your comment that

12 Hugh and -- Hugh Burnaby-Atkins and Jonathan Clark

13 wanted you to do a "Hello, how do you do?" type of

14 meeting -- do you remember that?  Do you remember

15 saying that?

16    A.  Yes.

17    Q.  And what did you mean by that?

18    A.  Precisely that:  that he didn't --

19 I think -- Hugh's approach was very much,

20 "Come along to one of our meetings, and then tell

21 us afterwards what you thought", whereas the

22 meeting for me, if I was doing operational

23 due diligence, was to go along and do operational

24 due diligence and ask operational due diligence

25 questions.

## Page 55

1    Q.  And when did this become clear to

2 you, that you and Hugh had different views of how

3 the meetings would be carried out?

4    MR. DANON:  Object to the form of the

5 question.

6    THE EXAMINER:  You may answer.

7    THE WITNESS:  I suspect fairly early on.

8 I -- I think -- again, it's important to

9 understand context here.  Investment analysts are

10 extremely protective of their relationships.

11 That's in -- in the world of hedge funds, that is

12 one of the most important things that an

13 investment analyst has, and so that is something

14 that they protect.

15    Now, I'm afraid the questions that --

16 that I ask some hedge fund managers view as being

17 quite intrusive and untrusting, and it needed to

18 be done, as far as I was concerned.  So that

19 created its own tensions.

20 BY MR. BLEICHMAR:

21    Q.  Do you have an understanding as --

22 as to why Manuel didn't want you to get involved

23 with Madoff?

24    MR. DANON:  Object to the form of the

25 question.

## Page 56

1    THE WITNESS:  Yes.  I think he was

2 concerned that I would spoil a very good

3 relationship with somebody that he had capacity

4 with.

5 BY MR. BLEICHMAR:

6    Q.  What do you mean by "spoil a very

7 good relationship"?

8    A.  Well, because I would essentially

9 not back down if I'd asked a particular question.

10    Q.  And why do you believe that he

11 thought you may spoil a very good relationship?

12    A.  Well, I think probably the best way

13 of describing that is with the instructions that

14 I was given prior to the meeting that I had in

15 February 2006 with Madoff.

16    Manuel had a pre-meeting with Madoff to

17 explain to him that I was going to be coming along

18 to ask questions.  I was also given instructions,

19 because I was going to be chaperoned at that

20 meeting by Hugh and by Jonathan, and that if they

21 determined that I shouldn't push on a particular

22 question, then I needed to shut up.

23    Q.  Did you have the sense that your

24 operational due diligence was limited?

25    A.  Yes.

## Page 57

1    Q.  Did -- was your operational

2 due diligence ability limited in any other

3 investment?

4    A.  Oh, yes.  I mean, the issues that we

5 are talking about were not unique to Madoff.

6    Q.  How do you know that Manuel had a

7 pre-meeting with Madoff?

8    A.  Well, (a) I was told; and (b) he was

9 there when I arrived.

10    Q.  I see.  So this pre-meeting

11 happened, more or less -- not on the same day that

12 you met with Madoff?

13    A.  Yes, it happened on the same day.

14 So he -- I think he left shortly after, and he

15 left Jonathan and -- and Hugh to look after me.

16    Q.  Did you find this out when you

17 arrived at Madoff's offices and saw Manuel there?

18    A.  I can't remember now.

19    Q.  But you can't remember whether

20 Manuel told you, "Rajiv, I will be there before

21 you arrive and speak with Madoff.  Be aware that's

22 going to happen"?

23    A.  I really can't remember.

24    Q.  And what is -- what is your

25 understanding of what Manuel discussed with Madoff

15 (Pages 54 to 57)

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 58

1  at this pre-meeting?
2      MR. DANON:  Object to the form of the
3  question.
4      THE WITNESS:  Essentially, what I've
5  told you: that, you know, they were developing
6  something new, in terms of operational
7  due diligence; I was the new guy I shouldn't --
8  that he shouldn't be offended by some of the line
9  of questioning that I took.
10 BY MR. BLEICHMAR:
11     Q.  And did Manuel tell you that this is
12 what he said to Madoff?
13     A.  I -- I -- I cannot specifically
14 recall that he actually said it to me, but that's
15 my belief now, so maybe he'd said it to me or
16 somebody else said it to me.  I can't -- can't
17 really remember.
18     Q.  And you mentioned that
19 Hugh Burnaby-Atkins and Jonathan Clark had
20 instructions to tell you to stop if you were
21 asking questions they did not like; is that more
22 or less correct?
23     A.  Yes.
24     Q.  And did that happen?
25     A.  Yes.

Page 59

1      Q.  At what point did it — did that
2  happen, do you remember?
3      A.  Well, there was -- there was one
4  question, and I just remember it just because
5  it's -- it's the terminology that was used.
6  I asked about fat finger controls, and
7  I just remember it because of the -- the term
8  "fat finger", and Bernie's reaction to it was,
9  "Well, I was the guy who helped developed the
10 controls around fat finger at the NASD", and --
11 well, you know, I mean, I've -- I've met enough
12 people who, you know, are -- are sort of the
13 people who -- who are reputable in their areas,
14 and they're used to fobbing people off with a -- a
15 comment, and I wasn't going to have that, so
16 I wanted to dig into more detail and I think,
17 you know, Hugh would probably have said something
18 like, "Right, well, let's carry on.  I mean, we
19 can -- we can deal with that later", so that was
20 my cue to basically stop.
21     Q.  Were there any questions or topics
22 you were told not to ask Madoff?
23     THE EXAMINER:  Do you mean before the
24 meeting?  In other words --
25     MR. BLEICHMAR:  Correct.

Page 60

1      THE EXAMINER:  -- given instructions
2  before the meeting.
3      THE WITNESS:  Well, I mean, one of the
4  instructions that I was given -- and, again,
5  probably best to give it in terms of context here.
6  A manager meeting is actually pretty meaningless.
7  I mean, other than actually having somebody face
8  to face.  If all you are going to do is sit in the
9  boardroom and be told what the operations and
10 procedures are, well, he could tell you anything,
11 so what's the point of that?
12     So the real value of a -- of a
13 due diligence meeting is, really, to do
14 two things, in my view: the first is to walk
15 around the office to get a sense of the place;
16 and the second is to do what I refer to as a
17 walk-through test, which is you go and you choose
18 a particular investment off the trading book or
19 the blotter, and then you follow it all the way
20 through, and you can sort of see how it's entered
21 into the system, how it appeared as a
22 reconciliation, how it might have appeared on the
23 statements, you know, from the brokers, and so on,
24 and I was just told that that just simply wasn't
25 going to happen, and I shouldn't raise it, and,

Page 61

1  again, if you've seen my report, you will see that
2  I make specific mention of that sensitivity.
3  BY MR. BLEICHMAR:
4      Q.  And did you follow the instruction
5  not to raise the walk-through test?
6      A.  Yes, that's right.  I didn't -- I --
7  I didn't follow the — the walk-through test, but
8  I did ask for a -- a walk around the offices, and,
9  again, you know, when somebody says to me,
10 "Would you like to go and see X, Y, Z", I never
11 say no; I say, "Yes, please".
12     So when he offered -- and, again, I can
13 only remember this because I've -- I've read the
14 report again recently to refresh my memory, when
15 you sent it through, but there was reference to
16 the 17th floor where there was the cage with the
17 cashiers, and -- and he said something like,
18 "Well, you know, I'm not going to take you up to
19 the 17th floor", and I responded by asking why
20 not, to which he said, "Well, I'm sure we can deal
21 with that later.  I mean, let's -- let's have a
22 look around", and, again, it got glossed over.
23     Q.  And sitting here today, after Madoff
24 has been arrested, what is the significance of the
25 17th floor, in your mind?

16 (Pages 58 to 61)

Page 62

1  A. Well, in reality, I don't think it
2  would have told me any more than what I found
3  looking around that particular floor, because it
4  was a standard brokerage house floor.
5  You know, it had Bernie's two sons
6  sitting on a -- a raised platform looking out onto
7  the trading floor; it had the standard brokerage
8  computer room with, you know, its bank of
9  computers in -- in there; there were people, there
10  were bodies.
11  You know, typically what I would do when
12  I walk around the office, if somebody says to me,
13  you know, "There are 30 people in the office",
14  I will tend to mentally count the number of bodies
15  there or the number of desks which have paper on
16  them to try to get a -- a sense of sort of the
17  number of people there, and it all seemed fairly
18  normal as to what you would expect of a brokerage
19  house.
20  So I'm not sure that it would have
21  actually added that much more, but it was just,
22  again, something that one remembers, given what
23  one knows now in hindsight.
24  Q. And does what we know now in
25  hindsight include the fact that the 17th floor was

Page 63

1  where the fraud was actually carried out? Is that
2  your understanding?
3  A. Well, I don't know.
4  Q. Going back to the walk-through test,
5  why is a walk-through test important?
6  A. Well, fundamentally, because that's
7  the only way you can verify what you've been told,
8  and -- there's no science to it.
9  You know, investors will often ask me,
10  you know, "What -- what's the point of doing
11  the -- the walk-through test? You know, what
12  happens if you find one error? Does that mean you
13  expand your sample? You know, what do you -- what
14  do you do?", and, you know, I have to say,
15  "It's not an audit".
16  You know, we're not auditors, we're not
17  trying to do sort of statistically significant
18  sample testing. It is just to get a sense of the
19  manager. That's why it's important.
20  And one of my frustrations with it was
21  that we were being told that others had been able
22  to do it.
23  Now, again, you know, looking back on it,
24  one can probably see the reasons why he might have
25  objected to something like that, but at the time,

Page 64

1  I just could not see why we shouldn't be able to
2  ask for something that he had apparently allowed
3  other people to do.
4  Q. Were you able to do a walk-through
5  test of other funds that you did operational
6  due diligence on?
7  A. A number, but, again, it's not
8  unusual for a manager to say, "No way, I'm not
9  going to let you go anywhere near my -- my
10  trades", normally on the grounds of
11  confidentiality. You know, sometimes it might be
12  for real, sometimes it just might be because they
13  can't be bothered. You have to form a view on it.
14  I -- I tend to get fairly upset about
15  it if I'm not allowed to do it, which is why
16  I put that particular item in the report the way
17  I did.
18  Q. Why do you get upset if you're not
19  allowed to do it?
20  A. Because that's the one way -- that's
21  the one source of verification that would give me
22  some comfort. Again, it's not statistically
23  significant in terms of the sample, but what it
24  shows me is attitude of mind.
25  So -- so, you know, let's say there's a

Page 65

1  trade there and let's just say that there are
2  actually errors on it. That -- that, in itself,
3  is not a problem. It's how they've actually dealt
4  with the trade that gives me the comfort.
5  So, you know, are they -- you know, is
6  there a second set of eyes that's looking at it;
7  how is it being reported; is there any danger of
8  conflicts of interest that might cover up the
9  issue?
10  So those were the things that would give
11  me comfort out of a -- out of a walk-through test.
12  So it -- it's not significant
13  statistically, but it's significant in terms of
14  the comfort, because it gives me some form of
15  verification, and -- I mean, it -- it is a problem
16  because a lot of -- a lot of analysts -- I mean,
17  I -- I faced this constantly at GAM, you know,
18  as -- as an example, where people would say to me,
19  "You're effectively auditing the auditors.
20  You know, what's the point of having auditors
21  there if you're going to do this", but what is
22  important is it gave you a sense of how the
23  manager operated.
24  Q. Do you know why you were given the
25  instruction not to ask for a walk-through test?

17 (Pages 62 to 65)

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 66

1     A. Yes, because it would --
2     MR. DANON:  Object to the form.
3     THE WITNESS:  Sorry.
4     MR. DANON:  That's okay.  It's for the
5  record.
6     THE WITNESS:  It -- well, again, just
7  because he -- he was worried that it would upset
8  the relationship.
9  BY MR. BLEICHMAR:
10     Q. And if the relationship was upset,
11  what would be the repercussions of that?
12     A. I think we'd get less capacity.
13  I mean, you know, it was all a capacity game,
14  at the end of the day.
15     Q. And what do you mean by "a capacity
16  game"?
17     A. Well, Bernie Madoff didn't really
18  need to give us access to his fund.  We were being
19  told we were being granted this great favor by
20  being allowed to invest with him.
21     So, you know, it was -- it was something
22  that they wanted to protect as much as they could,
23  and I was somebody who potentially could upset the
24  apple cart by -- by asking the questions that they
25  knew I asked.

Page 67

1     Q. And, just to clarify the record,
2  before when you said "because he was worried that
3  it would -- it would upset the relationship", were
4  you referring to Manuel?
5     A. Yes.  I mean, Hugh was worried as
6  well, but -- I mean ...
7     Q. Let me direct you to the first
8  attachment to the email that is part of exhibit 1,
9  and by --
10     THE EXAMINER:  Could I just ask, just
11  before you move there --
12     MR. BLEICHMAR:  Sure.
13     THE EXAMINER:  -- it's just for --
14  for -- for my knowledge, because I don't know --
15  I expect everyone else in the room does:  how long
16  had OIS invested in Madoff before you started
17  being employed there?  Do you know?
18     THE WITNESS:  Oh, I think about 13
19  years, maybe.
20     THE EXAMINER:  Thirteen years?
21     THE WITNESS:  I -- I'm not sure of my
22  numbers precisely, but it was a long time.
23     THE EXAMINER:  A long time.  Fine.
24  That's fine.  Thank you.
25  BY MR. BLEICHMAR:

Page 68

1     Q. Just to clarify that point, would it
2  refresh your recollection if I represent to you
3  that our understanding is that the investment by
4  Optimal SUS in -- in Madoff was approximately done
5  in 1996/1997?
6     MR. DANON:  Object to the form.
7     THE WITNESS:  It's entirely possible.
8  BY MR. BLEICHMAR:
9     Q. The -- the records are what they
10  are; correct?
11     A. Yes.
12     Q. Focusing on the first attachment,
13  which is Bates -- to the email marked as
14  exhibit 1, which is Bates stamped 682 through
15  95 -- do you see that document?
16     A. Yes.
17     Q. And it is labeled "Optimal Strategic
18  U.S. Equity"; correct?
19     A. Yes.
20     Q. And it is dated August 2003;
21  correct?
22     A. Yes.
23     Q. Do you see right below it, where it
24  says "New York Research Team"?
25     A. Yes.

Page 69

1     Q. What was your understanding of who
2  the New York research team included?
3     A. The New York research team was
4  Hugh Burnaby-Atkins, Jonathan Clark,
5  Balkir Zihnali, Tom Lileng.  They -- Balkir and
6  Tom came slightly later, I think.
7     I'm just trying to think of the layout of
8  that room.  I think that was it.  That was the
9  research team.
10     Q. And do you have an understanding as
11  to who was the primary author of this report, or
12  the primary authors of this report?
13     A. I -- I can only speculate at this
14  point.
15     THE EXAMINER:  No, I don't -- we
16  shouldn't have speculation.  If you don't know,
17  you don't know.
18  BY MR. BLEICHMAR:
19     Q. Do you see towards the middle of the
20  page it says "Attendees"?
21     A. Yes.
22     Q. And then there's a series of --
23  of -- of capital letters there?
24     A. (Witness nods head.)
25     Q. Could you tell me who those

18 (Pages 66 to 69)

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 70

1 individuals are referred to?
2    A. Well, "HBA" will be Jonathan --
3 sorry, will be Hugh Burnaby-Atkins; "JCL" I think
4 is Jonathan Clark. I'm not sure about the others.
5    Q. Is "MEF" --
6    A. "MEF" might be Manuel.
7    Q. Manuel Echeverria Falla?
8    A. Yes.
9    Q. Is that --
10    A. It might be, yes.
11    Q. You don't know who "SSE" is?
12    A. I can't recall.
13    Q. And "JWO" you can't recall either?
14    A. No.
15    Q. Okay. And when you received this
16 email, you read the report; correct?
17    A. I don't recall --
18    MR. DANON: Object to form.
19    THE WITNESS: -- reading it
20 specifically.
21 BY MR. BLEICHMAR:
22    Q. Do you have any reason to believe
23 you did not read it?
24    A. No. It's something I suspect
25 I would have read with interest.

Page 71

1    Q. Is that your normal operation --
2 your normal procedure at work: you would read the
3 reports they give to you?
4    A. Absolutely.
5    Q. Let me guide you to the first box
6 that says -- well, the second box. It says,
7 "Recommendation". Do you see that?
8    A. Yep.
9    Q. And do you see the second sentence
10 says:
11    "Although Madoff remains to some extent
12 secretive about the exact details of his strategy,
13 he nevertheless provides full transparency of
14 trades on a weekly basis."
15    A. (Witness nods head.)
16    Q. What did this mean to you, that
17 Madoff was, to some extent, secretive about the
18 exact details of his strategy?
19    MR. DANON: Object to the form of the
20 question.
21    THE WITNESS: Again, Madoff is really no
22 different to the vast multitude of hedge fund
23 managers who are secretive about what they do and
24 how they do it. So the fact that there was a
25 report there that was saying that he was secretive

Page 72

1 was not in the least bit surprising.
2 BY MR. BLEICHMAR:
3    Q. Further down in the section that
4 is -- well, let me strike that.
5    If Madoff is really no different to the
6 vast multitude of hedge fund managers, then what
7 was your understanding as to why that comment was
8 made here in the report?
9    MR. DANON: Object to the form;
10 speculative.
11    THE WITNESS: I -- I think because it --
12 it was something that was clearly obvious: he was
13 secretive. It meant that they couldn't do the
14 analysis that they would typically expect to do of
15 a -- of a hedge fund manager. It was certainly
16 much lighter in detail than a lot of the other
17 reports that I would have seen and dealt with.
18 So ...
19 BY MR. BLEICHMAR:
20    Q. Moving on to the box labeled
21 "Organization", the second paragraph. The second
22 sentence says:
23    "However, the accounts are not set up as
24 a hedge fund and do not charge any fees (despite
25 the fact that it would seem highly profitable to

Page 73

1 do so) ..."
2    Do you see that?
3    THE EXAMINER: I'm lost? Oh, it is in
4 the -- the second paragraph in that box.
5    MR. BLEICHMAR: The second sentence.
6 BY MR. BLEICHMAR:
7    Q. Do you see that?
8    A. Yes, I do.
9    Q. What did this mean to you?
10    MR. DANON: Again, objection to form.
11    THE WITNESS: Madoff, as I understood
12 the -- the structure, didn't wish to be registered
13 as an investment manager. So the way he
14 structured the account that we had was that he
15 traded the trades that he traded on an
16 execution-only basis, which meant that we were
17 effectively giving the order of the trades that he
18 was going to trade, and there were only
19 two discretions that were given to him. One was
20 when he went into the market and came out, and the
21 other was the price at which he went in and went
22 out, and the way he took his remuneration, given
23 that he was a broker/dealer, was that he took
24 whatever it was per share, and that was the -- the
25 commission that he -- he effectively took.

19 (Pages 70 to 73)



CONFIDENTIAL
MR. RAJIV JAITLY – 7/16/2012

Page 74

1    Now, again, you know, you do come across
2  hedge fund managers who will, for example, allow
3  access to their funds where there are, in fact,
4  no charges, so family and friends are a classic
5  category of investor that would not be charged
6  fees, and Madoff, in this particular instance, was
7  structuring it in such a way that he actually got
8  brokerage commission, rather than investment
9  management fees, and in some ways, you know, it –
10 it made sense. If he didn't want to be an
11 investment manager -- I mean, look, you know,
12 hedge funds, essentially, are structured to either
13 get around tax issues -- you know, that's why
14 investors go into offshore funds. You know,
15 they're -- they're looking at -- at those
16 particular aspects of structure, and Madoff
17 was just another one of those people.
18     He was structuring it in such a way that
19 he didn't have to register as an investment
20 manager and, yes, it would have been very
21 profitable for him to charge those fees, but he'd
22 chosen to do it this way and -- and, again, I --
23 I guess everyone was -- was grateful to him
24 because they were being given this capacity.
25     So, you know, they -- they sort of

Page 75

1  accepted the fact that -- that this was the way it
2  was going to be charged.
3  BY MR. BLEICHMAR:
4     Q.  When you say "registered as an
5  investment adviser", do you mean registered with
6  the Securities Exchange Commission in the
7  United States?
8     A.  That's correct.
9     Q.  So Madoff was not registered with
10 the SEC as an investment adviser?
11    MR. DANON:  Objection to form.
12    THE WITNESS:  If I recall it
13 correctly --
14 BY MR. BLEICHMAR:
15    Q.  At the time.
16    A.  Yeah, he became -- he subsequently
17 did register, as I understand it.
18    Q.  You mentioned that it would have
19 been very profitable for him to charge those fees;
20 correct?  It would have been very profitable for
21 Madoff to charge those fees, and I think you were
22 referring to --
23    A.  I -- I would assume so, based on the
24 returns he was giving and the amount of money he
25 purportedly had under management.

Page 76

1     Q.  And what was your understanding as
2  to why he did not charge those types of fees?
3     MR. DANON:  Objection to the form of the
4  question.
5     THE WITNESS:  As I have just explained,
6  it was because he didn't want to register as an
7  investment manager.
8  BY MR. BLEICHMAR:
9     Q.  So he -- is this fair to say, that
10 he was forgoing profitability to avoid
11 registration with the SEC?
12    MR. DANON:  Objection to the form of the
13 question.
14    THE WITNESS:  I don't know. I can only
15 assume that that was one of the reasons.
16 BY MR. BLEICHMAR:
17    Q.  Is that something that you assumed
18 at the time, that that was one of the reasons?
19    A.  Yes.
20    MR. DANON:  Objection to form.
21    THE WITNESS:  Sorry. I need to slow it
22 down.
23 BY MR. BLEICHMAR:
24    Q.  Did you discuss this report with
25 anyone?

Page 77

1     A.  This particular one?
2     Q.  Yes.
3     A.  I can't recall.
4     Q.  Putting aside whether it was in
5  connection with this report or not, did you
6  discuss with Hugh Burnaby-Atkins or Jonathan Clark
7  this issue that we've been talking about, that
8  Madoff was not registered with the SEC as an
9  investment adviser and that he does not charge any
10 fees as a hedge fund?
11    MR. DANON:  Objection to the form of the
12 question.
13    THE WITNESS:  I would almost certainly
14 have discussed it, because that was fundamental to
15 understanding how the structure operated.
16 BY MR. BLEICHMAR:
17    Q.  And what did you discuss?
18    A.  Well, I --
19    MR. DANON:  Object to the form.
20    THE WITNESS:  -- can't recall the detail
21 now.
22 BY MR. BLEICHMAR:
23    Q.  Going to the third paragraph under
24 "Organization", the last sentence in that
25 paragraph, do you see where it says:

20 (Pages 74 to 77)

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 78

1      "The inference is that the manager
2   prefers to operate using quiescent capital from
3   fund-of-funds who do not ask too many questions."
4      A.  Yes, I see it.
5      Q.  What did that mean to you at the
6   time?
7      A.  Again --
8      MR. DANON:  Object to the form of the
9   question.
10     THE WITNESS:  -- I'm afraid this is
11  fairly normal for a hedge fund.  It's the classic
12  problem I've had to face in doing operational
13  due diligence.
14     What will generally happen -- well,
15  let -- let me try and explain it this way:
16  if you've got $100 to give to a manager and
17  I've got $100 to give to a manager -- let's say
18  it's Bernie Madoff -- I'm the one who is going to
19  be asking lots of difficult questions and you're
20  not going to be asking any, because you're just
21  grateful to be given capacity by Mr. Madoff, and
22  he has only got $100 worth of capacity to take
23  from any investor.  Which investor is he going to
24  take?
25     Well, the chances are he will take you,

Page 79

1   because you're going to be less hassle for him.
2   So I'm afraid, with me coming along, I was,
3   in effect, the "hassle factor," because I was
4   starting to ask difficult questions, and, again,
5   you know, it's perfectly normal in this sort of
6   scenario to have managers who would say, "You know
7   what, we'd rather give -- we'd rather give that
8   capacity to -- somebody else," and it's
9   something, you know, I've faced in my career.
10     It's -- it -- it was certainly not the
11  first time, and, in fact, it hasn't been the last
12  either.  You know, I have faced it a number of
13  times since.
14  BY MR. BLEICHMAR:
15     Q.  You mentioned that, "with me coming
16  along, I was, in effect, the 'hassle factor',
17  because I was starting to ask difficult
18  questions"?
19     A.  Yes.
20     Q.  Was it your view that, until that
21  point, OIS had not been asking difficult
22  questions, until your arrival at Banco Santander?
23     A.  I don't know.
24     Q.  So what did you mean when you said,
25  "I was starting to ask difficult questions"?

Page 80

1      A.  Well, you've got to remember,
2   they hadn't really had somebody who was doing
3   unique due diligence, stand-alone due diligence,
4   so it was really in that context.
5      Look, you know, I used to get complaints
6   from managers.  You know, people would ring up --
7   it's one of the reasons why, in fact, I always
8   used to ask for my phone to be taped so that I had
9   a recorded phone, because occasionally I would
10  have -- the way it would go -- I mean, there was
11  one particular manager I remember I -- I asked
12  questions of, and whilst they were nice and
13  general questions, the feedback that was coming
14  back on emails was, "Wonderful chap, you know,
15  really professional", and then, when it came to
16  the decision to invest, I produced a side letter
17  with 30 points on it asking him to -- you know,
18  I wanted this tidied up in terms of operations,
19  I wanted this tightened up before we invested,
20  I wanted reports on this, at which point
21  I suddenly became the most unprofessional person
22  they'd ever encountered.
23     Now, all one could do in those
24  circumstances was play back the tapes.
25     So, you know, again, it was fairly

Page 81

1   normal, certainly at that time, for people to
2   go gently with managers who were successful and
3   who had limited capacity, because you wanted
4   access, and, really, a lot of the things that
5   I viewed in terms of what happened with Madoff
6   and with Optimal were because I felt that these
7   guys were trying to protect it, and I felt
8   possibly overly so in the way they approached it.
9      Q.  Why do you -- why did you feel they
10  were overly so trying to protect -- and let me --
11  let me clarify that question.
12     When you say "these guys", were you
13  referring --
14     A.  The investment analysts.
15     Q.  Hugh Burnaby-Atkins and
16  Jonathan Clark?
17     A.  Yes.
18     Q.  Would that include Manuel Echeverria
19  also?
20     A.  Yes.
21     Q.  So Manuel Echeverria,
22  Hugh Burnaby-Atkins and Jonathan Clark were
23  trying to protect the Madoff investment?
24     A.  I think they were trying to protect
25  the relationship, yes.

21 (Pages 78 to 81)

OPTIMAL_BERLAMONT-000021

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 82

1      Q. And when you say "overly so", what
2 do you mean by that?
3      A. Sorry, in -- you will have to remind
4 me of the context again.
5      Q. "I felt that these guys were trying
6 to protect it and I felt possibly overly so in the
7 way they approached it"?
8      A. Right. Well, yes, because, on the
9 one hand, they were saying that I'd been recruited
10 specifically to develop this -- this area, but,
11 on the other hand, they were worried about what is
12 happening with their relationship.
13      Q. Did you discuss Madoff prior to your
14 employment — let me strike that.
15      When you were being recruited, did you
16 discuss Madoff with Manuel Echeverria?
17      A. I discussed with it Hugh, as I told
18 you earlier.
19      Q. But you did not discuss it with
20 Manuel Echeverria?
21      A. No.
22      Q. Were you —
23      A. I don't -- I don't recall it.
24      Q. At this time, when — when you were
25 being recruited, did you have an understanding of

Page 83

1 the size of the investment with Madoff by -- by
2 OIS?
3      A. No.
4      Q. When did you — approximately when
5 did you find out the size of the investment with
6 OIS?
7      A. When I first --
8      Q. With Madoff by OIS?
9      A. Well, when I first looked at the
10 portfolio, when I -- when I arrived.
11      Q. Were you surprised by the size of
12 the investment with Madoff?
13      A. Yes.
14      Q. Why?
15      A. Well, again, for a fund-of-funds
16 it is normal practice to limit your exposure to
17 maybe 5 percent to any single issuer. This was a
18 lot larger, in terms of exposure.
19      Now, obviously you do get single manager
20 funds. They're not unusual. But to have that
21 large a chunk with one manager was surprising.
22      Q. How large, approximately, is your
23 recollection?
24      A. I think it was around 40 percent,
25 but I can't really recall the precise sort of

Page 84

1 nature of it.
2      Q. So approximately 40 percent of the
3 assets under management that OIS held were managed
4 by Madoff; is that more or less your recollection?
5      A. Yes.
6      Q. And when you discovered this,
7 did you discuss with this Manuel or with
8 Hugh Burnaby-Atkins or with Jonathan Clark?
9      A. Well, as I explained to you earlier,
10 we had this discussion about whether Madoff was
11 part of my remit, and I very much wanted it to be
12 part of my remit. So it's only in that context.
13      Q. Did you recommend that the
14 investment in Madoff be reduced when you first
15 started working at Banco Santander, based on the
16 size of the investment?
17      A. No.
18      Q. Why not?
19      A. Well, one of the reasons was,
20 before I arrived, one of the things that we agreed
21 was that my prime focus would be on new
22 investments, rather than on existing investments.
23      Now, obviously I'm chief risk officer not
24 of new investments, but of all the investments, so
25 I knew that I would have to get to grips with this

Page 85

1 at some point, and, in fact, at a later point,
2 when we looked at expanding our capacity, at that
3 stage I did discuss it both with Manuel and
4 group risk, who were essentially responsible
5 for -- well, what they did was, group risk would
6 sort of determine the amount of new capacity that
7 we were allowed to take with Madoff, and at that
8 point, I did say that I felt we were overexposing
9 ourselves here, particularly given sort of how
10 little we knew about the manager.
11      Q. And why do you say you knew so
12 little about the manager?
13      A. Well, it's patently clear, from all
14 the reports that you will see, that we actually
15 knew very little.
16      Q. And, for us, who are not
17 professional investment advisers and are not
18 finance people, what — what do you mean
19 specifically by "we knew very little"? What would
20 you have wanted to know that you didn't know?
21      A. Well, we didn't have any independent
22 verification of how our money was being held,
23 how the investments were being made and held.
24 You know, we had no idea about a number of issues
25 on that manager.

22 (Pages 82 to 85)

CONFIDENTIAL

MR. RAJIV JAITLY - 7/16/2012

Page 86

1      Q.  And why is information -- why is
2  independent verification of how the money being --
3  is being held important?
4      A.  Because that's the only way that
5  you can get comfort that the money is safe, and,
6  you know, it's -- does it give you total comfort?
7  Of course not.  You know, nothing is risk free.
8  But you're -- that is why it is important to do
9  some of the few things that you can do, and to do
10  them to the best of your ability.
11      Q.  Is obtaining independent
12  verification an important part of operational
13  due diligence?
14      A.  I think so.
15      Q.  Would you characterize it among the
16  different aspects of operational due diligence as
17  being in the most -- towards the more important
18  end of the spectrum or less important end of the
19  spectrum?
20      A.  Towards the more important.
21      Q.  Is there anything more important,
22  perhaps, than obtaining independent verification?
23      A.  Yes: the contractual terms.
24  You know, you could have some fairly silly
25  contractual terms and you could verify as much as

Page 87

1  you like, but if you don't have any rights, or the
2  rights are different to the ones you thought you
3  were investing, then that -- that can be serious.
4  But I suppose you could call that a form of
5  verification, if you wanted.
6      Q.  But the contractual terms are
7  something that you know what contractual terms
8  you have, versus what you don't have; correct?
9      A.  Theoretically.  I mean, it wasn't
10  the case with Madoff, for example.
11      Q.  And why not?
12      A.  Because there weren't actually,
13  in my view, proper contracts in place.
14      Q.  So you mentioned that one of the
15  aspects that is perhaps more important in terms
16  of -- in terms of operational due diligence than
17  independent verification is -- are contractual
18  terms; correct?
19      A.  Yes.
20      Q.  And contractual terms, in your view,
21  were not adequate with respect to Madoff; is that
22  right?
23      A.  Well, the problems were quite
24  fundamental.  The contract that I eventually
25  got to see was a trading execution agreement,

Page 88

1  if I remember correctly.
2      Now, I mean, yes, you know, the manager
3  was doing execution only on price and timing
4  discretion.  Those were the two variations.
5  But there was nothing there that gave me the
6  comfort as to how the money would be paid over,
7  how it would be received, how it would be held,
8  how the investments would be made, how the
9  investments would be held, to what extent we could
10  have comfort on the investments, what reporting
11  there was being done on it, whether I could expect
12  them to comply to certain regulatory standards or
13  not, and, also, the -- the signatory to the -- the
14  contract was an entity which, again, if I recall
15  correctly, had been liquidated a number of years
16  earlier.
17      So, as you will see from my report,
18  it was a fairly fundamental view that I had that
19  that needed sorting out, and, to a large extent --
20  I mean, one conversation that I certainly do
21  recall having with Manuel was, "You know, you can
22  do as much operational due diligence as you like,
23  but until you've got all the contracts and all the
24  paperwork sorted out, you know, this is neither
25  here nor there".

Page 89

1      So, you know, just in terms of
2  square one, the missing pieces are -- are not sort
3  of sorted out, and that took a long, long time to
4  sort out.
5      Q.  Did that ever get sorted out?
6      A.  It did, eventually; but never
7  completely to my satisfaction.
8      Q.  Why not?
9      A.  Because we made lots of compromises
10  along the way, and, again, as you will have seen
11  from the paperwork, it's not something that
12  I'm terribly happy about, and that's why --
13  I mean, you know, we -- we'd pushed and
14  we'd pushed.
15      I think, if you look at it in terms of
16  time line, I met Madoff in February --
17      Q.  Of 2006; correct?
18      A.  Of 2006.  If I recall correctly,
19  it's a couple of months after that that I actually
20  got to see the paperwork, because I think the
21  first reaction was, "Well, why do you need to see
22  it?  That's something for counsel to deal with".
23  But I eventually got to see it.
24      Then I raised the issues around it,
25  to which the first reaction was, "Well, that's

23 (Pages 86 to 89)



CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 90

1  rubbish. You know, there -- there isn't a
2  problem", and I said, "Well, actually, there is a
3  problem, and here's what I think the problems
4  are".
5      And I -- again, if I recall correctly,
6  I think it was 2007 that we finally got the
7  paperwork that we did eventually get signed up
8  signed up, and, in that time, I probably had one,
9  possibly two, conversations with -- with Madoff
10 on -- when Bernie sort of rang me up and said,
11 "Well, what do you want in this contract?"
12     Q.  And what did you say?
13     A.  Well, I told him -- you know,
14 I think you've seen there's a list of issues that
15 I had. I went through them and I said that's what
16 I wanted reflected.
17     Again, you see, maybe I should explain
18 something about the approach. My idea was that,
19 okay, we've got a secretive manager. There is
20 nothing unusual with that. But with secretive
21 managers, the -- the way to deal with it is to
22 build up a picture over a period of time, and this
23 is a manager who'd been with OIS for some time.
24     So I reckoned -- I mean, it's a bit like,
25 you know, with these reports here, but I wanted

Page 91

1  one that was building it up from an operational
2  due diligence perspective, so the issues that
3  mattered to me: the brokerage set-up; the fact
4  that the assets were segregated. These -- these
5  things mattered. The fact that there was a
6  regulatory oversight on it.
7      So the idea was, over a period of time,
8  I would get to meet this person and build a series
9  of reports on it, and that is what would help give
10 us the insight into the manager.
11     Q.  Did you ever write more than one
12 report on Madoff?
13     A.  No, it was -- that was the --
14 the one report that I wrote.
15     Again, you've got to look at it in the
16 context of all the other things that were going
17 on. There were several other issues that were
18 being debated, such as some of the new
19 due diligence that we were doing. So, you know,
20 that's the only one.
21     And also, in that context, given when
22 I realized sort of what the issues were, the --
23 the contractual issues, I started focusing on that
24 a lot more, because I wanted that sorted out first
25 before we developed any of the other.

Page 92

1      Q.  You mentioned that you were
2  interested or -- or that it mattered to you a
3  number of issues. One were -- of the issues was
4  the brokerage set-up; correct?
5      A.  Yes.
6      Q.  And what do you mean by the
7  brokerage set-up?
8      A.  Well, what we understood that Madoff
9  did was, he held the assets through DTC, which was
10 the -- the standard clearing corporation, but we
11 didn't know -- I mean, he'd told us that it was
12 held in a client account, so I guess, in terms of
13 comfort, I knew that if there was ever a problem
14 with Madoff, if what we'd been told was correct,
15 was that at least I'd have a tracing action into
16 the segregated assets that were client assets
17 sitting within DTC.
18     But I didn't really know who the brokers
19 were or how it was being held, whether that was in
20 fact really the case, and -- I mean, to an extent,
21 that whole verification process is really the nub
22 of the reason why I left, because, you know, they
23 weren't really prepared to go down that route of
24 really trying to sort that side out, and I just
25 felt my reputation was not worth it.

Page 93

1      Q.  To put it differently, Madoff was
2  his own custodian; is that correct? Or he
3  purported to be his own custodian; is that right?
4      A.  That's not strictly correct, because
5  he was saying that DTC held the assets there, but,
6  otherwise, yes, they were effectively
7  self-custodied. As we --
8      THE EXAMINER:  "DTC"? I'm sorry.
9      THE WITNESS:  Yes, DTC is a -- a company
10 that essentially clears and settles trades in
11 U.S. equities.
12     THE EXAMINER:  Is it a Madoff company or
13 was it a standard --
14     THE WITNESS:  No, no, it's a standard --
15 stand-alone, independent set-up. It clears all
16 the U.S. equity trades.
17     THE EXAMINER:  Sorry, Mr. Bleichmar, you
18 carry on.
19 BY MR. BLEICHMAR:
20     Q.  So your understanding of what Madoff
21 was saying was that DTC held the assets?
22     A.  Yep.
23     Q.  So in what sense was Madoff the
24 custodian?
25     A.  Because he controlled it.

24 (Pages 90 to 93)

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 94

1    Q.  Is it possible to have self-custody
2  but for there to be independent verification of
3  the assets?
4    A.  Well, that's what you have auditors
5  for.
6    Q.  So if you have self-custody, you
7  would want to ensure that the auditors are
8  independent; is that fair?
9    A.  Yes.
10    Q.  Were you ever able to confirm
11  whether DTC held the assets of Optimal SUS?
12    A.  No.
13    Q.  Why not?
14    A.  Because that is something that we
15  wouldn't have been allowed to do.
16    Q.  When you say "we weren't" --
17  "wouldn't have been allowed to do", what do you
18  mean by that?
19    A.  Well, OIS would not have been able
20  to go to DTC, because it was effectively a Madoff
21  account.
22    Q.  So OIS was never able to confirm
23  whether Madoff's statements that the -- that the
24  assets were held at DTC was correct; is that
25  right?

Page 95

1    A.  Yes.
2    MR. DANON:  Objection to the form.
3  BY MR. BLEICHMAR:
4    Q.  Would you agree with the statement
5  that Madoff was a custodian of the fund?
6    MR. DANON:  Object to the form.
7    THE WITNESS:  It depends on how you
8  define "custodian".
9  BY MR. BLEICHMAR:
10    Q.  How would you define "custodian"?
11    A.  Well, if you're holding the assets
12  and you're controlling them, then, yes, you're the
13  custodian, but, you know, you could have
14  somebody -- control -- control is not the sole
15  characteristic of it because -- I mean, on that
16  basis, anything that is custodied with a
17  third party is controlled by the manager, but,
18  essentially, the money was coming back into his
19  hands, so it was coming back into a Madoff account
20  with Madoff, Madoff the entity, and he was then
21  either buying treasuries -- and, again, I wanted
22  to know in whose name they were held, how they
23  were held, because we didn't really know that;
24  he was then buying stocks, so this was the basket
25  of equities that he was buying; and, again, so it

Page 96

1  was -- so it was the basket of equities that would
2  have gone through DTC.
3    Then there were the OTC options, so the
4  calls and the puts, which was essentially the
5  hedge against the basket.  Those were effectively
6  self-custodied, because he would be holding those.
7    So I guess -- I don't know whether that
8  answers your question.
9    Q.  It does.  But another way to put it
10  is that custody has two components:  one is
11  having, for example, the equities by DTC and
12  another aspect is the control; is that correct?
13    A.  Well, it's who's holding it and who
14  has control of it.
15    Q.  With respect to the treasuries, what
16  was your understanding as to the custody of the
17  treasuries?
18    A.  Well, we didn't know.  That's one of
19  the issues that I raised.
20    Q.  Who did you raise that with?
21    A.  I can't recall now, but there were
22  emails, and I think it's even in the report.
23    MR. BLEICHMAR:  Should we take a -- a
24  break?  Let's go off the record.
25    THE EXAMINER:  Okay.

Page 97

1    THE VIDEO OPERATOR:  Going off the
2  record.  The time is 12.05.  End of tape 1,
3  volume 1, of the videoed deposition of
4  Rajiv Jaitly.
5    (12:05 p.m.)
6        (Break taken.)
7    (12:20 p.m.)
8    THE VIDEO OPERATOR:  This is the
9  beginning of videotape number 2, volume I, in the
10  videotaped deposition of Rajiv Jaitly.  Going on
11  the record.  The time is 12.20.  Thank you, sir.
12    MR. BLEICHMAR:  I'm going to mark as
13  exhibit 2 a document bearing Bates stamps 3128584
14  through 87.
15    (Exhibit 2 marked for identification.).
16  BY MR. BLEICHMAR:
17    Q.  Do you see, Mr. Jaitly, that this
18  document reflects an email from Jonathan Clark to
19  Hugh Burnaby-Atkins on March 29, 2006, in which
20  you are copied?
21    A.  Yes.
22    Q.  Do you recognize this document or
23  can you tell us what this document generally is?
24    THE EXAMINER:  Just the front page, or
25  all of it?

25  (Pages 94 to 97)

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 98

1      MR. BLEICHMAR: All of it.
2      THE EXAMINER: I see. It's all
3   connected, is it?
4      MR. BLEICHMAR: Correct.
5      THE EXAMINER: Okay.
6      THE WITNESS: I mean, essentially,
7   the -- the background to this is that I had sent
8   to the analysts a copy of a report which was a
9   complaint by DePauw University, I think is -- is
10  how you refer to it, against Bayou, and that was a
11  complaint which essentially referred to what the
12  documents described as to the investment process
13  and what they would do in relation to that
14  particular investment, and the complaint was,
15  essentially, that -- that the manager had not
16  discharged those -- those particular obligations
17  that were in that document. So I --
18     THE EXAMINER: Does this have anything
19  to do with Madoff, this particular complaint?
20     THE WITNESS: No.
21     THE EXAMINER: It's completely separate?
22     THE WITNESS: It's completely -- it --
23  it was just something that appeared in the press,
24  that -- that this particular complaint had been
25  filed in the U.S., and, again, it was relevant to

Page 99

1   the -- the work that we did as an operational
2   due diligence team, in terms of the
3   responsibilities that we had, and so I circulated
4   it, again, really, to emphasize the importance of
5   what we disclosed in documents and how we dealt
6   with some of the issues.
7      And Hugh has -- is essentially responding
8   on it, and I -- I was, again, trying to emphasize
9   that we should be doing more around the
10  verification process on Madoff, and I guess that
11  was Jonathan's response to what Hugh had said.
12  BY MR. BLEICHMAR:
13     Q. Let me just go through some basics
14  on -- of the document itself.
15     Is there any reason to dispute the
16  authenticity of this document?
17     A. I can't think of any reason why
18  I would.
19     Q. So you don't have any reason to
20  believe that the document is not accurate;
21  correct?
22     A. (Witness shakes head).
23     Q. With respect to the DePauw complaint
24  that you were referring to, you also mentioned,
25  I think, an entity called Bayou; is that correct?

Page 100

1      A. Yes.
2      Q. Could you tell us what that is?
3      A. Bayou is another hedge fund manager
4   and hedge fund.
5      MR. DANON: I'm going to object.
6   That's outside the scope of the examination.
7      THE EXAMINER: Well, it is, rather.
8   Do we need to get into any more detail about
9   Bayou?
10     MR. BLEICHMAR: If I could just
11  establish the parallel between Bayou and Madoff,
12  because that's what -- the witness testified that
13  he sent it as part of the operational
14  due diligence.
15     I won't delve deeply into it, but it is a
16  document that the witness circulated.
17     THE EXAMINER: Mr. Danon?
18     MR. DANON: I mean, I -- I think
19  still -- I think he testified that this was not in
20  connection with Madoff and that it was just
21  general operational due diligence not specific to
22  Madoff.
23     THE WITNESS: That's correct.
24     THE EXAMINER: But he did circulate this
25  as a sort of pointer to the sort of things we

Page 101

1   should be looking at vis-a-vis Madoff.
2      MR. BLEICHMAR: And the response was in
3   respect of Madoff.
4      THE EXAMINER: I think a limited
5   exploration is okay.
6   BY MR. BLEICHMAR:
7      Q. Mr. Jaitly, is it true that Bayou
8   was also a ponzi scheme?
9      A. I shall be perfectly honest right
10  now, and there's a reason for this: I have just
11  been looking at a whole host of funds and I can't
12  for the life of me remember the precise details on
13  Bayou. I'm sorry. I should really know it, but
14  I -- I can't recall them.
15  (Exhibit 3 marked for identification.)
16     MR. BLEICHMAR: I'm going to mark as
17  exhibit 3 a document bearing Bates stamps 826891
18  through 20, 920, and this is an email from
19  Hugh Burnaby-Atkins to Jonathan Clark in which you
20  are copied; correct?
21     A. No, I don't think was copied in on
22  this one -- or am I?
23     Q. Do you see the --
24     A. Yes. Oh, yes, I am, sorry.
25     Q. Do you have any reason to believe

26 (Pages 98 to 101)

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 102

1  that this document is not an authentic copy of the
2  original document?
3      A.  No, no reason.  Sorry, do I need to
4  say that loudly: no.
5      Q.  And before that, you mentioned that
6  you had circulated a complaint, a DePauw-related
7  complaint; is that right?
8      A.  Yes.
9      Q.  Is this -- is the document bearing
10  Bates stamps 894 through 920 the document you were
11  referring to?
12      A.  I have no reason to doubt that it
13  isn't.
14      Q.  And does this refresh your
15  recollection as to why you circulated this
16  document in relation to Madoff?
17      MR. DANON:  Objection to the form of the
18  question.
19      THE WITNESS:  As I explained, it was
20  really to do with the nature of the disclosures
21  and how one operates in response to the
22  disclosures, and -- and also what response you can
23  get in the form of a complaint like this if one
24  doesn't follow them.
25  BY MR. BLEICHMAR:

Page 103

1      Q.  And what did you mean by "the nature
2  of the disclosure and how one operates in response
3  to the disclosures"?
4      A.  Well, again, I think what you have
5  here is a complaint which describes an investment
6  management process and how that management process
7  was discharged.
8      Now, one of the issues that I had in
9  relation to Madoff was that we needed to make our
10  disclosures in the document a lot more clearer
11  than they were as to what we did and what we were
12  not able to do, in particular, so that it was
13  absolutely clear that -- for example, that we were
14  not able to verify a number of the issues around
15  how Madoff operated.
16      Q.  When you say --
17      A.  But it wasn't -- I mean, you know,
18  it wasn't specific to Madoff.  It was -- again,
19  if I can just put a bit of context to it, it took
20  me five and a half years at GAM to get to a stage
21  where the analysts were sort of accepting of the
22  due diligence process, but it was a -- a long hard
23  slog to actually convert them from being people
24  who really felt that this was an unnecessary
25  process and really affected sort of how they --

Page 104

1  how they operated to how they ran.
2      Now, with Optimal, this was very much the
3  start of the journey, in that sense.  So what
4  I was doing with circulating information like this
5  was to really highlight to them the importance of
6  how we disclosed things and how we discussed
7  things with clients and how we actually then
8  backed it up with what we did.
9      Q.  A little bit earlier you said that
10  you thought you -- "we needed to make our
11  disclosures clearer in a document"?
12      A.  Yes.
13      Q.  Which document were you referring
14  to?
15      A.  The -- the offering memorandum.
16      Q.  Let me go back to exhibit 2.  Do you
17  see the second page?
18      A.  Yes.
19      Q.  There is an email from
20  Hugh Burnaby-Atkins to Jonathan Clark in which you
21  are copied, and the email is dated March 28th,
22  2006?
23      A.  March 29th.
24      Q.  On the second page, do you see
25  there's a prior email?

Page 105

1      A.  Oh, the 28th one?
2      Q.  Correct.
3      A.  Yes.
4      Q.  And do you see towards -- the --
5  the second paragraph starts, "Just to be clear"?
6      A.  Yep.
7      Q.  Do you see that?  If you could read
8  that paragraph and tell me what that paragraph is
9  about?
10      A.  Do you want me to read it aloud?
11      Q.  No, just read it to yourself and
12  just --
13      A.  Okay.  I mean, this -- this was --
14  this was one of the sort of issues that existed
15  between Hugh Burnaby-Atkins and myself as to
16  who was actually doing the operational
17  due diligence around Madoff.
18      He had instructed Jonathan to prepare
19  a report, which I think you have later on.
20  It's in one of the -- the documents that was
21  produced.  I think it's July -- I think it was
22  dated July, that he -- that he actually produced
23  this report, which covers sort of our knowledge of
24  Madoff up to that point.
25      And, again, you know, we -- when I spoke

27  (Pages 102 to 105)

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 106

1  to Manuel about this, it was unclear as to exactly
2  what the remit of this report was going to be; you
3  know, to what extent it was going to deal with
4  operational due diligence issues which, frankly,
5  I didn't really consider him to have the expertise
6  to -- to deal with.
7      Q.  Why not?
8      A.  Because he wasn't qualified to deal
9  with them.
10      And that that should really be something
11  that -- that I needed to deal with.
12      So -- but -- but Hugh was --
13  was determined to go ahead and -- and do the
14  report, and -- and, to the extent that it covered
15  investment issues and was sort of a catch-all,
16  fine, but -- but, to a large extent, the --
17  the publication of that report by Jonathan, to a
18  large extent, was what started my decision process
19  to leave Optimal.
20      Q.  Why -- why do you -- why did you
21  believe that Jonathan Clark was not qualified to
22  write a report on operational due diligence?
23      A.  Well, he's not a chartered
24  accountant; he's not run businesses in financial
25  difficulty and, therefore, doesn't necessarily

Page 107

1  understand some of the operational issues that one
2  would need to look at.
3      Q.  And how did you come to this
4  conclusion?
5      A.  Because he wasn't a chartered
6  accountant and didn't have the relevant
7  experience.
8      Q.  You said you discussed this report
9  that Jonathan was going to prepare with Manuel;
10  correct?
11      A.  Yeah.
12      Q.  And what did you discuss?
13      A.  Well, just whether it was
14  appropriate or not, and I think, again, there are
15  emails in the pack that discuss the
16  appropriateness of what I thought about his
17  involvement in it.
18      Q.  And -- and what was Manuel's view as
19  to the appropriateness of Jonathan Clark writing
20  this report?
21      A.  Well, I think -- I think Manuel's
22  approach to most things, when there was antagonism
23  of this sort, was to say, "Oh, well, you know,
24  let's -- let's get it done.  We can read it and
25  then have a look at it later".

Page 108

1      So he would -- he would try and smooth
2  things through.  He was always -- you know, he --
3  he didn't really want conflict.
4      In many ways, you know, I think that was
5  the problem with -- with Optimal:  they were
6  just -- their -- their Achilles heel, in my view,
7  was that they were just very nice people who
8  didn't want to upset others.
9      Q.  You mentioned that this report was
10  the beginning of your process of -- of leaving
11  OIS; is that more or less correct?
12      A.  Yes.
13      Q.  What did you mean by that?
14      A.  Well, when I joined Optimal,
15  I thought I was going to build what I would term a
16  world-class operational due diligence team.
17  I mean, here was a -- a huge bank with the
18  potential to be a huge investor.
19      So, you know, I -- I was looking at it as
20  being an extremely exciting challenge, but I was
21  slowly coming to the realization that -- because
22  they were so worried about these relationships and
23  how they were going to handle them, that I wasn't
24  really going to be able to do a proper job in the
25  way that I was comfortable in doing it.

Page 109

1      But, as I explained to you earlier,
2  it took me almost five and a half years to get to
3  a stage where I was more or less -- not totally,
4  but more or less -- comfortable in my previous
5  job, so I felt I was very much at the start of a
6  journey here, and I was still keeping an open
7  mind, but if I -- if I had to sort of point to a
8  marker, it would be that report because -- well,
9  I mean, there were certain things in that report
10  that I -- I took objection to.
11      For example, the report, at its very
12  beginning, says that their view was that Madoff
13  was a well-run and efficient organization, to
14  which my response was, "On what basis?  You know,
15  what evidence do we have for it?  What has
16  Jonathan actually read and seen that leads him to
17  that conclusion", because I'm not in a position to
18  say.  I wasn't in a position to say it was badly
19  run, but I wasn't in a position to say it was well
20  run either.
21      Q.  Did you discuss this disagreement
22  about Jonathan's conclusion regarding Madoff being
23  well run with Manuel?
24      A.  Oh, yes, and with the management
25  committee and with the investment committee.

28 (Pages 106 to 109)



Page 110

1  I discussed it with a lot of people. I was
2  incensed at the time.
3      Q.  What did you say?
4      A.  Well, I just said that --
5  well, again, I think my emails will probably give
6  a better account of what I said, because I --
7  I just -- I was very annoyed that assertions were
8  being made in it that I felt we couldn't
9  substantiate.
10     Q.  Did you feel those assertions were
11 incorrect?
12     A.  I felt they were unsubstantiated.
13     Q.  And when you say "unsubstantiated",
14 what do you mean?
15     A.  Well, I couldn't prove them one way
16 or the other.
17     Q.  And did you explain to Manuel that
18 some of the assertions in the report were
19 unsubstantiated?
20     A.  Yes.
21     MR. DANON:  Objection to form.
22 BY MR. BLEICHMAR:
23     Q.  And what did --
24     A.  Sorry.
25     Q.  And what did Manuel say with respect

Page 111

1  to that?
2      A.  I think it was his usual response:
3  "Well, you know -- well, you know, that's his
4  view. He doesn't really have the experience.
5  Don't worry. It's just -- you know, it's a
6  collation. You know, we need to move forward on
7  it".
8      Manuel didn't want a major confrontation
9  over it. The issue was of concern to me
10 because -- what I was worried about was that the
11 marketing people would then take this report and,
12 you know, it was one of the -- the bases of the
13 argument that we ran when the management committee
14 were concerned about the reports that I was
15 producing, when they were saying, sort of,
16 "Where are -- where are all these reports that you
17 need -- you know, that you should have produced by
18 now?" What I was saying is, "Well, it's a
19 question of substance over form".
20     I think they were more concerned about
21 the form of having reports there that they could
22 then produce to clients and say, you know, "This
23 is what we do", and I was more concerned about the
24 substance of what we'd actually done. So there
25 were discussions on it.

Page 112

1      MR. BLEICHMAR:  I'm going to mark as
2  exhibit 4 a seven -- a nine-page report entitled
3  "Madoff Securities" that was filed with the court
4  in the United States as -- as docket number 46-1.
5  (Exhibit 4 marked for identification.)
6  BY MR. BLEICHMAR:
7      Q.  Is this the report that you were
8  referring to and that we were just talking about,
9  Mr. Jaitly?
10     A.  Yes, it is. So if you go to the
11 second page, "View":
12     "Despite the above, we believe the
13 organization is efficiently and professionally
14 managed."
15     Q.  And you -- you reviewed this report
16 during your employment at Banco Santander?
17     A.  I did.
18     Q.  And is there any reason to believe
19 that this copy of this report is not authentic?
20     A.  No.
21     Q.  Do you have an understanding as to
22 whether this report is the final complete version
23 and not a draft of this report?
24     A.  I think it was a final.
25     Q.  And what leads you to believe that

Page 113

1  it was a final report?
2      A.  When it was issued, because it would
3  have been issued as a final report.
4      THE EXAMINER:  Where do I find that?
5  Where do I find when it had been issued?
6      THE WITNESS:  I -- I think you will find
7  right at the top right-hand corner it says
8  July 2006.
9      THE EXAMINER:  Thank you.
10     THE WITNESS:  I think -- even though the
11 date is July 2006, it might have been issued
12 slightly later, but I -- yeah, passage of time.
13     THE EXAMINER:  Were drafts stamped
14 "Draft" across the page?
15     THE WITNESS:  Not necessarily. I mean,
16 sometimes you might have just sort of had an -- an
17 email attachment which said, you know, "Attached
18 is a draft".
19 BY MR. BLEICHMAR:
20     Q.  And what other areas of this report
21 do you believe are unsubstantiated?
22     MR. DANON:  Objection to form.
23     THE EXAMINER:  Have you had a chance to
24 review this recently?
25     THE WITNESS:  Yes. These are documents

29 (Pages 110 to 113)



CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 114

1   that were sent to me.
2       Well, I mean, I think you will, again,
3   find comments that I have made in emails, but if
4   you go to page 5, "Regulation", where they say:
5       "Madoff Securities suffering or
6   committing an irregularity is possible but
7   remote."
8       Well --
9   BY MR. BLEICHMAR:
10      Q.   Where is that, excuse me?
11      A.   Page 5, under "Regulation", again,
12  "View".
13      Q.   Right.
14      A.   So he was expressing a view saying
15  that Madoff Securities suffering or committing an
16  irregularity is possible but remote.
17      I was, again, saying, "Well, on -- you
18  know, on what basis?" You've got -- in fact,
19  I mean, in terms of the irregularities, we had the
20  NASD evidence by then that they'd been fined.
21  I mean, okay, it was $500, or whatever it was, or
22  $2,000, but, you know, they had been fined.
23      So, again, it was really a question of
24  sort of some of the assertions that he made that
25  I had a concern, because I was saying, "Well,

Page 115

1   on -- on what basis? You know, what -- what basis
2   do you have to form these views?", because
3   I didn't believe that we had enough evidence at
4   that point to form a view either way.
5       Q.   Turning to the first page of the
6   report, do you see halfway down that page, it
7   says:
8       "Summary areas of potential risk."
9       A.   Yep.
10      THE EXAMINER:   Sorry, which page are we
11  on?
12      MR. BLEICHMAR:   The first page.
13      THE EXAMINER:   Oh, the first page.
14      MR. BLEICHMAR:   The front page.
15      THE EXAMINER:   Yes.
16      MR. BLEICHMAR:   "Summary areas of
17  potential risk".
18  BY MR. BLEICHMAR:
19      Q.   And do you see there's a number of
20  bullet points there?
21      A.   Yes.
22      Q.   Do you agree that those bullet
23  points generally reflect the summary areas of
24  potential risk?
25      MR. DANON:   Objection to the form.

Page 116

1       THE WITNESS:   These were all risks that
2   we had identified in the other report as well.
3   BY MR. BLEICHMAR:
4       Q.   Do you have an understanding as to
5   what work Jonathan Clark did to prepare this
6   report?
7       A.   Well, he'd obviously been present at
8   the meeting that I had been at. He had access to
9   the -- the previous reports.
10      I think, by then, he had also had a
11  conversation with the auditors, which was, again,
12  another area that I took exception to, because
13  I didn't think that Hugh and Jonathan should be
14  the people having the discussion with the
15  auditors. They didn't speak the same language,
16  they didn't really understand what the issues
17  were.
18      I mean, some of the questions that they
19  actually asked on the call that I came into at the
20  tail end of, I -- I really didn't like, because it
21  just clearly demonstrated that they weren't --
22  you know, they -- they were asking questions on
23  U.S. GAAP.
24      I wanted to understand sort of how this
25  person was actually conducting the audit. You

Page 117

1   know, for example, what -- what sample size was he
2   using, how was -- how was he approaching it, what
3   level of materiality.
4       So those were the sort of things I would
5   have expected somebody to be raising in that
6   conversation.
7       Q.   Did you raise those?
8       A.   So -- no, I didn't, because I never
9   got a chance to -- to speak to him subsequently
10  because we were just given that -- those --
11  I think there were two windows that we were
12  given by Madoff, because Madoff didn't want
13  us approaching the auditors directly, and
14  he wanted to be present whenever the conversations
15  occurred.
16      So, you know, I lost that opportunity,
17  and I was -- you know, I raised that with Manuel,
18  because I felt that was a wasted opportunity.
19      Q.   And by "the auditors", you mean
20  Madoff's auditors; correct?
21      A.   Yes, that's right.
22      Q.   And does the name Friehling &
23  Horowitz --
24      A.   Yes.
25      Q.   -- refresh your recollection?

30 (Pages 114 to 117)

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 118

1    A. Yes, that's right.
2    Q. Friehling & Horowitz were
3 the auditors for Madoff?
4    A. It was David Friehling, I think was
5 his name, who was the person that we spoke to.
6    THE EXAMINER: Look at the bottom of
7 page 6.
8    THE WITNESS: Yes, David Friehling,
9 thank you.
10 BY MR. BLEICHMAR:
11    Q. And you were never able to speak to
12 Mr. Friehling with respect to Madoff?
13    A. No, I just --
14    MR. DANON: Objection to the form.
15    THE WITNESS: I just had a -- I came
16 into the tail end of a conference call, and
17 I think you will again see emails setting out
18 the objections I had at the time on it.
19 BY MR. BLEICHMAR:
20    Q. You also prepared a report on
21 Madoff; correct?
22    A. Yes.
23    Q. And why did you prepare a report,
24 given that Jonathan Clark had already prepared one
25 himself?

Page 119

1    A. Well, my report had been prepared
2 earlier. My report clearly raised issues that
3 I had a problem with, as are set out.
4    This report was, I suppose, to allay some
5 of those fears, to say, you know, we'd -- we'd
6 done some more work.
7    Q. "This report" meaning
8 Jonathan Clark's report?
9    A. Jonathan Clark's report. And that
10 was, again -- like I said, this was the marker for
11 the point when I started thinking that it was time
12 for me to leave and -- but I wasn't going to
13 get -- be able to cover the work that I needed to
14 do in the way that I wanted to do it.
15    Q. When you said "this report",
16 referring to Jonathan Clark's report, "was to
17 allay some of those fears", what do you mean by
18 that?
19    A. Well, because what it was saying is,
20 "Well, we've identified some potential risks, but,
21 really, guys, we don't -- there is nothing to
22 worry about because it's all very well run and,
23 you know, any possibility of any problems are
24 fairly remote", and what I was saying is, "Well,
25 you know, we need more of a basis to make those

Page 120

1 assertions, so what we've done is we've identified
2 certain risks and we need to get comfortable
3 around those risks, and to the extent that we are
4 not able to get comfortable around those risks, we
5 need to make sure that investors are aware of what
6 those risks are".
7    Again, you know, there's no magic to
8 operational due diligence. I mean, if you tell
9 your investor that, you know, you're investing
10 blind, then, you know, it's up to the investor to
11 make that decision, so long as it's disclosed.
12    Q. Was it your view that the investors
13 were not aware of the risks in investing with
14 Madoff?
15    A. Well, I had a number of discussions
16 in relation to this with counsel, and one of the
17 things that we looked at was the extent to which
18 there were disclosures in the explanatory
19 memorandum.
20    MR. DANON: I think I object to
21 privilege --
22    THE EXAMINER: "With counsel", did you
23 say?
24    THE WITNESS: Sorry?
25    THE EXAMINER: "With counsel", did you

Page 121

1 say?
2    MR. DANON: -- to the extent he's
3 getting into conversations with counsel.
4    THE EXAMINER: I think --
5    MR. DANON: We object on privilege.
6    THE EXAMINER: I don't think we want to
7 go down that particular route, of conversations
8 you had with counsel.
9    THE WITNESS: Okay.
10 BY MR. BLEICHMAR:
11    Q. Putting aside your conversations
12 with counsel, was it your view that the investors
13 were not aware of the risks in investing with
14 Madoff?
15    MR. DANON: I think I would lodge the
16 objection on privilege to the extent it requires
17 him to -- in order to answer, it requires him to
18 divulge or disclose any conversations with
19 counsel.
20 BY MR. BLEICHMAR:
21    Q. Correct. Putting aside any
22 conversations --
23    THE EXAMINER: You are being asked about
24 your own view, quite independent of any
25 discussions you had with counsel. If you can

31 (Pages 118 to 121)



CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 122

1  restrict your answer to --
2  THE WITNESS: But -- but my view was
3  determined by what counsel had told me.
4  THE EXAMINER: You've got a problem
5  there, Mr. Bleichmar.
6  BY MR. BLEICHMAR:
7  Q. Let's take a step back. Did you
8  have a view before speaking with counsel?
9  A. Yes, I did.
10  Q. And what was your view before you
11  spoke with counsel?
12  A. I -- I felt that the disclosures
13  didn't go far enough.
14  Q. And when you say the disclosures
15  didn't go far enough, what do you mean by that?
16  A. Well, there were assertions about
17  what we had done and what we would be doing that
18  I was not comfortable with.
19  THE EXAMINER: Do you mean in this
20  report?
21  THE WITNESS: Sorry?
22  THE EXAMINER: Do you mean in this
23  report?
24  THE WITNESS: No, sorry, in the --
25  in the offering document --

Page 123

1  THE EXAMINER: Oh, these were these --
2  THE WITNESS: -- that investors
3  received.
4  THE EXAMINER: These were the
5  explanatory memoranda?
6  THE WITNESS: That's right. So it was
7  basically explaining the basis on which the
8  investments were being made.
9  MR. BLEICHMAR: Let me mark as exhibit 5
10  a document that states "Optimal Investment
11  Services" on the top. It was filed with the
12  court. It has the -- the headline "Page 24 of
13  133".
14  (Exhibit 5 marked for identification.)
15  BY MR. BLEICHMAR:
16  Q. And let me ask you whether you
17  recognize this document?
18  A. Yes, I do.
19  Q. And what do you recognize this
20  document to be?
21  A. It's a document that I prepared.
22  Q. And did you prepare it as part of
23  your duties and responsibilities while you were
24  employed at Banco Santander?
25  A. That's correct.

Page 124

1  Q. And you prepared it at the time of
2  your employment with Banco Santander; correct?
3  A. During my time, yes.
4  Q. During.
5  A. Yes.
6  Q. Any reason to dispute the
7  authenticity of this document?
8  A. No.
9  Q. And approximately when did you
10  prepare this document?
11  A. Well, this is -- the -- the meeting,
12  the visit, took place in February, February 2006,
13  as it says here, so it was sometime between then
14  and July 2006, when Jonathan's report came out.
15  So I -- I find it hard to remember now
16  the exact date when it came out.
17  Q. That's fine. But you remember
18  that, relative to Jonathan Clark's report, you
19  completed this report, exhibit number 5, before
20  Jonathan Clark's report?
21  A. Yes.
22  Q. And why do you have that
23  recollection?
24  A. Because of how annoyed I was when
25  this finally got prepared.

Page 125

1  Q. When you say "this", you're
2  referring to Jonathan Clark's report?
3  A. Sorry, Jonathan Clark's 2006 report.
4  I'll get used to it.
5  Q. Did you distribute -- let me strike
6  that.
7  Is it fair that we refer to exhibit
8  number 5 as "Mr. Jaitly's report"?
9  A. Yes.
10  Q. And we refer to Jonathan Clark's
11  report as "the Clark report"?
12  A. Yes, that's fine.
13  Q. That way we can keep it straight.
14  A. Yes, that's fine.
15  Q. Did you -- did you share or send
16  the -- the Jaitly report to anyone?
17  A. Yes, it was sent to the entire
18  analyst team.
19  Q. And who would that include?
20  A. Hugh Burnaby-Atkins, Jonathan Clark,
21  the analyst team in Geneva, Manuel.
22  Q. And do you know approximately when
23  you distributed it to those individuals?
24  A. I can't recall now, but there should
25  be an email that gives you the exact date.

32 (Pages 122 to 125)

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 126

1  Q.  Do you believe that you distributed
2  it before Jonathan Clark's report was issued?
3  A.  Yes, I believe I did.
4  Q.  Did you send the report to anybody
5  outside of OIS?
6  A.  Yes, I did.
7  Q.  Who did you send it to?
8  A.  To Grupo Santander, at their
9  request.
10  Q.  And who specifically at
11  Grupo Santander?
12  A.  Amadeo Pascual Reynes.
13  Q.  Anybody else outside of OIS?
14  A.  No, I don't think so.  I -- I would
15  have -- again, one of the problems that I had was
16  the -- who got to see these reports, because
17  sometimes people were quite free as to who they
18  showed it to, and I -- I didn't think that even
19  investors should really get to see some of these
20  internal reports.
21  Q.  Do you have any understanding as to
22  whether Amadeo Pascual Reynes distributed this
23  report to other individuals at Grupo Santander?
24  A.  I have no idea.
25  Q.  Do you know if anybody else,

Page 127

1  other than Amadeo Pascual Reynes, saw this report
2  at Grupo Santander?
3  A.  Well, I would have thought at least
4  Pepe Mercado, who was his boss, would have seen
5  it, because we did have a discussion around it
6  when I met him.
7  Q.  And what did you discuss with
8  Mr. Mercado when you met him, with respect to
9  the -- the Jaitly report?
10  A.  I can't recall the precise details,
11  but it would have been essentially highlighting
12  the conclusions that I'd -- I'd reached and why
13  I'd reached them and what the proposed actions
14  were and what I was planning to do in relation to
15  it.
16  Q.  And could you summarize what those
17  conclusions were?
18  A.  Well, as they're set out, the --
19  the primary issue that I had was the contractual
20  documentation.  I had a concern about that.
21  I also wanted comfort around the
22  segregation of the assets, because, again, the way
23  I was looking at it is, to the extent that there
24  was a blow-up, I wanted to be able to trace back
25  in to those assets to claim them to be ours.

Page 128

1  I wanted to get comfort that -- that
2  Bernie Madoff was doing what he said he was going
3  to be doing.
4  So, you know, in -- in terms of the
5  actual trading mandate, I wanted to make sure that
6  he wasn't in breach of -- I mean, one of the
7  things, for example, in this report that is noted
8  is the issue -- when we met Bernie Madoff, he said
9  that he traded 45 of the S&P 500 stocks -- S&P 100
10  stocks, sorry, and when we spoke -- so when we
11  spoke to him he said 45, and when you look at the
12  documents it says 35.
13  So, you know, I didn't know whether it
14  was in compliance or not, because, you know, which
15  one was right?  Had it changed?  And if it had
16  changed, to what extent had it changed and who
17  had authorized the change and agreed it and where
18  was the documentation around it?  So there was
19  that.
20  There was the issue that we couldn't
21  really do any exercises ourselves to establish
22  whether there was any fraud or misrepresentation
23  on the process.
24  We were obviously relying on one person
25  and his word, and -- I mean, you know, if you

Page 129

1  think about it, to a large extent, this report is
2  based on a conversation that we had with a -- a
3  gentleman for two hours, basically telling us what
4  he thought -- you know, what his view was of how
5  they did things, but I only had his word for it,
6  and, as history shows, it was only his word, and
7  nothing else.
8  Q.  Did you ever meet Madoff again?
9  A.  I only met him the once.  But
10  I spoke to him probably, I think, twice after that
11  on the phone, to sort out -- the legal contractual
12  stuff, and that was, again -- it -- it was, to a
13  large extent, I think counsel throwing their hands
14  up and saying, "Right.  You know, why don't you
15  just have a discussion directly with him about the
16  things you want".
17  Q.  Let me direct your attention to --
18  if you look at the top right of each page, it says
19  "Page X of 133"?
20  A.  Yes.
21  Q.  If you go to page 36 of 133.  Do you
22  see between sections G and H there is an
23  underlined, bolded paragraph?
24  A.  Yes.
25  Q.  Would you mind reading it out loud?

33 (Pages 126 to 129)