CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 130

1    A. Sure:
2    "Given the apparent sensitivity of the
3 relationship with this manager, no request was
4 made to review how a trade is made and allocated
5 to a client - however, I note that the investment
6 team has recorded that a Fairfield Partner has
7 previously been given such access and there is
8 absolutely no reason why we should not make a
9 similar request."
10    Q. Is this what you were referring
11 earlier as a walk-through?
12    A. That's correct.
13    Q. Why did you bold and underline the
14 section?
15    A. Because I really thought that that
16 was something we ought to do.
17    Q. When you —
18    A. And particularly given the evidence
19 that we had that other people had been able to do
20 it, I just could see absolutely no reason why we
21 were not able to ask the same question of them --
22 of Bernie Madoff.
23    Q. Was that a major point of contention
24 between you and -- on the one hand, and Manuel,
25 Hugh Burnaby-Atkins and Jonathan Clark, on the

Page 131

1 other?
2    A. Yes.
3    Q. And why do you say that it was a
4 major point of contention?
5    A. Because I wanted to do it and they
6 didn't.
7    Q. Let me direct you to now page 25 of
8 133.
9    A. Sorry, page 25?
10    Q. Twenty-five. You see there's a
11 point number 1 there, where it says "Integrity and
12 Enforceability of contractual arrangements with
13 the Broker Dealer"?
14    A. Yes.
15    Q. And the first sentence says:
16    "Currently the Optimal Accounts do not
17 have a complete set of documentation in relation
18 to each account (i.e. Infiltrator for Optimal
19 Arbitrage and SUS) ..."
20    A. Yes.
21    Q. What was "Infiltrator for Optimal
22 Arbitrage"?
23    A. That was another subsidiary,
24 if I remember correctly. It was just a -- it was
25 just a codename that they used for the investment

Page 132

1 into Optimal Arbitrage.
2    Q. So it was another investment that
3 OIS managed that was submanaged by Madoff; is that
4 correct?
5    A. Yes. I mean, essentially, the --
6 the Optimal investments into Madoff were done,
7 if I remember correctly, through two -- there
8 were -- there were two separate investments. One
9 was through Optimal Arbitrage, where obviously it
10 was just one investment amongst many others; and
11 SUS was the -- the single manager fund, if you
12 like, of just Madoff.
13    Q. And is this what you were referring
14 earlier as one of the concerns you had with
15 Madoff, the lack of a complete set of documents?
16    A. That's correct.
17    THE EXAMINER: Are you referring —
18 you're referring to the contractual documentation
19 you were referring to earlier?
20    THE WITNESS: Yes.
21 BY MR. BLEICHMAR:
22    Q. Now, further down in that paragraph,
23 the last sentence, which is quite long —
24    A. Sorry, this is on page 25 still?
25    Q. Correct.

Page 133

1    A. Yes.
2    Q. It says:
3    "In addition, we should confirm whether
4 the trading strategy has changed since the
5 original trading authorisations which were entered
6 into state they trade no less than 35 equities in
7 the S&P 100 whereas Bernie Madoff stated in the
8 meeting that they deal in the top 45 equities ..."
9    Why was that important for you to note in
10 your report?
11    A. Well, I'm not sure how we could do
12 any compliance tests or checks. I mean, this
13 was -- this was another bone of contention,
14 because, as far as Hugh Burnaby-Atkins was
15 concerned, this was investment stuff that was none
16 of my business.
17    So he was saying, "Why do you need to
18 know? It's -- it's investment strategy", and
19 I was saying, "Well, I can't actually do my work
20 without actually understanding whether it's 35 or
21 45, so I need to know, and I also need to know
22 when it changed and who agreed to it".
23    So, you know, there were arguments going
24 on around that as well, at the time.
25    Q. And what was your understanding as

34 (Pages 130 to 133)

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 134

1   to who selected the 35 or 45 stocks to be
2   purchased or sold? Was it Madoff or was it OIS?
3       A. It was Madoff.
4       Q. Did you ever resolve this issue?
5       A. No.
6       Q. Why not?
7       A. Because I was told it was not part
8   of my remit. So it was an argument that we had --
9   well, actually, no, that's not strictly correct,
10  because we -- we finalized the trading document
11  eventually, and in that document it does -- it
12  resolves -- I think it -- it goes to 45 equities,
13  if I remember correctly, but the issue of why it
14  had changed never got resolved.
15      Q. Looking at it from today's
16  standpoint, why do you think -- why do you think
17  that a discrepancy existed?
18      MR. DANON: Objection to the form.
19      THE WITNESS: I have no idea.
20  BY MR. BLEICHMAR:
21      Q. Looking at point number 2, where it
22  says "Traceability and recovery of assets in the
23  event of a failure of the Broker Dealer or a
24  counterparty", in the first sentence, do you see
25  where it says:

Page 135

1       "... nothing in the documentation
2   reviewed to-date indicates that properly
3   segregated ... accounts have been set up for the
4   receipt of cash from the -- from which the
5   transactions on an execution only basis will be
6   managed."
7       A. Yes.
8       Q. Did you ever obtain any confirmation
9   as to whether the client accounts were properly
10  segregated?
11      A. No. That's one of the reasons why
12  I resigned.
13      Q. Why is that a reason that you
14  resigned?
15      A. Because I felt that the SAS 70
16  report that I was asking would cover that area,
17  and that's what would give us the comfort, and
18  when the final -- when I was told finally that it
19  just wasn't going to happen, that is when
20  I basically rang up a headhunter and said, "Get me
21  out of here".
22      Q. What is a SAS 70 report?
23      A. It basically is a -- a report --
24  it's a set of agreed-upon procedures which a --
25  an independent party, normally an auditor, will

Page 136

1   conduct on a business to verify that the
2   operations are operating in the way that they are
3   set out to operate, and, typically, you would
4   expect a broker dealer to have a SAS 70 report.
5       Q. Did you ever see a SAS 70 report for
6   Madoff?
7       A. No.
8       Q. When you said that you were told
9   finally that it just wasn't going to happen, who
10  told you that?
11      A. Manuel.
12      Q. What did he say?
13      A. He said, "We're not going to do it".
14      Q. Did he give you a reason?
15      A. No.
16      Q. And when did Manuel tell you he was
17  not going to do it?
18      A. This was probably about two months
19  before I actually submitted my resignation.
20  That's about the time it took me to get out.
21      Q. Do you recall approximately when you
22  submitted your resignation?
23      A. I believe I submitted it in
24  October 2007, and I think I was in place at
25  AXA Investment Management in November 2007.

Page 137

1       Q. So if two -- two months before your
2   resignation, it would have been approximately
3   August of 2007; correct?
4       A. Yes.
5       Q. So, more or less, in August of 2007,
6   Manuel told you that he just was not going to ask
7   for a SAS 70 report?
8       A. That's right.
9       THE EXAMINER: Did you ask him why not?
10  Did you ask him why not?
11      THE WITNESS: Yes, and he basically said
12  it was something that would just -- he wasn't
13  going to ask him because we would never get it,
14  and my view was that we should, at the very least,
15  ask for it, because if we haven't asked for it, we
16  haven't been given the "no".
17  BY MR. BLEICHMAR:
18      Q. When you say "he wasn't going to ask
19  him", just to clarify the record, you're saying
20  that Manuel wasn't going to ask Madoff for the
21  SAS 70 report; correct?
22      A. That's correct. I mean, my view was
23  that, even to the extent that we actually had to
24  pay for it, it was something that we ought to do.
25  It was the least that I felt that we needed to do,

35 (Pages 134 to 137)

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 138

1  just to get comfortable that the structure
2  operated as he was telling us.
3      Q.  And you never received the SAS 70 —
4  the SAS 70 report; correct?
5      A.  No.
6      Q.  Let me move on to point 3.  It's
7  labeled "Monitoring compliance with the given
8  mandate".  Do you see the second sentence says:
9      "We should verify on a regular basis
10  (a) that all trades are in accordance with the
11  mandate and (b) that we receive an adequate rate
12  of interest for the periods when the positions
13  have been exited and holdings — and the holdings
14  are in cash."
15      Just focusing on (a), do you have an
16  understanding as to whether Optimal verified on a
17  regular basis that all trades are in accordance
18  with the mandate?
19      A.  Well, again, you will see my email
20  exchange on how upset I got when I discovered that
21  they weren't doing it, and what I was told at the
22  time, by — by Jonathan Clark — because my first
23  conversation was — I think the — the
24  conversation was Tasneem Jeevanjee — actually,
25  no, sorry.

Page 139

1      Jonathan and myself had a conversation on
2  the phone, and it was basically the extent —
3  at — at that particular point, there'd been lots
4  of other stuff going on.  I think, if I remember
5  correctly, we'd — the UBS Dillon Read issues were
6  also going on at the same time, and it was just a
7  point of — of catching up.
8      So I rang Jonathan up to say, you know,
9  "How's — how's it going?  How's — how's the
10  trade verification going?"  Because one of the
11  things was that when — when I'd come out — come
12  away from that first meeting with Madoff, one of
13  the things that we agreed, post that meeting, was
14  that we would start doing this whole process
15  again, of verifying.
16      So I — I sort of felt, well, okay,
17  you know, even if we've got somebody who can
18  receive these paper tickets from Madoff, put them
19  into a spreadsheet, go back into the market to see
20  what prices or price ranges there were for those
21  securities on that particular day, then, you know,
22  within a couple of basis points, we should be able
23  to get to the — the position where we can at
24  least verify that these trades are happening the
25  way he says they are.

Page 140

1      So, you know, there should be a — a —
2  a modicum of reasonableness to be able to sort of
3  say that there's — there's something there that
4  we can check back to.
5      So — and at the time, they sort of said,
6  "Yeah, yeah, yeah, you know, we already do
7  something like that anyway, so that — that's not
8  a problem, we'll do it", and I — I didn't really
9  think too much of it.  You know, once we'd spoken
10  and we'd agreed on it, I thought it'd happen.
11      So when I then rang up to sort of see how
12  it was going, he said, "Oh, no, no, we haven't
13  done that — we haven't done that for months".
14  I said, "Well, what do you mean you haven't done
15  it for months?"
16      And he said, "Look, Rajiv, you know, we
17  all know you're a difficult guy.  You know, we had
18  to calm you down at the — at that particular
19  point, so we agreed to it, but, you know, there's
20  really no need to do it, we're all over this, we
21  understand the investment strategy.  You know, it
22  doesn't need this", and my response, again, is
23  clear, it's set out in the email that I wrote,
24  where I just said it was completely unacceptable
25  and that — that I hoped that Manuel would support

Page 141

1  me on it, and — and, again, you know, in
2  fairness, Manuel had always said, "Yes, yes, yes",
3  to me, "of course we're going to support it".
4      Then he'd go to Hugh and Jonathan and
5  say, "Don't worry about it, we'll — you know,
6  we'll — we'll sort things out".  So he was,
7  again, doing his, sort of, role of placating
8  everyone on it, but, you know, that was my
9  reaction to it.  I was — I was extremely
10  concerned that they hadn't — hadn't done it.
11      So that, again, was another one of these
12  issues where I started thinking, well, are these
13  guys really serious about doing due diligence.
14      Q.  You said that Jonathan Clark told
15  you, "Look, Rajiv, we all know you're a difficult
16  guy, we had to calm you down at that particular
17  point, so we agreed to it, but there's really no
18  need to do it"; right?
19      A.  Yes.
20      Q.  Do you feel — do you think he was
21  lying to you at the time?
22      A.  No.  I think — I mean, I'm quite
23  surprised that Jonathan is actually a defendant to
24  these proceedings.  I mean, he's about as straight
25  list a guy as you can get, in my view, for what

36 (Pages 138 to 141)

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

### Page 142

1  it's worth.
2      Q.  Point number 4 --
3      THE EXAMINER:  Are you going to spend a
4  lot more time on this document?
5      MR. BLEICHMAR:  On this document? Not a
6  lot more, but a little more.
7      THE EXAMINER:  Okay.
8      MR. BLEICHMAR:  Do you want to take a
9  break for lunch?
10     THE EXAMINER:  No, I -- if you're going
11 to get to the end of this document shortly, that
12 would probably be a convenient time.
13     MR. BLEICHMAR:  Okay. I will do that.
14     THE EXAMINER:  Sorry, 4.
15 BY MR. BLEICHMAR:
16     Q.  "4. Risk of Fraud and
17 misrepresentation of process"; do you see that?
18     A.  Yes.
19     Q.  "One of the difficulties" -- the
20 first sentence, do you see where it says:
21     "One of the difficulties with this
22 account is the current inability to verify actual
23 trading activity in the market through
24 counterparty and other market user intelligence."
25     What do you mean by -- or could you

### Page 143

1  explain what "verifying actual trading activity
2  through counterparty" means?
3      A.  Well, to be able to go to a
4  counterparty and say, "Have you entered into this
5  trade with Madoff?"
6      So if somebody was saying to us, "Yes,
7  we're entering into these trades", that would give
8  us some comfort that it was actually happening the
9  way he was describing it.
10     Q.  And were you ever -- ever able to
11 confirm with a counterparty that Madoff was
12 entering into trades?
13     A.  No.
14     Q.  Within point number 4, the
15 second-to-last sentence says:
16     "A major issue is that the key controls
17 are all in the hands of family members ..."
18     Do you see that?
19     A.  Yes.
20     Q.  What did you mean by that?
21     A.  Well, the -- the lawyer that --
22 the general counsel was Peter Madoff, his brother.
23 -- sorry, I'm getting this the wrong way
24 around. It was his niece who was general counsel;
25 Peter was effectively his number two; his two sons

### Page 144

1  controlled the trading operation on the trading
2  floor; and his wife purportedly did the books.
3      Q.  So what risk arose out of the fact
4  that the family members were so involved with --
5  in the Madoff operation?
6      A.  Well, lack --
7      MR. DANON:  Objection to form.
8      THE WITNESS:  Lack of independence and
9  conflicts of interest.
10 BY MR. BLEICHMAR:
11     Q.  And was that a red flag?
12     A.  Yes.
13     Q.  And you understand the term
14 "red flag"; correct?
15     A.  Yes, I do.
16     Q.  And if you could, please, just
17 describe it for -- for the record?
18     A.  Well, red flags with -- in -- in
19 hedge fund speak, if I can put it that way, are
20 areas of concern that one might sort of examine
21 further.
22     Q.  Was the inability to confirm a
23 counterparty also a red flag?
24     A.  Yes.
25     Q.  And it was a red flag that was never

### Page 145

1  resolved; correct?
2      A.  That's correct.
3      MR. BLEICHMAR:  Let's -- let's go off
4  the record.
5      THE VIDEO OPERATOR:  Going off the
6  record. The time is 13:12.
7  (1:13 p.m.)
8          (Break taken.)
9  (1:49 p.m.)
10     THE VIDEO OPERATOR:  Going back on the
11 record. The time is 13:49. Thank you.
12 (Exhibit 6 marked for identification.)
13 BY MR. BLEICHMAR:
14     Q.  Good afternoon, Mr. Jaitly. I put
15 in front of you what I marked as exhibit number 6,
16 which is a document bearing Bates stamps 490570.
17 Do you see that the top email reflects an email
18 from you to Jonathan Clark on May 17th, 2006?
19     A.  Yes.
20     Q.  Did you prepare this email?
21     A.  I cannot recall, but if that's what
22 it says, I have no reason to dispute it.
23     Q.  There's no reason to dispute the
24 authenticity of this document; correct?
25     A.  No.

37 (Pages 142 to 145)

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 146

1    Q. Could you tell me, after reading
2  this email discussion, what this email discussion is about?
3    A. Well, again, I can't remember the
4  message on -- the discussion we had on Tetragon,
5  but as far as Madoff is concerned, this sends me
6  five years of audit reports from the SEC.
7    Q. And do you see in the next
8  paragraph, the third paragraph in Jonathan Clark's
9  email to you, where it says, the second sentence:
10  "I spoke to the DTC today and they
11  provide nothing - even auditor requests go through
12  their client (ie Madoff)."
13    A. Yes.
14    Q. And then he says:
15  "However, they did verify that Madoff is
16  a 'direct participant'."
17  Correct?
18    A. That's correct.
19    Q. And you answer:
20  "What do you mean by direct participant?"
21  Right?
22    A. Yes.
23    Q. And did he provide you an answer to
24  your question?
25    A. I can't recall whether he did or

Page 147

1  didn't. He probably picked up the phone, but
2  I can't remember.
3    Q. And what is your understanding of
4  what a direct participant in DTC is?
5    A. Well, it is one of the reasons why
6  I was asking the question, because I wasn't sure
7  what the implications of it were. Again, I can
8  speculate as to what I think it means, but --
9    THE EXAMINER:  Did you ever get a
10  response?
11    THE WITNESS:  I can't recall whether we
12  had a discussion, but it was -- it was fairly
13  normal. I mean, sometimes we would just pick up
14  the phone if, you know, we'd received an email and
15  we'd have a discussion.
16    MR. BLEICHMAR:  Let me mark as exhibit 7
17  a document bearing Bates stamps 3144197.
18  (Exhibit 7 marked for identification.)
19  BY MR. BLEICHMAR:
20    Q. Do you recognize this document,
21  Mr. Jaitly?
22    A. Yes.
23    Q. And do you see that the top email is
24  an email from you to Manuel Echeverria dated
25  July 10th, 2006?

Page 148

1    A. Yes.
2    Q. Do you have any reason to believe
3  that you did not send that email?
4    A. No.
5    Q. Any reason to dispute the
6  authenticity of the document?
7    A. No.
8    Q. After — could you — if you could
9  please read the document and tell us what the
10  email chain is about?
11    A. It was -- it was to do with the
12  meeting with the auditors, and it -- it was a
13  question of, basically, what they were going to be
14  asked, and I was really querying, again, based on
15  sort of we -- what we discussed earlier, as to
16  exactly what they were going to be discussing with
17  the auditor.
18    Q. And this is an email that you sent
19  while at work; correct?
20    A. Yes.
21    Q. Do you see in the first line you —
22  you write:
23  "... why is an assessment of operational
24  robustness being led by them?"
25    A. That's correct.

Page 149

1    Q. And why did you ask that question?
2    A. Because I didn't believe that they
3  were appropriately qualified to -- to lead it.
4    Q. And at the end of the email,
5  you say:
6  "... I think you need ..."
7  Strike that.
8  When you say "they were" — "I didn't
9  believe they were appropriately qualified", who
10  are you referring to?
11    A. Sorry?
12    Q. Who are you referring to when you
13  say "they"?
14    A. Hugh Burnaby-Atkins and
15  Jonathan Clark.
16    Q. Thank you. At the end of that first
17  email you say:
18  "... I think you need to put your foot
19  down on this?"
20  Do you see that?
21    A. Yes.
22    Q. What did you mean by that?
23    A. Well, this is an -- an email
24  addressed to Manuel Echeverria, and I was
25  effectively asking for his support, to say,

38 (Pages 146 to 149)

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 150

1 "I should be the one who should be leading this
2 discussion and there should be a proper agenda to
3 it".
4 　　Q.  And what — did Manuel put his foot
5 down?
6 　　A.  No.
7 　　Q.  In other words, you did not lead the
8 discussion with Madoff's auditors; correct?
9 　　A.  Well, as, again, the emails will
10 show you, I came in towards the tail end of the
11 conference call that they were having.
12 　　MR. BLEICHMAR:  I'm going to mark as
13 exhibit number 8 a document bearing Bates stamps
14 3130940.
15 (Exhibit 8 marked for identification.)
16 BY MR. BLEICHMAR:
17 　　Q.  Do you see that the top email is an
18 email from you to Manuel Echeverria dated July 11,
19 2006?
20 　　A.  Yes.
21 　　Q.  And is that an email that you sent?
22 　　A.  Yes.
23 　　Q.  And you sent it while you were at
24 work?
25 　　A.  Yes.

Page 151

1 　　Q.  Any reason to believe that this
2 document is not authentic?
3 　　A.  No.
4 　　Q.  Towards the end of the first
5 sentence — well, strike that.
6 　　At the end of the first line, do you see
7 where it says:
8 　　"... I am ..."
9 And then it goes on in the second line:
10 "... very concerned about the view people
11 have of us as a consequence ..."
12 　　A.  Yes.
13 　　Q.  What did you mean by that?
14 　　A.  Well, I wanted to make sure that
15 when people saw us operating within the market,
16 that we were seen as professionals who knew what
17 we were doing.
18 　　Q.  And when you say "people" here, who
19 would — were you referring to?
20 　　A.  Hugh Burnaby-Atkins and
21 Jonathan Clark.
22 　　Sorry, I'm just looking at this again.
23 　　THE EXAMINER:  Yes, just reflect on it.
24 　　THE WITNESS:  Yes, well, I mean,
25 "people" here, in the context of the email, I beg

Page 152

1 your pardon, are investors.
2 BY MR. BLEICHMAR:
3 　　Q.  And —
4 　　A.  And other operators that we were
5 speaking to.
6 　　Q.  And why were you concerned that
7 investors and other operators would not see you as
8 professionals?
9 　　A.  Because we needed to be asking
10 pertinent, relevant, searching questions.
11 　　Q.  And after that you say:
12 "... I think we will come across like
13 amateurs."
14 　　Do you see that?
15 　　A.  Yes.
16 　　Q.  And what did you mean by that?
17 　　A.  Well, that we weren't professionals.
18 　　Q.  And by that you mean, if the call
19 was led by Hugh Burnaby-Atkins and Jonathan Clark,
20 and not by you; correct?
21 　　A.  Yes.
22 　　MR. DANON:  Objection to form.
23 BY MR. BLEICHMAR:
24 　　Q.  At the end of that email, the last
25 sentence, you say:

Page 153

1 　　"I have just had an email exchange with
2 Jonathan - the accounts he has for 2005 are not
3 even complete - not sure what sort of review has
4 been conducted here."
5 　　Do you see that?
6 　　A.  Yes.
7 　　Q.  What did — what did you mean by
8 that?
9 　　A.  Well, Jonathan was suggesting he'd
10 done a review, and I was saying, "Well, I'm not
11 sure what sort of review it would be", given that
12 the accounts weren't even complete.
13 　　Q.  In your mind, had an operational
14 due diligence review been completed?
15 　　A.  I'm sorry?
16 　　Q.  Let me rephrase that.
17 　　In the email, you say, "I'm not sure what
18 sort of review has been conducted here".  What
19 were you asking or what were you suggesting to —
20 to Mr. Echeverria with — with that sentence?
21 　　A.  I think it relates to the accounts.
22 　　Q.  In what sense?
23 　　A.  Well, whether he'd actually reviewed
24 them and what sort of review he'd conducted.
25 　　Q.  In other words, whether Manuel had

39 (Pages 150 to 153)

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 154

1 actually reviewed the accounts of Madoff?
2     A.  No, whether Jonathan --
3     Q.  Oh.
4     A.  -- had actually conducted a review.
5     Q.  In other words, you're -- you're
6 asking here -- you're not sure that Jonathan Clark
7 has -- has conducted a review of the accounts of
8 Madoff; is that right?
9     MR. DANON:  Objection to form.
10     THE WITNESS:  No, what I was saying was
11 I'm not sure what sort of review he's conducted,
12 given that he was saying that he had conducted a
13 review.
14 BY MR. BLEICHMAR:
15     Q.  Did you come to understand what sort
16 of review had been conducted after this?
17     A.  Well, again, as I've said in the
18 email, when I looked at the accounts, they were
19 incomplete and they related to the -- the broker
20 dealership anyway, so it was a -- related to a
21 different entity, in effect.
22     Q.  When you say "they related to the
23 broker dealership anyhow, so it related to a
24 different entity", are you distinguishing between
25 the broker dealer side of Madoff's business and

Page 155

1 the investment advisory business?
2     A.  Yes.
3     Q.  So, if I understand you correctly,
4 Jonathan Clark had looked at the broker dealership
5 side of the business --
6     A.  Yes.
7     Q.  -- but not at the investment
8 advisory side of the business?
9     A.  Well, the broker dealer side of the
10 business is the one that had accounts, because
11 that was the entity, so there was an entity that
12 was filing accounts, so that is what he had
13 actually looked at, but when we actually looked
14 at -- and I can't recall exactly what was missing,
15 in terms of it being complete or not, but,
16 you know, clearly I'd noticed that they weren't,
17 and I was -- again, I was making the point as to
18 whether they were really the right people to be
19 doing it, because that was effectively what I was
20 raising an issue over.
21     Q.  When you say "the broker dealer side
22 of the business is the one that had accounts, so
23 that was the entity that was filing accounts",
24 does that mean that the investment advisory side
25 of the business were not -- did not -- were not

Page 156

1 the auditing documents that Jonathan Clark was
2 looking at?
3     A.  No, because there weren't any
4 accounts on -- on that side.  There were the
5 broker dealer accounts.
6     I mean, essentially, we were looking for
7 as many sources of information as we could get,
8 and that was one of the sources.
9 (Exhibit 9 marked for identification.)
10     MR. BLEICHMAR:  I have marked as
11 exhibit 9 a document bearing Bates stamps 267596
12 through 7601.
13 BY MR. BLEICHMAR:
14     Q.  Mr. Jaitly, do you see this document
15 reflects an email from you to Manuel Echeverria
16 dated September 25th, 2006?
17     A.  Yes.
18     Q.  Do you recognize this document?
19     A.  Yes.
20     Q.  Did you send this document while at
21 work at Banco Santander?
22     A.  Yes.
23     Q.  Any reason to dispute the
24 authenticity of this document?
25     A.  No.

Page 157

1     Q.  Can you tell us what this email
2 exchange is about?
3     A.  Well, it's -- it's a response to an
4 earlier email, which I think is also there, which
5 sets out concerns on my performance in the
6 function of operational due diligence, and sets
7 out a number of concerns that the investment team
8 had about my performance in doing operational
9 due diligence and my response to it.
10     Q.  And what were the concerns that --
11 well, strike that.
12     And what was your response to the
13 concerns expressed by the investment team?
14     A.  Well, they're set out in the email.
15 I disagreed with a number of the assertions and
16 I gave my reasons for it.
17     Q.  Let me refer you to the end of your
18 email, which is at page 599.
19     A.  Sorry, that's?
20     Q.  Bates stamped 599.
21     A.  Oh, yes.
22     Q.  Do you see towards the end of your
23 email the paragraph that begins with "I am
24 committed"?
25     A.  Yes.

40  (Pages 154 to 157)

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 158

1    Q.  Do you -- do you see that it says,
2  towards the middle of that paragraph:
3        "... I genuinely feel that your note
4  today - despite what you say and despite your
5  comments that you are reflecting opinion - is not
6  one of support ..."
7    A.  Yes.
8    Q.  Why did you say that?
9    A.  Because I felt that I was not being
10 supported in doing the work that I wanted to do
11 in order to create the -- the world-class team
12 that I was looking to create, and that I had been
13 given an opportunity to -- to do, in coming to --
14 to Optimal.
15    Q.  And you were not given the support,
16 in your view, by whom?
17    A.  By Manuel.
18    Q.  And how did he -- how did you come
19 to this view that Manuel was not supporting you?
20    A.  Well, I think, again, that email
21 sets out sort of my -- my reasoning behind it,
22 but, essentially, it was one of a lack of support,
23 because, on the one hand, he wanted a whole host
24 of things to be done and completed, but I wasn't
25 being really given the support in order to --

Page 159

1  to be able to fulfill that.
2    Q.  Was your view that others were
3  getting Manuel's support, but you were not?
4    A.  Well, I think operational
5  due diligence, as a whole, was not being given
6  that support, so I don't think -- you know, it
7  wasn't direct -- I don't think it was directed to
8  me personally, but it was directed at operational
9  due diligence at large.
10    Q.  Let me point you to the first page
11 of the email, point number 7.
12    A.  Sorry, that's on the second page?
13    Q.  Oh, I'm sorry, yes, on the -- on the
14 second page.
15        Do you see towards the middle of that
16 paragraph where it says:
17        "A full non-investment due diligence has
18 never been done on Amaranth ..."
19    A.  Yes.
20    Q.  What do you mean by that, that a
21 non-investment due diligence -- a full
22 non-investment due diligence had never been done?
23    A.  Well, this goes back to part of the
24 rationale behind my being appointed, where what we
25 had agreed was that I would do due diligence

Page 160

1  reports of the process that we had on new
2  investments, but not on existing ones.
3        Amaranth was, in fact, a seed investment,
4  so Optimal had been a seed investor in Amaranth,
5  and, again, part of the reason for this was that,
6  when we'd gone to meet Amaranth, I had, at that
7  point, done a financial statement review on
8  Amaranth and that had highlighted a number of
9  concerns for us.
10       There were issues, such as the traders'
11 bonuses were actually being paid out of the fund
12 accounts rather than from the managers' sort of
13 money, so there was provision in the accounts for
14 that; there were complicated intermediate
15 structures that were lending and cross-lending
16 within the organization.
17       So when we arrived at Amaranth and --
18       THE EXAMINER:  Can I -- has this got
19 anything to do with Madoff at all?
20       MR. BLEICHMAR:  It goes to the overall
21 operational due diligence procedures.
22       THE EXAMINER:  Well, I understand that,
23 but I don't really want to get into all the
24 details of the difficulties you found with
25 Amaranth.  You found difficulties?

Page 161

1        THE WITNESS:  Yes.
2        THE EXAMINER:  And no -- no full
3  due diligence was ever carried out?
4        THE WITNESS:  That's correct.
5        THE EXAMINER:  I think, Mr. Bleichmar,
6  that is probably enough, for the purposes of this.
7        MR. BLEICHMAR:  Yes, thank you.
8  BY MR. BLEICHMAR:
9    Q.  Moving on to point number --
10 number 9, do you see in the middle of that
11 paragraph where you say:
12       "... I am not going to prepare
13 substandard reports simply to meet a requirement
14 to produce a report ..."
15    A.  That's correct.
16    Q.  What did you mean by that?
17    A.  Well, there was a concern at the
18 time that there weren't enough of these reports.
19 We talked about substance over form earlier on,
20 and there was this feeling that what needed to be
21 there were reports.  They weren't -- they weren't
22 too worried about sort of the content of it, they
23 just wanted the reports there so that they could
24 say there were reports on each one of these and
25 they were able to say that.

41 (Pages 158 to 161)



CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 162

1       Now, for me, what was far more important
2   was that (a) I had done the work; (b) that I had
3   identified what the issues were that might be of
4   concern to me, that I had communicated those to
5   the investment analysts and we had a course of
6   action that had been agreed as to what we did on
7   it.
8       The fact that we had a piece of paper
9   there was neither here nor there, because, as far
10  as I was concerned, I had enough there as evidence
11  of the work that I'd actually done.
12      Q.  When you say that there was a
13  concern at the time that there weren't enough of
14  these reports, who was expressing that concern?
15      A.  Well, I think they were being
16  expressed particularly by three people, which was
17  Manuel, Hugh and Esteban.
18      Q.  And how did you come to that
19  understanding?  Did they tell you directly?
20      A.  Esteban and Manuel certainly did.
21  I think Hugh I -- I got to hear about via other
22  people.
23      And, actually, there was also a
24  management committee meeting where this was
25  discussed in a fair amount of detail, where

Page 163

1   I essentially had to defend my position, because
2   the committee was saying this wasn't good enough
3   and that they needed reports.
4       Q.  And did you prepare these reports?
5       A.  Eventually, yes; but once I was
6   happy that I'd done enough work and that there was
7   some substance to it.
8       Q.  Did anybody support your position
9   that the reports were not as important as getting
10  the substance of the work done?
11      A.  No.  I was a lone voice there and,
12  again, the emails are ample evidence of that,
13  I think.
14      Q.  You were head of operational
15  due diligence at Optimal.  Who else was in -- in
16  your team?
17      A.  Well, the team slowly expanded.  It
18  was just me, to start off with, when I first
19  arrived.  I then brought in a member of my former
20  team to assist me, as number two.
21      We had -- we -- over time, we recruited
22  other people as well.  Do you want me to go
23  through the entire team as it was, or --
24      Q.  Well, why don't we -- we go slowly
25  and break it up.  Why don't we start with your --

Page 164

1   your number two?
2       A.  Right.  My number two was a lady
3   called Sharmila Soosaipillai.  She was a qualified
4   accountant -- sorry, I will spell that out for you
5   later.
6       She was a qualified accountant.  She had
7   experience as -- in doing hedge fund audits, and
8   she was somebody I'd trained at GAM, so I was
9   quite comfortable that she would do and follow the
10  processes that I wanted followed in pursuing the
11  work we were doing.
12      Q.  And do you think she was a —
13  a competent professional in conducting operational
14  due diligence?
15      A.  Yes, she was.
16      Q.  And how long had you worked with her
17  at GAM?
18      MR. DANON:  Object as outside the scope
19  on the issues of Sharmila.
20      THE EXAMINER:  What, you mean all the
21  issues of the -- the team?
22      MR. DANON:  Well, I think in the issues
23  he's got Jonathan Clark, but not the entire
24  Optimal due diligence team.
25      THE EXAMINER:  You're looking at

Page 165

1   schedule A?
2       MR. DANON:  Yes.  Just to -- to put that
3   in focus, to the extent that person would have
4   function with Madoff, then I think it would be in
5   the scope.
6       MR. BLEICHMAR:  Yeah, I think it — why
7   don't we explore the functions of -- of the team
8   and who was involved in Madoff, and then we can
9   move on from there?  But I need to find out who
10  was involved with Madoff or not.
11      THE EXAMINER:  It seems to me that,
12  within 1, the due diligence conducted on Madoff,
13  you are entitled to know who in the team were
14  conducting it, but establish that each witness was
15  involved with Madoff -- sorry, each -- each person
16  he -- he mentions was involved in the Madoff
17  due diligence.
18  BY MR. BLEICHMAR:
19      Q.  Could you please tell me, within
20  your due diligence team, who was involved in --
21  at any level in conducting due diligence of
22  Madoff?
23      A.  Well, there were probably two people
24  who were directly involved, though all the team at
25  some point would have been involved in

42 (Pages 162 to 165)

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 166

1  discussions, because I -- I don't believe in
2  operating in isolation.
3      So if I had an issue, what we would
4  effectively do -- we -- we were all in one room.
5  I would effective say, "Guys, down tools. Here is
6  the issue. What do you think?"
7      Q. Did you discuss --
8      A. And then everyone would -- would
9  then debate the issues around it.
10     Q. Did you discuss Madoff with
11  Ms. Soosaipillai?
12     A. Yes. She reviewed the first draft
13  of my report and we discussed, for example, toning
14  down some of the language and some of the issues,
15  just because of, again, the fact that we didn't
16  actually have evidence on -- on some of the
17  issues, and so that was discussed with her.
18     Q. So going back to my original
19  question, was it your view that -- no, there was
20  an answer to that question.
21     How long did you work with
22  Ms. Soosaipillai at GAM, prior to working with her
23  at Banco Santander?
24     A. Again, I'm not quite sure, because
25  she was one of the later recruits that I brought

Page 167

1  in, so it's probably between six months to a year,
2  but I -- I am not certain of my facts, again,
3  there.
4      Q. But you believe she was a -- a -- a
5  competent professional in conducting operational
6  due diligence; correct?
7      A. Yes. She was competent.
8      Q. What -- what did you discuss with
9  respect to Madoff with Ms. Soosaipillai?
10     A. Well, we discussed the -- the report
11  generally. We discussed how we -- how we dealt
12  with the issues and how we would take it forward,
13  what sort of actions we should take, what were the
14  ways of getting comfort on some of the issues.
15     So, you know, could we -- could we get
16  comfort by looking at things in a different way.
17  Fairly -- it's fairly standard stuff for -- for --
18  you know, for a due diligence operation, where if
19  you -- if you're identifying concerns, sometimes
20  it is not -- it's not just a question of attacking
21  it to say, "There is a particular flag here,
22  you know, how do you deal with it?"; it's a
23  question of, well, what other set of mitigating
24  circumstances might there be and how do you
25  actually deal with it.

Page 168

1      Q. And do you have a recollection as to
2  when you had these conversations with
3  Ms. Soosaipillai?
4      A. It would have been after my visit.
5      Q. After your visit to Madoff?
6      A. Yes.
7      Q. So is it fair to say that it was
8  sometime after February 2006?
9      A. Yes.
10     Q. And you said she provided comments
11  to your report?
12     A. Yes.
13     Q. Do you remember what comments she
14  provided?
15     A. No.
16     Q. Do you remember whether she had any
17  substantial disagreements with anything in your
18  report?
19     A. I think not of substance; probably
20  of tone, which we -- we discussed.
21     Q. And what was her comment about the
22  tone?
23     A. Well, some of it she felt, well,
24  you know, in terms of views, you know, what
25  evidence did we have, how -- how were we going to

Page 169

1  approach it in terms of the action points, what
2  could we do, what could we realistically do within
3  the time scale. We talked about those.
4      Q. Did she suggest that you toned down
5  your draft?
6      A. Yes.
7      Q. And did you tone it down?
8      A. Yes.
9      Q. In what --
10     A. Some of it.
11     Q. In what ways did you tone it down?
12     A. I can't really recall now.
13     Q. Was there one draft or multiple
14  drafts of your report?
15     A. I think there was one draft, which
16  we discussed internally as a team, and there --
17  then there was the document that you've shown me.
18     THE EXAMINER:  Do we have the draft?
19     MR. BLEICHMAR:  That's what I'm getting
20  to.
21     THE EXAMINER:  Well, you must know by
22  now.
23     MR. BLEICHMAR:  We don't.
24     THE EXAMINER:  You don't?
25     MR. BLEICHMAR:  Well --

43 (Pages 166 to 169)



CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 170

1    THE EXAMINER: You don't?
2    MR. BLEICHMAR: Well, we haven't seen
3 it.
4    THE EXAMINER: You haven't seen it.
5 When I say "do we have", I mean is it in play, and
6 the answer is no.
7 BY MR. BLEICHMAR:
8    Q.  Do you know where you stored that
9 draft at the time?
10    A.  It would have been on the Optimal
11 drives.
12    Q.  Did you keep a copy of that draft
13 when you left Optimal?
14    A.  No.
15    Q.  Who else was a member of your team
16 with whom you discussed this report, or this
17 draft – the draft of the Jaitly report?
18    A.  What, within the operational
19 due diligence team?
20    Q.  Yes.
21    A.  I mean, I can't remember who were
22 constituent members of the team at that particular
23 point, because Chris Gibson, who was the junior
24 analyst, was there. He used to do my monthly
25 reporting, which we used to send to

Page 171

1 Grupo Santander, on risk exposures, so when we
2 were reporting every month on the portfolio, that
3 used to go – he used to prepare and collate that
4 information to send out.
5    THE EXAMINER: Sorry, who was he?
6 I missed his name?
7    THE WITNESS: Christopher Gibson.
8 He was a junior analyst. He was actually a Geneva
9 analyst who was then seconded over and sort of
10 assisted us.
11 BY MR. BLEICHMAR:
12    Q.  So, so far we have Ms. Soosaipillai
13 and Mr. Gibson as members of the team –
14    A.  Yes.
15    Q.  – whom you discussed the Madoff
16 report with?
17    A.  Yes, but – but, I mean, there were
18 other members, and I can't quite remember at which
19 point they joined the team, but people like
20 Michelle Hughes or Michelle Perry – I'm not quite
21 sure which way around she was then –
22 Kirstin Meadows, who was one of the lawyers.
23    But we would have had – I mean, it –
24 again, it was fairly – Madoff, in itself, was not
25 a – a specific item that we sort of dealt with,

Page 172

1 you know, as a specific major area of concern.
2    It was – every time we discussed issues around
3 the due diligence we were doing, then we would
4 discuss it as a group, and I would quite often ask
5 the team, you know, just to join in the
6 conversation and discuss it.
7    Q.  You've previously mentioned –
8    A.  And given that we were in one room,
9 sometimes even the marketing people sitting
10 around, who were in the same room, would join in
11 and air – and air views, so ...
12    Q.  When you say you were in one room,
13 are you referring to your London office?
14    A.  Yes, that's correct.
15    Q.  There was one big area where
16 everybody was sitting?
17    A.  Yeah, it's slightly smaller – well,
18 it's probably half the size of this room and, yes,
19 we all sat in – in the same room.
20    Q.  Previously, you mentioned that
21 Ms. Soosaipillai thought you should tone down the
22 report; correct?
23    A.  Mmm-hmm.
24    THE EXAMINER: We need a verbal
25 response.

Page 173

1    THE WITNESS: Oh, sorry. Yes. Sorry
2 about that.
3 BY MR. BLEICHMAR:
4    Q.  When she said to tone it down, was
5 it because it was inaccurate or was it because she
6 didn't want to create problems at Optimal?
7    A.  No, I think it was – when we looked
8 at reports, any report that went out, we looked at
9 a couple of things: what sort of risks were we
10 identifying; what sort of risks did it create for
11 us – I mean, I was, after all, the risk officer
12 for Optimal, so I was looking at protecting
13 Optimal; and how we dealt with them and how we
14 recorded it. So these were general discussions.
15    It was, again, nothing unusual in terms
16 of Madoff alone. You know, similar discussions
17 were had in relation to some of the investments
18 we've discussed. It's fairly normal. There was
19 nothing unusual in it.
20    And, you know, the thing that I always
21 encouraged my team to do was to actually say,
22 "You know what, we disagree with you".
23    Q.  Did Ms. Soosaipillai say,
24 "We disagree with you with respect to the Jaitly
25 report"?

44 (Pages 170 to 173)

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 174

1      A.  No.
2      Q.  Did she say, "I agree with you with
3  respect to the Jaitly report"?
4      A.  Can I put it in those terms?
5  Probably.
6      Q.  After you left Banco Santander in
7  October 2006 -- 2007 --
8      A.  '7.
9      Q.  -- where did you go?
10      A.  I went to AXA Investment Management.
11      Q.  And what did you do there?
12      A.  I was the chief operating officer
13  for the fund of hedge fund platform.
14      Q.  So it was a similar type of job?
15      A.  It was.  Slightly wider, because
16  I was responsible for other operations as well.
17      Q.  And are you still involved in the
18  hedge fund operational due diligence business?
19      A.  Yes, I am.  I -- I got fired from
20  AXA Investment Manager in -- AXA Investment
21  Managers for vetoing an investment they wished to
22  make, and after that I set up a consultancy which
23  advises on governance and due diligence.
24      Q.  When you say "AXA", is that A-X-A or
25  is that Aksia, A-K-S-I-A?

Page 175

1      A.  No, A-X-A.
2      Q.  And that was also here in London;
3  correct?
4      A.  That's correct.
5      Q.  Previously, you mentioned that at --
6  at one point in time you resigned from
7  Banco Santander; correct?
8      A.  Yes.
9      Q.  Can you tell me about that
10  resignation?
11      A.  What would you like to know?
12      Q.  Why did you resign?
13      A.  Well, I resigned --
14      THE EXAMINER:  Can we get a date first?
15  When -- when it was?
16      THE WITNESS:  Sorry?
17      THE EXAMINER:  Can we get -- establish
18  when it was, first?
19      THE WITNESS:  It was October 2007.
20  I've -- again, I think you've got the email which
21  sets out the exact date.
22      The reason I resigned was because I felt
23  that Optimal weren't serious about risk; they
24  weren't really serious about creating an -- an
25  operational due diligence team; and that our views

Page 176

1  were quite different as to how risk ought to be
2  managed.  And I felt that the only thing that
3  I had which I needed to protect was my reputation
4  as an operational due diligence specialist, and so
5  I decided it was appropriate for me to leave.
6  BY MR. BLEICHMAR:
7      Q.  You felt your reputation was in --
8  in jeopardy if you did not leave?
9      A.  That's correct.
10      MR. BLEICHMAR:  Can we go off the record
11  for one minute?
12      THE EXAMINER:  Yes.
13      THE VIDEO OPERATOR:  Going off the
14  record.  The time is 14:23.
15  (2:23 p.m.)
16          (Break taken.)
17  (2:24 p.m.)
18      MR. BLEICHMAR:  Let me mark this is --
19      THE EXAMINER:  Hang on.
20      THE VIDEO OPERATOR:  Going back on the
21  record.  The time is 14:24.  Thank you.
22  (Exhibit 10 marked for identification.)
23  BY MR. BLEICHMAR:
24      Q.  I have marked as exhibit 10 a
25  document bearing Bates stamps 3972069 through 71.

Page 177

1      A.  Thank you.
2      Q.  Do you see that there is an email
3  from you to a number of recipients, including
4  Michelle Hughes, on April 20th, 2007?
5      A.  Yes, that's correct.
6      Q.  Did you send this email?
7      A.  Yes, I believe so.
8      Q.  And you sent it in connection with
9  your responsibilities at Optimal?
10      A.  Yes.
11      Q.  Any reason to believe that this
12  document is not authentic?
13      A.  No.
14      Q.  Let me direct you to the second
15  paragraph, the one that says, "SUS".  Do you see
16  where it says:
17      "SUS - there is no due diligence on this
18  fund ..."
19      A.  Yes.
20      Q.  What do you mean by that?
21      A.  Well, precisely that:  we hadn't
22  done any due diligence.
23      Q.  So, in your view, there was no
24  due diligence that had been done on -- on the --
25  on SUS?

45 (Pages 174 to 177)

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 178

1    A. That's right. Just to get some
2 terminology correct here, when we normally talk
3 about due diligence, we are talking about the
4 full due diligence process. When we talk about
5 manager visits, we are talking about the visit
6 aspect which we were doing on the existing
7 portfolio, as opposed to the new.
8    So with new investments, we did a full
9 due diligence process, that's the due diligence;
10 with the existing portfolio, we did manager
11 visits.
12    So what is happening, in the context
13 of this particular email, we were launching a
14 Spanish product, and there was a whole host of
15 things that had been to go into it, one of which
16 was Madoff. But the regulators in Spain required
17 us to have certain bits of paperwork in place, and
18 this was really part of that process, to say what
19 we thought was going to be enough to meet those
20 particular requirements in Spain, as opposed to
21 anything else.
22    Q. So you're making a difference
23 between due diligence and just a manager visit;
24 correct?
25    A. That's correct, yes.

Page 179

1    Q. And just to get a clear answer,
2 the -- in your view, the only thing that had been
3 done in SUS, that you had done, was a -- was a
4 manager visit; correct?
5    A. Yes, and as -- as we've discussed
6 before, there were a number of things that we
7 hadn't been able to complete that I would regard
8 as important on a manager visit.
9    Q. And those were some of the aspects
10 we've talked about; correct? Like counterparty --
11    A. Such as verification, and so on.
12    Q. Independent verification of trading;
13 correct?
14    A. Yes.
15    Q. Did you discuss your resignation
16 with Ms. Soosaipillai?
17    A. Yes.
18    Q. And what did you say to her?
19    A. Well, I discussed it with my entire
20 team. They were all aware of my decision and the
21 reasons why I decided to go.
22    Q. And what did you tell them?
23    A. I told them that I wasn't happy with
24 the way risk was being dealt with. I felt,
25 therefore, that it was time for me to move on.

Page 180

1    Q. And what did they say to you?
2 How did they react?
3    A. They were not surprised.
4    Q. They were not surprised?
5    A. No.
6    Q. Is that because you had been
7 expressing your views throughout your tenure at
8 Banco Santander?
9    A. That's correct.
10    Q. Did they agree with your assessment
11 of operational due diligence at Optimal?
12    A. Yes.
13    Q. Did you discuss your resignation
14 with Hugh Burnaby-Atkins?
15    A. Yes, I did, just prior to leaving,
16 I think, when he sort of rang to wish me well.
17    Q. Did you have any substantive
18 conversations about your reasons for your
19 departure with Hugh Burnaby-Atkins?
20    A. He knew that I -- it was basically
21 that I was unhappy about the way risk had been
22 dealt with, and I -- I did say to him as well
23 I was unhappy with the way he had responded on the
24 risk issues and the support that I had had.
25    I mean, he was very conciliatory at that

Page 181

1 point, but then I was leaving and I think none of
2 us wanted to leave with bad blood between us.
3    Q. So you left on amicable terms?
4    A. Yes. I mean, like I've always
5 said, you know, these were, I thought, decent
6 people, but it's just that they had a different
7 view as to how to approach operational
8 due diligence and it didn't happen to be my view,
9 which I thought needed to be a lot more thorough.
10    Q. A lot more?
11    A. Thorough.
12    Q. Thorough.
13    Did you discuss your resignation with
14 Jonathan Clark?
15    A. No. But, again, Jonathan sent me a
16 very nice email when I left, saying how much he'd
17 learned from me.
18    THE EXAMINER: "I wish you well, but not
19 here"?
20    THE WITNESS: Precisely.
21 BY MR. BLEICHMAR:
22    Q. Do you think he learned from you?
23    A. In retrospect, I'm almost certain he
24 did.
25    Q. And why do you say that?

46 (Pages 178 to 181)

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 182

1    A.  Well, I guess history shows that --
2    you know, I -- I always say to my teams that you
3    can't necessarily identify issues when you do
4    due diligence, but so long as you look at the
5    checks and balances that exist within operations,
6    then you should be able to identify weak points,
7    and it should be possible to convince people to
8    strengthen those weak points so that at least
9    you've done as much as you can to mitigate some of
10   the issues that you might identify.
11       MR. BLEICHMAR:  Let me mark as
12   exhibit 11 a document bearing Bates stamps 1804843
13   through 891.
14   (Exhibit 11 marked for identification.)
15   BY MR. BLEICHMAR:
16       Q.  Do you recognize this document,
17   Mr. Jaitly?
18       A.  Well, I certainly recognize --
19   there were various versions of this floating
20   around, so I can certainly recognize a version of
21   it, but I don't know whether this is one that I've
22   specifically seen or not.
23       Q.  Is this a document that you
24   prepared?
25       A.  I'm sure I would have had input into

Page 183

1    it in relation to risk management, but otherwise,
2    no.
3        Q.  And when you say "input in relation
4    to risk management", are you -- are you referring
5    on page number 1 to the bullet point in the agenda
6    called "Risk management"?
7        A.  I'm referring to page 34,
8    "Non-investment risk management - primary
9    procedures".
10       Q.  And did you --
11       A.  And subsequent ones after that.
12       Q.  And were you involved in preparing
13   those sections, as part of your work
14   responsibilities at Optimal?
15       A.  Yes.  I mean, either I or one of my
16   team will have done something to that effect,
17   which I would have been responsible for.
18       Q.  You don't have any reason to dispute
19   the authenticity of this document; correct?
20       A.  No.
21       Q.  Do you have an understanding as to
22   who else prepared the other sections of the
23   document?
24       A.  Well, there would have been a number
25   of people involved in the preparation, primarily

Page 184

1    the marketing people, and then other people would
2    have had input into their respective sections.
3    But whether or not they did with this particular,
4    specific document, I cannot tell.
5        Q.  And if you go to page 34, I think
6    that is one of the pages that you mentioned that
7    you were involved with; correct?
8        A.  Yes.
9        Q.  And you see it's a list of primary
10   procedures concerning non-investment risk
11   management; right?
12       A.  That's correct.
13       Q.  Do you see where it says "On-site
14   visit"?
15       A.  Yes.
16       Q.  Those are the types of issues that
17   you would conduct operational due diligence on;
18   correct?
19       A.  That's correct.
20       Q.  And you would want to get complete
21   answers to any issues that arose in connection
22   with those areas; correct?
23       A.  Yes.
24       Q.  And if you didn't get complete
25   answers, what would you do?

Page 185

1        A.  Well, we'd note it on the -- the
2    report, and we would discuss it in -- in committee
3    to see what the issues might be, whether there
4    were any mitigating circumstances, whether there's
5    any other way we could get comfort, whether there
6    were things that we wanted -- a side letter, for
7    example.
8        Q.  With respect to the issue of
9    independent verification of the trading with
10   Madoff --
11       A.  Yes.
12       Q.  -- did you ever -- were you ever
13   able to independently verify that trading and
14   complete that due diligence?
15       A.  No, that's why I wanted the SAS 70
16   report done.
17       Q.  And that was not done either;
18   correct?
19       A.  No.
20       MR. BLEICHMAR:  I'm going to mark as
21   exhibit number 12 a document bearing Bates stamps
22   3742549 through 672.
23   (Exhibit 12 marked for identification.)
24   BY MR. BLEICHMAR:
25       Q.  Do you recognize this document,

47  (Pages 182 to 185)

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 186

1   Mr. Jaitly?
2      A.  Yes, I do.
3      Q.  Did you prepare this document?
4      A.  It was prepared by my team, yes.
5      Q.  And at your direction?
6      A.  Yes.
7      Q.  And it was prepared as part of your
8   duties and your team's duties in connection with
9   their work at Banco Santander?
10     A.  That's correct.
11     Q.  And —
12     A.  This is part of the -- the processes
13  that we wanted to bring in, which was being
14  pointed out to say that I had no process.
15     Q.  Any reason to dispute the
16  authenticity of this document?
17     A.  No.
18     THE EXAMINER:  So was this prepared by
19  you and your team from scratch?
20     THE WITNESS:  Yes.
21  BY MR. BLEICHMAR:
22     Q.  Let me direct you -- on the first
23  page, do you see where there's an appendix E,
24  "Manager visit template"?
25     A.  Yes.

Page 187

1      Q.  Is it correct that the manager visit
2   is only one of the many aspects of operational
3   due diligence?
4      A.  That's correct.
5      Q.  And is it correct that the only
6   aspect of operational due diligence conducted on
7   Madoff had been the manager visit?
8      MR. DANON:  Objection to form.
9      THE WITNESS:  No, that's not correct
10  because, as we've discussed before, I had reviewed
11  the contracts, and obviously there were issues
12  around the contracts, and then there was the --
13  the manager visit.  So there were two aspects to
14  it.
15  BY MR. BLEICHMAR:
16     Q.  There were two aspects out of all
17  the aspects listed in this first page; correct?
18     A.  Well, they were the two main
19  aspects, because if you look at -- you know,
20  these -- these cover different things, so I would
21  not really have expected corporate actions as part
22  of the -- the Madoff process, but -- I mean, the
23  specific things there would be the pre-investment
24  initial due diligence -- I mean, the way we worked
25  it was, before an investment commenced, before we

Page 188

1   even got involved with spending time reviewing
2   documents, I would send out a pre-investment
3   questionnaire, and what that actually identified
4   were a couple of, again, red flags, to use the
5   word we used earlier, and -- and this would be for
6   new investments now, not the existing portfolio,
7   because it just wasn't possible to do it, just in
8   terms of the time.
9      So I would send this out, and,
10  essentially, based on the responses I got, that
11  would be my starting position to actually say,
12  "Do we actually want to spend any time on this?",
13  or, "This is not going to fly".
14     So you had the pre-investment
15  questionnaire that went out.  You then had the
16  initial due diligence.  As part of the initial
17  due diligence, you then had the manager visit.
18  So it was -- it was part of that.
19     You then had the ongoing monitoring that
20  happened as well, and the ongoing monitoring was
21  generally done either off the back of the
22  financial statements when we got them, or if there
23  was a particular issue that had cropped up that we
24  decided merited a visit, and so off the back of a
25  manager visit, we would then do an annual review.

Page 189

1      So -- I mean, if you think about Madoff
2   and the February 2006 report, to an extent, that
3   was part of the ongoing process, the ongoing
4   due diligence process that we had, and that's what
5   we were, really -- sort of trying to cover it off
6   as part of that.
7      Q.  Do you have any understanding as to
8   whether a full due diligence was performed on
9   Madoff at the time of the initial investment?
10     A.  Only insofar as the reports that
11  we've seen.  That's the information that we had.
12     Q.  And the information -- and the
13  documents you've seen and the reports you've seen,
14  you haven't seen anything else that -- other than
15  those reports that you've seen here today?
16     A.  Yep.
17     MR. DANON:  Objection to form.
18     THE WITNESS:  Not that I can recall.
19  Sorry.
20  BY MR. BLEICHMAR:
21     Q.  What is your understanding of how
22  the initial investment in Madoff was done?
23     Or let me rephrase that:  is it your
24  understanding that Madoff came to Optimal through
25  Manuel Echeverria?

48  (Pages 186 to 189)

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 190

1    A.  I don't know.
2        MR. DANON:  Objection to form.
3    BY MR. BLEICHMAR:
4        Q.  Do you have an understanding as to
5    Mr. Madoff's relationship with Mr. Echeverria?
6        A.  They were friendly, they had
7    conversations. That's about all I can tell you.
8    And obviously we had capacity.
9        Q.  And that was very important for
10   Optimal, to have capacity; correct?
11       A.  Yes.
12       MR. DANON:  Objection to form.
13   BY MR. BLEICHMAR:
14       Q.  You previously mentioned that,
15   in addition to your meeting with Madoff in
16   February of 2006, you had, I think I recall you
17   said, two telephone conversations, approximately
18   with Mr. Madoff?
19       A.  No, that's after the 2006 meeting.
20   So, subsequently, I had two conversations with
21   him, to deal with the legal issues in the
22   contracts.
23       Q.  So, just to put all your
24   interactions with Madoff together, is this the
25   universe of all your interactions: the visit —

Page 191

1    the physical visit in February of 2006 and
2    two subsequent telephone calls with him, that you
3    can recall?
4        A.  Well, actually, he was also a party
5    to the conference call with the auditors when
6    I came in at the tail end, so that was one, and
7    I think that's probably the sum total of my —
8    my contact with him.
9        Q.  And, putting aside the conference
10   call with the auditors, the telephone calls
11   between you and Mr. Madoff, was there — was there
12   anybody else on those calls, in addition to the
13   two of you?
14       A.  No, it was just the two of us.
15       Q.  And do you know approximately when
16   you had those calls?
17       A.  I'm sorry, I can't really recall.
18   But it would have been prior to the signing of the
19   agreements.
20       Q.  Would it have been prior to the
21   completion of your — of the Jaitly report?
22       A.  It would have been after, because
23   I'd already identified the issues. That was the
24   point at which I was being told that there were no
25   issues to worry about, and I was saying there

Page 192

1    were. So, in the end, I guess I won the argument
2    to say that there were issues, and that's what we
3    then tried to address.
4        Q.  And the subject matter of those
5    two telephone calls was essentially the contracts;
6    correct?
7        A.  Yep.  He wanted to know exactly what
8    we were looking for.  He wanted to understand what
9    we wanted in the — in the contracts and what my
10   reasons for it were, and I was quite clear about
11   that.  You know, I wanted something to be able to
12   pin him down with.
13       Q.  You previously mentioned that you
14   insisted that your telephone conversations be
15   taped; correct?
16       A.  That's correct.
17       Q.  Were these two conversations taped?
18       A.  They should have been, yes.
19       Q.  And do you have copies of those
20   tapes?
21       A.  I don't, no.
22       Q.  Do you know who has copies of those
23   tapes?
24       A.  I would assume Banco Santander do.
25       Q.  These conversations with Madoff, did

Page 193

1    you have them from your office in London?
2        A.  Yes.
3        Q.  And that was the phone that you had
4    insisted that it be taped?
5        A.  Yes.
6        Q.  And what was the procedure for those
7    tapes?  Who stored them?
8        A.  They were stored by Banco Santander,
9    as far as I know.  I think we only — at Optimal,
10   I think I've only ever recalled them once, on an
11   unrelated issue.  Again, I think it was — Hugh
12   had sort of queried what I'd said to a manager and
13   I basically had the tapes recalled and it just put
14   him right.
15       THE EXAMINER:  When you say "recalled",
16   what do you mean?
17       THE WITNESS:  Well — so we had the
18   phone conversation.  Maybe a week later — I can't
19   remember how long it was — Hugh sort of made a
20   comment about what I'd said to the manager, and
21   what we did is we asked the IT specialist to
22   retrieve that conversation so everyone could
23   actually hear what — what the conversation —
24   what the conversation had been, so it was replayed
25   back to the people who were saying that — it



CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 194

1   was -- it was basically -- it was an accusation
2   that I'd acted unprofessionally.
3        THE EXAMINER: I'm not concerned about
4   the substance.
5        THE WITNESS: Okay.
6        THE EXAMINER: But they were stored in
7   London?
8        THE WITNESS: Sorry?
9        THE EXAMINER: They were --
10       THE WITNESS: Yes.
11       THE EXAMINER: -- stored in London?
12       THE WITNESS: That's correct.
13       THE EXAMINER: Right.
14       THE WITNESS: And so, essentially,
15   that -- the tape got recalled and then everyone
16   could hear exactly what I'd said.
17   BY MR. BLEICHMAR:
18       Q. And your understanding is that
19   Optimal had control of those tapes?
20       A. Well, Santander had control.
21       Q. Banco Santander --
22       A. Yes.
23       Q. -- had control of those tapes?
24       A. Yes.
25       Q. Do you know whether those tapes were

Page 195

1   ever, as a matter of -- as a matter of course,
2   regularly erased?
3        A. I -- I really don't know the
4   procedure. I think, from my perspective, I was
5   just concerned to have it done.
6        I know there were some complications in
7   terms of getting it done because of the way that
8   information is stored on the servers, and so on,
9   but I -- I'm pretty certain it was done in the
10   end, because, if my memory serves me correctly,
11   that's what we did on one occasion.
12       Q. Were there any restrictions as to
13   which conversations got taped, or was it
14   indiscriminately every conversation you had on --
15   on that telephone?
16       A. No, as far as I was concerned, my
17   phone was a taped phone, period.
18       THE EXAMINER: We've got five minutes on
19   the tape.
20       MR. BLEICHMAR: Why don't we go off the
21   record. Thank you.
22       THE VIDEO OPERATOR: Going off the
23   record. The time is 14:43. This is the end
24   of tape 2, volume I in the videotaped deposition
25   of Rajiv Jaitly.

Page 196

1   (2:44 p.m.)
2        (Break taken.)
3   (14:50 p.m.)
4        THE VIDEO OPERATOR: This is the
5   beginning of videotape number 3, volume I, in the
6   videotaped deposition of Rajiv Jaitly. Going on
7   the record. The time is 14:50. Thank you.
8        MR. BLEICHMAR: Mr. Jaitly, I'm going to
9   mark as exhibit 13 a document bearing Bates stamps
10   3702345 through 360.
11   (Exhibit 13 marked for identification.)
12   BY MR. BLEICHMAR:
13       Q. Do you recognize this document,
14   Mr. Jaitly?
15       A. I can't say I specifically do,
16   but -- I mean, there were variations of this in
17   existence at the time.
18       Q. Did you prepare either this document
19   or the variations of this document?
20       A. No, but I would have had input into
21   it, I would expect, particularly in relation to
22   the operational due diligence side of it.
23       Q. And would you have had input in
24   connection with your work at Banco Santander?
25       A. Yes.

Page 197

1        Q. And do you have any reason to
2   dispute the authenticity of this document?
3        MR. DANON: Objection to form.
4   BY MR. BLEICHMAR:
5        Q. You can answer.
6        A. No. But I don't specifically recall
7   this particular document.
8        THE EXAMINER: This -- this document
9   appears, from the front page, to have been
10   prepared in 2003; is that right?
11       THE WITNESS: Yes, that's before --
12       THE EXAMINER: Before you --
13       THE WITNESS: Yes.
14       THE EXAMINER: Before you were there, so
15   you wouldn't have had any input into this version?
16   BY MR. BLEICHMAR:
17       Q. Well, let me -- let me rephrase
18   that.
19       Did you see this document while you were
20   employed at Banco Santander?
21       A. I don't recall specifically seeing
22   this particular document.
23       Q. Okay.
24       A. But I'm -- I'm sure I've seen
25   variations of it.

50 (Pages 194 to 197)

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 198

1    THE EXAMINER:  There were some
2  procedures in place for due diligence when you got
3  there?
4    THE WITNESS:  Oh, yes.  The analysts
5  used to do the due diligence.  What changed when
6  I came was that there were dedicated people just
7  doing the operational due diligence.
8    Maybe I should just explain what
9  "due diligence" means as well, because there were
10  two types of due diligence that were done on a
11  fund.
12    There was investment due diligence, which
13  looked at the investment strategy, so, you know,
14  the split strike option strategy, that would have
15  been part of the investment team's due diligence
16  work; and then there was the operational
17  due diligence.
18    So before I arrived, I guess, it would
19  have all just been encompassed under a standard
20  due diligence.  So we were -- we were really
21  trying to sort of create more process around the
22  operational due diligence side.
23    MR. BLEICHMAR:  Let me mark as
24  exhibit 14 a document bearing Bates stamps
25  3742547.

Page 199

1  (Exhibit 14 marked for identification.)
2  BY MR. BLEICHMAR:
3    Q.  Do you see, Mr. Jaitly, this is a
4  document reflecting an email from Michelle Perry,
5  in which you are copied, on September 24th, 2007?
6    A.  Yes, that's correct.
7    Q.  Did you receive this document,
8  or this email?
9    A.  Yes, I expect I did.
10    Q.  And did you receive it as part of
11  your responsibilities at Banco Santander?
12    A.  Yes.
13    Q.  And do you have any reason to
14  dispute the authenticity of this document?
15    A.  No.
16    Q.  What is this document about?
17    A.  This deals with the Spanish product
18  launch.  So this is looking at the whole process
19  around the -- the launch of the Spanish product.
20    Q.  Okay.
21    A.  And -- and -- I mean, essentially,
22  what we -- just to sort of explain what "PIRQ"
23  means in that email, that's the pre-investment
24  review questionnaire, which I referred to earlier,
25  where we said that prior to an investment, before

Page 200

1  we started, we needed this.
2    Now, one of the -- one of the issues was
3  that, with this launch, when they decided, there
4  was actually very little time to actually launch
5  this product, and there was absolutely no way that
6  we could have done the due diligence on this in
7  relation to all the new things that were there
8  in -- in the format that was needed.
9    So one of the things that we agreed was
10  that we would ensure that, on every manager, we
11  had at least the PIRQ done, and the -- the idea
12  was that there would be a PIRQ on file which
13  actually, at least sort of at a basic level,
14  showed that there'd been some review done in
15  relation to each investment.
16    Q.  Do you see there in the email
17  there's a list under -- a list of bullet points
18  under the heading "The team"?
19    A.  Yes.
20    Q.  Is that, to the best of your
21  recollection, a fair and accurate list of the
22  members of your operational due diligence team?
23    A.  Yes.  I -- I think the -- the last
24  two people are probably junior analysts -- well,
25  they're called team members, so that's fine.

Page 201

1  That's what they were, team members.
2    Q.  Going back to Ms. Soosaipillai, do
3  you have an understanding of whether she still
4  works at Optimal or Banco Santander?
5    A.  She works at AXA Investment
6  Management.  She followed me when I went there.
7    Q.  Do you have an understanding -- so
8  she left Optimal; correct?
9    A.  Shortly after I left, yes.
10    Q.  Do you have an understanding as to
11  why she left Optimal shortly after you?
12    A.  Well, she'd expressed an interest --
13  I mean, she had moved from GAM, where I was
14  previously.  I had hired her from there.  And she
15  wished to sort of carry on with that relationship,
16  so she asked me if there was a place for her on
17  the team and I arranged for an interview for her
18  so that she could do that.
19    Q.  Do you have an understanding as to
20  why she decided to leave Optimal, rather than --
21  and start a new job, with respect to issues
22  relating to Optimal?
23    A.  Well, she knew the concerns I had --
24    MR. DANON:  I'm going to object to the
25  form of the question and also object as going

51 (Pages 198 to 201)

CONFIDENTIAL
MR. RAJIV JAITLY – 7/16/2012

Page 202

1  beyond the scope.
2       THE EXAMINER:  I think her reasons for
3  leaving are a little outside the scope.
4       MR. BLEICHMAR:  Well, I'm trying to find
5  out whether her reasons for leaving have to do
6  with Madoff.
7       THE EXAMINER:  Yes, but I think that's
8  rather outside the scope.
9       MR. BLEICHMAR:  Okay.
10  BY MR. BLEICHMAR:
11       Q.  Mr. Jaitly, what did you do to
12  prepare for this deposition?
13       A.  Well, I read the papers that you
14  sent.
15       Q.  And how long did you spend preparing
16  for this deposition?
17       A.  Probably a -- day, a little bit
18  more than that.
19       Q.  Did you have any conversations with
20  anyone other than your counsel with respect to
21  this deposition?
22       A.  I think you will have seen
23  the exchange of emails that I had with
24  Richard Homewood, and I copied Santander into
25  that, because I believed that -- again, I didn't

Page 203

1  really want to be viewed as a partisan to either
2  side, and it was important that both sides knew
3  what discussions I was having.
4       Q.  Did you have any discussions with
5  anyone other than your attorney with respect to
6  the substance of your testimony here today?
7       A.  No.  I mean, I -- I have -- I had a
8  phone call from Sharmila to inform me that she was
9  going to be deposed as well, but there wasn't any
10  discussion of -- of the details, and I --
11  you know, I have been in contact with Optimal
12  people.
13       For example, a couple of days ago I had a
14  phone call from Christopher Gibson, who was going
15  to be coming into London, and he said, well, the
16  team were all meeting up, would I like to meet up;
17  unfortunately, I couldn't actually make it to that
18  evening.
19       THE EXAMINER:  The question was about
20  the substance of your deposition, not about social
21  arrangements, or anything else.
22       THE WITNESS:  Okay. Fine. Well, no is
23  the answer. Thank you.
24  BY MR. BLEICHMAR:
25       Q.  How did it come about that – let me

Page 204

1  rephrase that.
2       Q.  Are you paying the legal fees of your
3  attorneys?
4       A.  No.
5       Q.  And do you have an understanding as
6  to who is paying them?
7       A.  Yes.
8       Q.  And who is that?
9       A.  Santander.  In the same way as
10  I think you're paying me for my time today.
11       Q.  Correct.  And how did you come to
12  such an arrangement for Santander to pay for your
13  legal fees?
14       A.  Well, I was contacted by counsel,
15  Jaime Calvo, and by Esteban Estevez, and what they
16  said to me was --
17       THE EXAMINER:  Well, hang on, you were
18  contacted by counsel?
19       THE WITNESS:  By Jaime, who was --
20  who is Optimal's counsel, that's correct, and
21  Esteban Estevez.
22       MR. BLEICHMAR:  After his employment.
23       THE EXAMINER:  So?  Are you content for
24  this evidence to be given?
25       MR. DANON:  Give me one second.  We say

Page 205

1  the fact that they had the conversation is not
2  privileged.  The content --
3       THE EXAMINER:  The fact that they had
4  the conversation --
5       MR. DANON:  Right.
6       THE EXAMINER:  -- is not privileged.
7       MR. DANON:  But the content --
8       THE EXAMINER:  The contents of the
9  conversation may have --
10       MR. DANON:  -- will have some privilege
11  implications, to the extent there is any common
12  interest privilege that prevails afterwards.
13       THE EXAMINER:  It may well have.
14  BY MR. BLEICHMAR:
15       Q.  Let's put aside the conversation
16  with Mr. Calvo.  Did you have an independent
17  conversation with Mr. Estevez?
18       A.  Yes.
19       Q.  And Mr. Estevez is not an
20  attorney – correct? – to the best of your
21  understanding?
22       A.  Indeed not, he is not an attorney.
23       Q.  And what did you discuss with
24  Mr. Estevez?
25       MR. DANON:  I think I would still assert

52 (Pages 202 to 205)

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 206

1  the objection for Esteban. First of all, he is an
2  attorney, although he was not acting as the
3  counsel, but he would have been doing it at the
4  direction of counsel.
5      THE EXAMINER:  What is his position?
6      MR. DANON:  He is the current CEO of
7  Optimal.
8      THE EXAMINER:  Are the details of the
9  arrangement by which, as I understand it, you're
10  paying for his time and Santander are paying for
11  his legal fees, material?  Are you going to put
12  all this in front of a jury?  You don't know yet.
13      MR. BLEICHMAR:  I -- I don't know yet.
14  That's why this is discovery.
15  Mr. Estevez was not acting as a lawyer.
16  He's a third party, compared --
17      THE EXAMINER:  He's not a lawyer, but --
18  but --
19      MR. DANON:  At the direction of counsel
20  he'd be talking to him.
21      THE EXAMINER:  Mr. Danon says he was
22  acting at the direction of counsel, which may or
23  may not be borderline; I don't know.
24      I think you can pursue it, but we may
25  have to put the brakes on at any given moment.

Page 207

1      MR. BLEICHMAR:  Okay.
2  BY MR. BLEICHMAR:
3      Q.  When did you have this conversation
4  with Mr. Estevez?
5      A.  I think shortly after I responded to
6  Mr. Homewood's email to me.
7      Q.  And did --
8      A.  He'd sent me an email saying that
9  the intention was to -- to depose me, and I then
10  responded and I copied Santander in to that
11  response.
12  So he then rang me up, essentially, to
13  say -- well, basically, what he said to me was
14  that my evidence was my evidence.  The only thing
15  that he could say was that I should get some legal
16  advice on it, and, to the extent that I wanted
17  legal advice, they'd pay for it.  And that was
18  essentially it.
19      MR. BLEICHMAR:  Let's go off the record
20  for two minutes.
21      THE VIDEO OPERATOR:  Going off the
22  record.  The time is 15:02.
23  (3:02 p.m.)
24      (Break taken.)
25  (3:12 p.m.)

Page 208

1      THE VIDEO OPERATOR:  Going back on the
2  record.  The time is 15:12.
3  (Exhibit 15 marked for identification.)
4  BY MR. BLEICHMAR:
5      Q.  Mr. Jaitly, I'm going to show to
6  you what I have marked as exhibit number 15,
7  bearing -- a document bearing Bates number 213095
8  through 100, and I will represent to you that the
9  highlighted portions were not in the original
10  document, but I will not be asking you
11  specifically about those portions.
12      A.  Oh, I see, they were taken out.
13      THE EXAMINER:  Sorry, these -- these
14  have been highlighted since?
15      MR. BLEICHMAR:  Correct.
16      THE EXAMINER:  Okay.
17  BY MR. BLEICHMAR:
18      Q.  Do you see that this document
19  reflects an email from you to Hugh Burnaby-Atkins
20  on June 12th, 2006?
21      A.  Yes.
22      Q.  Did you send this email?
23      A.  I believe I did, yes.
24      Q.  And did you send it as part of your
25  work responsibilities at Banco Santander?

Page 209

1      A.  Yes.
2      Q.  And do you have any reason to
3  believe that this document is not an authentic
4  document?
5      A.  No.
6      MR. BLEICHMAR:  Let me mark as
7  exhibit 16 a document bearing Bates stamps
8  3755329.
9  (Exhibit 16 marked for identification.)
10  BY MR. BLEICHMAR:
11      Q.  And do you see that this document
12  reflects an email from you to Mr. Echeverria on
13  October 19, 2006?
14      A.  Yes.
15      Q.  And, again, the highlighted part was
16  not part of the original document.  The -- the
17  highlight -- the highlight itself; the text is
18  part of the original document, but the highlight
19  itself was not there.
20  Did you send and receive this --
21      A.  But this was in the documents.
22  I mean, this was in the documents that was sent,
23  even including the highlighted bit.
24      MR. CAULFIELD:  I think he's saying that
25  the original didn't have that mark on it.

53 (Pages 206 to 209)

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 210

1    THE WITNESS: Oh, I see. It didn't have
2  the highlighting, yes. I'm sorry.
3  BY MR. BLEICHMAR:
4    Q.  Did you send and receive this set of
5  emails?
6    A.  Yes.
7    Q.  And did you send and receive them as
8  part of your work at Optimal?
9    A.  Yes.
10    Q.  At Banco Santander, excuse me.
11    A.  Well, at both.
12    Q.  And do you have any reason to
13  dispute the authenticity of this document?
14    A.  No.
15    MR. BLEICHMAR:  Thank you, Mr. Jaitly.
16    THE EXAMINER:  That now concludes your
17  examination?
18    MR. BLEICHMAR:  That concludes my
19  examination. I reserve the time to re-examine.
20    THE EXAMINER:  Absolutely. Yes,
21  Mr. Danon.
22  CROSS-EXAMINATION BY MR. DANON:
23  BY MR. DANON:
24    Q.  Good afternoon, Mr. Jaitly.
25    A.  Good afternoon.

Page 211

1    Q.  I think I've asked you – I've
2  referred you to exhibit 5. I just have a few
3  questions that I'm going to ask you that follow up
4  on some questions Mr. Bleichmar had asked you
5  before.
6    If you pull in front of you exhibit 5,
7  which Mr. Bleichmar had showed to you and talked
8  to you, this is your report; correct?
9    A.  Yes.
10    Q.  And I think during the testimony it
11  was referred to it as "the Jaitly report"; is that
12  correct?
13    A.  That's right.
14    Q.  And this, as you testified before,
15  was the only report, written report, that you
16  prepared on Madoff?
17    A.  That's correct.
18    Q.  And SUS; correct?
19    A.  Yes.
20    Q.  Okay. And nowhere in this written
21  report do you conclude that Mr. Madoff was
22  operating a fraud or a ponzi scheme; correct?
23    A.  That's correct.
24    Q.  Okay. And you never told anyone at
25  Optimal, did you, that you concluded that Madoff

Page 212

1  was operating a fraud or a ponzi scheme; correct?
2    A.  No. I would have reacted quite
3  differently, had that been the case.
4    Q.  Okay. You also, I think – during
5  your direct examination, there were questions
6  regarding the explanatory memo. I think you
7  called it the offering memorandum.
8    A.  Yes.
9    Q.  Do you – do you recall those
10  questions; right? And – okay. Do you – do you
11  recall testifying about the –
12    A.  About the memorandum.
13    Q.  – offering memorandum?
14    A.  Yes.
15    Q.  Correct. Okay. Do you recall
16  what offering memorandum you reviewed, which one
17  you –
18    A.  No, I cannot at this stage remember.
19    Q.  Okay. Did you –
20    A.  There were a number of variations to
21  it, though.
22    Q.  Okay. Do you – do you recall what
23  year you would have reviewed the offering
24  memorandum?
25    A.  Well, I mean, only really from some

Page 213

1  of the documentation I think I've seen since, but,
2  no, I can't specifically recall which version it
3  was.
4    Q.  Okay. Do you recall which fund it
5  was that you reviewed the offering documents for?
6  Was it for the –
7    A.  I think it was for SUS.
8    Q.  Okay. And what SUS fund? Was it
9  the Bahamian SUS fund or the Irish SUS fund?
10    A.  I believe it was the Irish SUS fund,
11  but I can't be certain.
12    Q.  So you don't recall, at least here,
13  with certainty whether you ever reviewed the
14  Bahamian fund's offering documents; is that
15  correct?
16    A.  I -- I don't recall specifically
17  which entities' documents it -- it was that
18  I reviewed now.
19    Q.  And I believe your testimony was
20  that you felt there were some disclosures in there
21  that you felt were not done; is that – was that
22  your testimony?
23    A.  No.
24    Q.  Okay.
25    A.  That's not my testimony. What

54 (Pages 210 to 213)

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 214

1  I felt was that there were certain items of
2  disclosure that I felt didn't accurately reflect
3  exactly how we were operating, and that was some
4  of the discussions that I then had with counsel.
5      Q.  And this is prior to, I think you —
6  you said, your view prior to any discussions with
7  counsel. We already went through the privilege
8  issue. I don't want to —
9      A.  That's correct, yes.
10     Q.  Do you — did you, prior to any
11 discussions with counsel, have a view of any
12 specific section of that offering memorandum?
13     A.  Sorry, of — a view as in did I see
14 it —
15     Q.  Yes.
16     A.  — or a view as in did I have an
17 opinion on it?
18     Q.  Did you have an opinion on it?
19     A.  Yes, I did have an opinion on it.
20     Q.  Okay. What specific section are you
21 referring to?
22     A.  It — it was to do with the work
23 that was being done in relation to Madoffs,
24 the due diligence aspects of it.
25     Q.  Do you recall what section of the

Page 215

1  offering section?
2      A.  Not specifically, no.
3      Q.  Do you recall what the offering
4  memorandum said that you — that you were
5  referring to?
6      A.  I — I think it related to the
7  due diligence procedures that were being
8  conducted.
9      Q.  Okay. Any — any other section,
10 other than that section, the due diligence
11 section?
12     A.  No, it was — it was really in
13 relation to that, so what had we done —
14     Q.  Okay.
15     A.  — in relation to Madoff.
16     MR. DANON:  I'm — I'm done with my
17 examination.
18     THE EXAMINER:  Thank you. Any
19 re-examination arising out of that?
20     MR. BLEICHMAR:  Give me 30 seconds, but
21 I don't think so. We'll just confer.
22     THE VIDEO OPERATOR:  Going off the
23 record. The time is 15:18.
24     (3:19 p.m.)
25         (Break taken.)

Page 216

1  (3:20 p.m.)
2      THE VIDEO OPERATOR:  Going back on the
3  record. The time is 15:19. Thank you.
4      MR. BLEICHMAR:  Nothing further.
5      THE EXAMINER:  Thank you very much.
6  That concludes your deposition, Mr. Jaitly.
7  Thank you very much.
8      THE WITNESS:  Thank you.
9      THE VIDEO OPERATOR:  Going off the
10 record. The time is 15:20. End of tape 3,
11 volume I. This is the end of the videotaped
12 deposition of Rajiv Jaitly.
13     THE EXAMINER:  Thank you.
14     (Whereupon, the deposition concluded at 3.20 p.m.)

Page 217

CORRECTIONS PAGE
Page No    Line No        Description

55 (Pages 214 to 217)

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 218

1        DEPONENT'S DECLARATION
2
3
4        I,              , hereby declare
5    under penalty of perjury under the laws of the
6    United States and the State of New York that I
7    have read the foregoing transcript and identify it
8    as my own and approve same as a true and correct
9    transcript save and except for changes and/or
10   corrections, if any, as indicated by me on the
11   CORRECTIONS page hereof.
12
13        '         '        ,
14   Date      City      State
15
16
17        Signed:
18
19
20
21
22
23
24
25

Page 219

1        REPORTER'S CERTIFICATE
2
3        I, Judith White, of Merrill Legal
4    Solutions Pty Limited, do hereby certify that the
5    foregoing testimony was recorded by me
6    stenographically and thereafter transcribed by me,
7    and that the foregoing transcript constitutes a
8    full, true and accurate record of said examination
9    of and testimony given by said witness, and of all
10   other proceedings had during the taking of said
11   deposition, and of the whole thereof, to the best
12   of my ability.
13        I further certify that I am not a
14   relative, employee or counsel of any of the
15   parties of the within cause, nor am I an employee
16   or relative of any counsel for the parties, nor am
17   I in any way interested in the outcome of the
18   within cause.
19
20
21   Signed _____ Dated _____
22     (Judith White)
23
24
25

56 (Pages 218 to 219)

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 1



**A**

Abdul 4:6,6 11:23
abdulazeem.abduls...
4:9
ability 13:2,6 57:2
86:10 219:12
able 39:6 40:17 63:21
64:1,4 94:10,19,22
103:12,14 108:24
118:11 119:13 120:4
127:24 130:19,21
139:22 140:2 143:3
143:10 159:1 161:25
179:7 182:6 185:13
192:11
absolutely 35:25 71:4
103:13 130:8,20
200:5 210:20
accept 31:19
acceptable 32:15
36:25
accepted 31:10 75:1
accepting 103:21
access 66:18 74:3 81:4
116:8 130:7
accompanies 15:11
account 73:14 92:12
94:21 95:19 110:6
131:18 142:22
accountant 14:17
15:10,12,19 106:24
107:6 164:4,6
Accountants 14:18
accounts 72:23 131:16
135:3,9 153:2,12,21
154:1,7,18 155:10,12
155:22,23 156:4,5
160:12,13
accurate 99:20 200:21
219:8
accurately 214:2
accusation 194:1
Achilles 108:6
acted 194:2

acting 206:2,15,22
action 1:7 92:15 162:6
169:1
actions 127:13 167:13
187:21
activity 142:23 143:1
acts 42:25
actual 128:5 142:22
143:1
added 28:22 62:21
addition 133:3 190:15
191:12
additional 28:25
address 12:7,9 192:3
addressed 36:2 149:24
adequate 87:21
138:11
advice 207:16,17
adviser 75:5,10 77:9
advisers 85:17
advises 174:23
advisory 155:1,8,24
adyer@4pumpcour...
4:15
aellman@labaton.c...
2:11
afraid 55:15 78:10
79:2
afternoon 37:24
145:14 210:24,25
agenda 150:2 183:5
ago 203:13
agree 40:19 95:4
115:22 174:2 180:10
agreed 84:20 128:17
133:22 139:13
140:10,19 141:17
159:25 162:6 200:9
agreed-upon 135:24
agreement 13:4
agreements 13:4
191:19
agricultural 14:10,11
agriculture 14:9

ahead 44:24,25 46:7
106:13
air 172:11,11
Aksia 174:25
Alan 2:9 11:7
allay 119:4,17
allegations 41:3
Allen 1:14 4:13 12:1
allocated 130:4
allow 74:2
allowed 64:2,15,19
66:20 85:7 94:15,17
aloud 105:10
Alvarez 34:1
Amadeo 26:18 126:12
126:22 127:1
Amaranth 159:18
160:3,4,6,8,17,25
amateurs 152:13
amended 28:19
America 13:17
amicable 181:3
Amit 32:3
amount 75:24 85:6
162:25
ample 163:12
analysis 23:15 72:14
analyst 55:13 125:18
125:21 170:24 171:8
171:9
analysts 23:12 33:3,11
33:12,21 35:24 36:20
37:16,20 38:3 42:15
43:16,20,24 44:10
55:9 65:16 81:14
98:8 103:21 162:5
198:4 200:24
and/or 218:9
annoyed 110:7 124:24
annual 188:25
answer 12:24 13:19
17:22 25:19 36:6
46:7,8 53:17 55:6
121:17 122:1 146:19

146:23 166:20 170:6
179:1 197:5 203:23
answered 22:23
answers 53:12 96:8
184:21,25
antagonism 107:22
anybody 26:14 126:4
126:13,25 163:8
191:12
anyway 140:7 154:20
apparent 130:2
apparently 64:2
appear 48:12
appeared 60:21,22
98:23
Appearing 2:3 3:1 4:1
appears 48:2 197:9
appendix 186:23
apple 66:24
appointed 159:24
appointment 27:1
approach 40:15 54:19
90:18 107:22 169:1
181:7
approached 17:19
22:3 81:8 82:7
approaching 117:2,13
appropriate 31:18
46:25 107:14 176:5
appropriately 23:18
149:3,9
appropriateness
107:16,19
approve 218:8
approximately 18:2
24:8 39:20,25 49:2
68:4 83:4,22 84:2
124:9 125:22 136:21
137:2 190:17 191:15
April 8:5 24:10 177:4
arb 45:20
arbitrage 45:9,11,13
45:17,18,20 46:4,10
131:19,22 132:1,9



OPTIMAL_BERLAMONT-000057

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 2

area 17:11 20:9 27:25
  33:21 82:10 116:12
  135:16 172:1,15
areas 30:6 59:13
  113:20 115:8,16,23
  144:20 184:22
argue 13:17
argument 50:13
  111:13 134:8 192:1
arguments 50:7
  133:23
arising 215:19
arose 18:24 144:3
  184:21
arranged 201:17
arrangement 25:23
  204:12 206:9
arrangements 131:12
  203:21
arrested 61:24
arrival 79:22
arrive 57:21
arrived 57:9,17 83:10
  84:20 160:17 163:19
  198:18
arriving 16:5
aside 77:4 121:11,21
  191:9 205:15
asked 50:25 56:9 59:6
  66:25 80:11 116:19
  121:23 137:15
  148:14 193:21
  201:16 211:1,4
asking 52:9 58:21
  61:19 66:24 78:19,20
  79:21 80:17 116:22
  135:16 147:6 149:25
  152:9 153:19 154:6
  208:10
aspect 96:12 178:6
  187:6
aspects 74:16 86:16
  87:15 179:9 187:2,13
  187:16,17,19 214:24

assert 205:25
assertions 110:7,10,18
  114:24 120:1 122:16
  157:15
assesses 24:5
assessment 38:21,23
  148:23 180:10
Asset 17:9 19:19,25
  22:13
assets 41:8 84:3 91:4
  92:9,16,16 93:5,21
  94:3,11,24 95:11
  127:22,25 134:22
assist 163:20
assisted 171:10
associated 24:6
Association 14:23
assume 75:23 76:15
  192:24
assumed 76:17
Attached 113:17
attachment 67:8 68:12
  113:17
attachments 6:4,9,14
  48:6
attacking 167:20
attain 15:13
attended 33:8
Attendees 69:20
attention 19:11 129:17
attitude 64:24
attorney 203:5 205:20
  205:22 206:2
attorneys 13:16 204:3
attractive 24:17,21
audit 16:9 18:9 63:15
  116:25 146:6
auditing 65:19 156:1
auditor 135:25 146:11
  148:17
auditors 63:16 65:19
  65:20 94:4,7 116:11
  116:15 117:13,19,20
  118:3 148:12 150:8

191:5,10
audits 164:7
August 68:20 137:3,5
authentic 102:1
  112:19 151:2 177:12
  209:3
authenticity 47:19
  48:17 99:16 124:7
  145:24 148:6 156:24
  183:19 186:16 197:2
  199:14 210:13
author 69:11
authorisations 133:5
authorized 128:17
authors 69:12
Avenue 3:4,8
avoid 76:10
avoided 53:17
aware 13:3 57:21
  120:5,13 121:13
  179:20
AXA 136:25 174:10
  174:20,20,24 201:5
Azeem 4:6 11:23
A-K-S-I-A 174:25
A-X-A 174:24 175:1
a.m 1:17 10:2,18

B
b 29:25 57:8 138:11
  162:2
bachelor 14:8
back 26:1 27:17 30:4
  37:17,25 54:11 56:9
  63:4,23 80:14,24
  95:18,19 104:16
  122:7 127:24 139:19
  140:4 145:10 159:23
  166:18 176:20
  188:21,24 193:25
  201:2 208:1 216:2
backed 104:8
background 13:10
  98:7
bad 181:2

badly 109:18
Bahamian 213:9,14
bailiwick 49:25 50:15
  50:17 51:13
balance 42:2
balances 182:5
Balkir 69:5,5
Banco 20:19 21:6,22
  26:10,14 28:4 30:7
  37:8 48:24 49:3 54:2
  79:22 84:15 112:16
  123:24 124:2 156:21
  166:23 174:6 175:7
  180:8 186:9 192:24
  193:8 194:21 196:24
  197:20 199:11 201:4
  208:25 210:10
bank 3:13 19:1 62:8
  108:17
based 20:11 25:16,21
  29:12,13,14 32:4,6
  75:23 84:15 129:2
  148:14 188:10
bases 111:12
basic 12:18 200:13
basically 18:23 38:1
  41:18 50:4 53:17
  59:20 123:7 129:3
  135:20,23 137:11
  139:2 148:13 180:20
  193:13 194:1 207:13
basics 99:13
basis 41:22 71:14
  73:16 95:16 109:14
  114:18 115:1,1
  119:25 123:7 135:5
  138:9,17 139:22
basket 95:24 96:1,5
Bastianpillai 32:3
Bates 6:5,10,15 7:5,11
  7:17,25 8:5,9,13,18
  8:25 9:5,12 47:13
  68:13,14 97:13
  101:17 102:10

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 3

145:16 147:17
150:13 156:11
157:20 176:25
182:12 185:21 196:9
198:24 208:7 209:7
**battle** 42:14
**Bayou** 98:10 99:25
100:3,9,11 101:7,13
**BCCI** 16:15 19:2
**bearing** 6:17,22 47:13
97:13 101:17 102:9
145:16 147:17
150:13 156:11
176:25 182:12
185:21 196:9 198:24
208:7,7 209:7
**beg** 10:12 151:25
**began** 21:5
**beginning** 10:4 97:9
108:10 109:12 196:5
**begins** 157:23
**behalf** 2:3 3:1 4:1 11:6
11:9,13,18 42:20,23
**belief** 58:15
**believe** 15:5 32:19
34:23 36:25 48:8
56:10 70:22 99:20
101:25 106:21
112:12,18,25 113:21
115:3 126:1,3 136:23
148:2 149:2,9 151:1
166:1 167:4 177:7,11
208:23 209:3 213:10
213:19
**believed** 202:25
**Bernard** 4:2 11:22
**Bernardo** 8:23
**bernard.caulfield@...**
4:5
**Bernie** 54:4 66:17
78:18 90:10 128:2,8
130:22 133:7
**Bernie's** 59:8 62:5
**best** 24:12 30:9 56:12

60:5 86:10 200:20
205:20 219:11
**better** 110:6
**Betts** 2:22 11:15,15
**beyond** 202:1
**big** 172:15
**bit** 20:3 24:11 30:3
47:20 51:13 72:1
90:24 103:19 104:9
202:17 209:23
**bits** 178:17
**Bleichmar** 2:5 5:4
11:5,5 12:12,13,14
13:11 14:6 23:5 26:6
28:16,18 37:4 42:17
45:5 46:12,18,23
47:12,16 55:20 56:5
58:10 59:25 61:3
66:9 67:12,25 68:8
69:18 70:21 72:2,19
73:5,6 75:3,14 76:8
76:16,23 77:16,22
79:14 93:17,19 95:3
95:9 96:23 97:12,16
98:1,4 99:12 100:10
101:2,6,16 102:25
110:22 112:1,6
113:19 114:9 115:12
115:14,16,18 116:3
118:10,19 121:10,20
122:5,6 123:9,15
132:21 134:20
137:17 142:5,8,13,15
144:10 145:3,13
147:16,19 150:12,16
152:2,23 154:14
156:10,13 160:20
161:5,7,8 165:6,18
169:19,23,25 170:2,7
171:11 173:3 176:6
176:10,18,23 181:21
182:11,15 185:20,24
186:21 187:15
189:20 190:3,13

194:17 195:20 196:8
196:12 197:4,16
198:23 199:2 202:4,9
202:10 203:24
204:22 205:14
206:13 207:1,2,19
208:4,15,17 209:6,10
210:3,15,18 211:4,7
215:20 216:4
**blind** 120:10
**blood** 181:2
**blotter** 60:19
**blow-up** 127:24
**blow-ups** 16:13
**board** 18:19
**boardroom** 60:9
**Boca** 2:15
**bodies** 62:10,14
**bold** 130:13
**bolded** 129:23
**bone** 133:13
**bonuses** 160:11
**book** 60:18
**books** 144:2
**borderline** 206:23
**boss** 26:18 127:4
**bothered** 64:13
**bottom** 118:6
**bought** 17:8
**box** 71:5,6 72:20 73:4
**brakes** 206:25
**branch** 20:20 26:5
**breach** 128:6
**break** 13:24 17:22
96:24 97:6 142:9
145:8 163:25 176:16
196:2 207:24 215:25
**Brickell** 3:4,8
**bring** 186:13
**Broadway** 2:6,10
**broker** 42:19,20,21,21
43:2,2,6,10,12
131:13 134:23 136:4
154:19,23,25 155:4,9

155:21 156:5
**brokerage** 62:4,7,18
74:8 91:3 92:4,7
**brokers** 42:23 43:1
60:23 92:18
**broker/dealer** 73:23
**broking** 42:7,18
**brother** 143:22
**brought** 21:13 163:19
166:25
**build** 90:22 91:8
108:15
**building** 2:23 91:1
**bullet** 115:20,22 183:5
200:17
**Burnaby-Atkins** 6:7
6:12 9:4 32:2 33:22
34:13 43:25 54:12
58:19 69:4 70:3 77:6
81:15,22 84:8 97:19
101:19 104:20
105:15 125:20
130:25 133:14
149:14 151:20
152:19 180:14,19
208:19
**business** 14:23 24:1
27:20 133:16 136:1
154:25 155:1,5,8,10
155:22,25 174:18
**businesses** 106:24
**Buttinger** 3:12 11:20
11:20
**buying** 95:21,24,25

─────────  C  ─────────

**C** 2:1 10:1
**cage** 61:16
**call** 87:4 116:19
118:16 150:11
152:18 191:5,10
203:8,14
**called** 14:13 16:11
17:9 21:8,17 33:15
37:20 99:25 164:3

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 4

183:6 200:25 212:7
calls 96:4 191:2,10,12
 191:16 192:5
calm 140:18 141:16
Calvo 204:15 205:16
canceled 54:8
capability 22:10,19
 23:9
capacity 34:8 56:3
 66:12,13,15 74:24
 78:21,22 79:8 81:3
 85:2,6 190:8,10
capital 69:23 78:2
career 16:4 24:20 79:9
Caron 32:3
carried 32:17 55:3
 63:1 161:3
carry 59:18 93:18
 201:15
cart 66:24
case 10:25 34:24 87:10
 92:20 212:3
cash 135:4 138:14
cashiers 61:17
catching 139:7
catch-all 106:15
category 46:17 74:5
Caulfield 4:2 11:22,22
 28:13 209:24
cause 219:15,18
Cecilia 34:1,3
central 42:24
CEO 26:12 206:6
certain 32:17 41:23
 88:12 109:9 120:2
 167:2 178:17 181:23
 195:9 213:11 214:1
certainly 26:22 34:23
 44:6 72:15 77:13
 79:10 81:1 88:20
 162:20 182:18,20
certainty 213:13
certificate 15:16 219:1
certify 219:4,13

chain 7:1,7,13,19 8:1
 8:20 9:1,7 148:10
challenge 108:20
Chambers 2:22 11:16
chance 3:12 11:21
 13:20 113:23 117:9
chances 78:25
change 128:17
changed 128:15,16,16
 133:4,22 134:14
 198:5
changes 218:9
chap 37:21 50:10
 80:14
chaperoned 56:19
characteristic 95:15
characterize 46:13
 86:15
charge 72:24 74:21
 75:19,21 76:2 77:9
charged 74:5 75:2
charges 74:4
charter 15:11,13,22
 15:23
chartered 14:17,18
 15:10,12 106:23
 107:5
check 140:4
checks 133:12 182:5
chief 21:11,20 51:20
 84:23 174:12
choose 60:17
chosen 74:22
Chris 170:23
Christopher 171:7
 203:14
chunk 83:21
circulate 100:24
circulated 99:3 100:16
 102:6,15
circulating 104:4
circumstances 80:24
 167:24 185:4
City 3:13 218:14

CIVIL 1:7
claim 127:25
clarify 67:1 68:1 81:11
 137:19
Clark 6:3,7,12 7:4
 33:22 34:14 48:2
 49:6,16 54:12 58:19
 69:4 70:4 77:6 81:16
 81:22 84:8 97:18
 101:19 104:20
 106:21 107:19 116:5
 118:24 125:11,20
 130:25 138:22
 141:14 145:18
 149:15 151:21
 152:19 154:6 155:4
 156:1 164:23 181:14
Clark's 119:8,9,16
 124:18,20 125:2,3,10
 126:2 146:8
classic 74:4 78:11
clear 34:21 42:22 53:6
 55:1 85:13 103:13
 105:5 140:23 179:1
 192:10
clearer 103:10 104:11
clearing 42:25 92:10
clearly 72:12 116:21
 119:2 155:16
clears 93:10,15
client 34:7 92:12,16
 130:5 135:9 146:12
clients 36:24 104:7
 111:22
Clifford 3:12 11:21
close 39:21
closed 39:8,8,19
clue 48:14
codename 131:25
coincidence 18:6
collate 171:3
collation 111:6
colleague 11:7,19,23
 40:9

college 13:10 14:13,13
come 27:8 34:7,9 52:4
 52:8 54:20 74:1
 107:3 139:11,11
 152:12 154:15
 158:18 162:18
 203:25 204:11
comfort 64:22 65:4,11
 65:14 86:5,6 88:6,10
 92:13 127:21 128:1
 135:17 143:8 167:14
 167:16 185:5
comfortable 108:25
 109:4 120:2,4 122:18
 138:1 164:9
coming 56:17 79:2,15
 80:13 95:18,19
 108:21 158:13
 203:15
commenced 187:25
comment 19:11 54:11
 59:15 72:7 168:21
 193:20
comments 114:3 158:5
 168:10,13
commission 73:25
 74:8 75:6
committed 157:24
committee 31:6,22,24
 31:25 32:9,13,16,22
 32:25 33:1,2,7,10,19
 34:15,16 35:3,6,14
 109:25,25 111:13
 162:24 163:2 185:2
committing 114:6,15
common 27:16 205:11
communicated 162:4
company 2:18 11:11
 93:9,12
compared 206:16
compensation 28:22
competent 164:13
 167:5,7
complaint 98:9,11,14

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 5



**98:**19,24 **99:**23 **102:**6
  102:7,23 **103:**5
**complaints** 80:5
**complete** 112:22
  131:17 132:15 153:3
  153:12 155:15 179:7
  184:20,24 185:14
**completed** 124:19
  153:14 158:24
**completely** 38:4 89:7
  98:21,22 140:24
**completion** 191:21
**compliance** 128:14
  133:12 138:7
**complicated** 160:14
**complications** 195:6
**comply** 88:12
**components** 96:10
**composed** 33:3
**compromises** 89:9
**computer** 62:8
**computers** 62:9
**concern** 43:4 52:8
  111:9 114:25 127:20
  144:20 161:17 162:4
  162:13,14 172:1
**concerned** 38:19 42:6
  55:18 56:2 111:14,20
  111:23 133:15
  141:10 146:5 151:10
  152:6 162:10 194:3
  195:5,16
**concerning** 184:10
**concerns** 27:2,9 31:8
  35:22 36:1 37:11
  44:20 45:1 132:14
  157:5,7,10,13 160:9
  167:19 201:23
**conciliatory** 180:25
**conclude** 211:21
**concluded** 211:25
  216:14
**concludes** 210:16,18
  216:6

**conclusion** 107:4
  109:17,22
**conclusions** 127:12,17
**condition** 48:12
**conduct** 40:1 136:1
  184:17
**conducted** 153:4,18,24
  154:4,7,11,12,16
  165:12 187:6 215:8
**conducting** 116:25
  164:13 165:14,21
  167:5
**confer** 215:21
**conference** 118:16
  150:11 191:5,9
**CONFIDENTIAL**
  1:12
**confidentiality** 64:11
**confirm** 94:10,22
  133:3 143:11 144:22
**confirmation** 135:8
**conflict** 42:11 43:7
  108:3
**conflicts** 65:8 144:9
**confrontation** 111:8
**confusing** 38:14
**connected** 98:3
**connection** 77:5
  100:20 177:8 184:21
  186:8 196:24
**consequence** 24:21
  151:11
**consider** 106:5
**considered** 18:15,16
**constantly** 65:17
**constituent** 170:22
**constitutes** 219:7
**consultancy** 174:22
**contact** 191:8 203:11
**contacted** 204:14,18
**content** 161:22 204:23
  205:2,7
**contention** 130:23
  131:4 133:13

**contents** 205:8
**context** 17:2 28:2 31:5
  49:15 54:4 55:9 60:5
  80:4 82:4 84:12
  91:16,21 103:19
  151:25 178:12
**contract** 26:22 28:4,7
  28:10,19 29:1 30:4,5
  87:24 88:14 90:11
**contracts** 87:13 88:23
  187:11,12 190:22
  192:5,9
**contractual** 86:23,25
  87:6,7,17,20 91:23
  127:19 129:11
  131:12 132:18
**control** 38:18 95:14,14
  96:12,14 194:19,20
  194:23
**controlled** 93:25 95:17
  144:1
**controlling** 95:12
**controls** 59:6,10
  143:16
**convenient** 142:12
**conversation** 22:5
  37:23 88:20 116:11
  117:6 129:2 138:23
  138:24 139:1 172:6
  193:18,22,23,24
  195:14 205:1,4,9,15
  205:17 207:3
**conversations** 26:24
  90:9 117:14 121:3,7
  121:11,18,22 168:2
  180:18 190:7,17,20
  192:14,17,25 195:13
  202:19
**conversion** 45:22 46:3
  46:14 47:1
**convert** 103:23
**convertible** 45:20
**convince** 182:7
**COO** 32:7 37:19 52:14

**copied** 6:8,13 8:23 9:4
  97:20 101:20,21
  104:21 199:5 202:24
  207:10
**copies** 192:19,22
**copy** 28:7,10 98:8
  102:1 112:19 170:12
**corner** 113:7
**corporate** 16:12
  187:21
**corporation** 1:19
  10:20 92:10
**correct** 15:19 17:25
  19:19 20:12,13 31:22
  33:16 38:21,24 43:17
  43:21 46:18 48:24
  53:8 58:22 59:25
  68:10,18,21 70:16
  75:8,20 87:8,18
  89:17 92:4,14 93:2,4
  94:24 96:12 98:4
  99:21,25 100:23
  101:20 105:2 107:10
  108:11 117:20
  118:21 121:21
  123:25 124:2 130:12
  132:4,16,25 134:9
  137:3,21,22 138:4
  144:14 145:1,2,24
  146:17,18 148:19,25
  150:8 152:20 161:4
  161:15 167:6 172:14
  172:22 175:3,4,7
  176:9 177:5 178:2,24
  178:25 179:4,10,13
  180:9 183:19 184:7
  184:12,18,19,22
  185:18 186:10 187:1
  187:4,5,9,17 190:10
  192:6,15,16 194:12
  199:6 201:8 204:11
  204:20 205:20
  208:15 211:8,12,17
  211:18,22,23 212:1

OPTIMAL_BERLAMONT-000061

CONFIDENTIAL
MR. RAJIV JAITLY - 7/16/2012

Page 6

212:15 213:15 214:9
218:8
corrections 217:1
218:10,11
correctly 15:24 18:12
26:21 34:2 37:18
38:12 41:23,25 75:13
88:1,15 89:18 90:5
131:24 132:7 134:13
139:5 155:3 195:10
counsel 11:3 89:22
120:16,22,25 121:3,8
121:12,19,25 122:3,8
122:11 129:13
143:22,24 202:20
204:14,18,20 206:3,4
206:19,22 214:4,7,11
219:14,16
count 62:14
counterparty 134:24
142:24 143:2,4,11
144:23 179:10
couple 37:25 38:6
89:19 139:22 173:9
188:4 203:13
course 13:22 17:4
21:14 86:7 141:3
162:5 195:1
court 1:1,24 4:13 6:19
6:24 10:24 11:1
12:23 112:3 123:12
cover 48:1 65:8 119:13
135:16 187:20 189:5
covered 23:15 106:14
covers 14:24 105:23
create 23:17 24:18
25:4 158:11,12 173:6
173:10 198:21
created 17:15 55:19
creating 20:5 175:24
credibility 44:9 51:24
credit 43:13
cropped 188:23
Cross-examination

5:5 210:22
cross-lending 160:15
cue 59:20
current 142:22 206:6
Currently 131:16
custodian 93:2,3,24
95:5,8,10,13
custodied 95:16
custody 96:10,16
cut 35:23
cut-and-dried 35:18

D

D 5:1 10:1
danger 65:7
Danon 3:3 5:5 11:17
11:17 13:15 22:21
36:10 44:21,24 46:5
55:4,24 58:2 66:2,4
68:6 70:18 71:19
72:9 73:10 75:11
76:3,12,20 77:11,19
78:8 95:2,6 100:5,17
100:18 102:17
110:21 113:22
115:25 118:14
120:20 121:2,5,15
134:18 144:7 152:22
154:9 164:18,22
165:2 187:8 189:17
190:2,12 197:3
201:24 204:25 205:5
205:7,10,25 206:6,19
206:21 210:21,22,23
215:16
date 10:9 24:12 39:24
113:11 124:16
125:25 175:14,21
218:14
dated 6:4,8,13 7:4,10
7:17,24 8:5,18,24 9:5
9:11 48:3 68:20
104:21 105:22
147:24 150:18
156:16 219:21

dates 28:24 29:22
David 118:4,8
Davidson 2:13 11:9
day 57:11,13 66:14
139:21 202:17
days 203:13
deal 59:19 61:20 89:22
90:21 106:3,6,8,11
133:8 167:22,25
190:21
dealer 131:13 134:23
136:4 154:25 155:9
155:21 156:5
dealership 154:20,23
155:4
deals 199:17
dealt 65:3 72:17 99:5
167:11 171:25
173:13 179:24
180:22
debate 40:20 166:9
debated 91:18
decent 181:5
Dechert 4:3,7 11:23
decide 44:16
decided 41:21 42:1
45:3 176:5 179:21
188:24 200:3 201:20
decision 19:1 35:8
44:4,14,19 45:3
80:16 106:18 120:11
179:20
decisions 33:4 34:17
46:17 47:5,7
DECLARATION
218:1
declare 218:4
dedicated 23:16,18
198:6
deeply 100:15
defend 163:1
defendant 28:15
141:23
defendants 3:1 11:18

11:21 13:5
define 95:8,10
defunct 14:13
degree 13:10 14:5,8
15:1,6
Deloitte 17:25 19:16
19:18
Deloittes 16:7,8,17,21
16:21 17:6
delve 100:15
demonstrated 116:21
departure 180:19
DePauw 98:9 99:23
DePauw-related 102:6
depends 95:7
DEPONENT'S 218:1
depose 207:9
deposed 12:16 203:9
deposition 1:12 10:21
12:2 97:3,10 195:24
196:6 202:12,16,21
203:20 216:6,12,14
219:11
describe 29:5 39:3
45:10 144:17
described 47:9 98:12
describes 103:5
describing 56:13
143:9
description 6:1 46:24
217:2
desks 62:15
despite 72:24 112:12
158:4,4
detail 19:12 24:2 39:4
52:6 59:16 72:16
77:20 100:8 162:25
details 27:13 71:12,18
101:12 127:10
160:24 203:10 206:8
determine 32:16 85:6
determined 19:4
56:21 106:13 122:3
develop 17:10 20:9



22:11 28:1 30:3
  82:10
developed 59:9 91:25
developing 17:13 27:5
  58:5
difference 23:22 32:24
  52:2 178:22
different 31:20 34:4
  40:23 49:19 55:2
  71:22 72:5 86:16
  87:2 154:21,24
  167:16 176:1 181:6
  187:20
differently 93:1 212:3
difficult 78:19 79:4,17
  79:21,25 140:17
  141:15
difficulties 142:19,21
  160:24,25
difficulty 106:25
dig 59:16
diligence 8:13,17
  17:12,14,17 20:2,7
  20:16 22:10,19 23:9
  23:11 27:18 31:16
  40:1,8,17,22 54:23
  54:24,24 56:24 57:2
  58:7 60:13 64:6
  78:13 80:3,3 86:13
  86:16 87:16 88:22
  91:2,19 99:2 100:14
  100:21 103:22
  105:17 106:4,22
  108:16 120:8 141:13
  153:14 157:6,9 159:5
  159:9,17,21,22,25
  160:21 161:3 163:15
  164:14,24 165:12,17
  165:20,21 167:6,18
  170:19 172:3 174:18
  174:23 175:25 176:4
  177:17,22,24 178:3,4
  178:9,9,23 180:11
  181:8 182:4 184:17

185:14 187:3,6,24
  188:16,17 189:4,8
  196:22 198:2,5,7,9
  198:10,12,15,17,20
  198:22 200:6,22
  214:24 215:7,10
Dillon 36:17 40:4,6
  43:17,21 45:7 139:5
dinner 22:4
direct 26:11 53:11
  67:7 129:17 131:7
  146:16,20 147:4
  159:7 177:14 186:22
  212:5
directed 159:7,8
direction 186:5 206:4
  206:19,22
directly 28:14 53:15
  117:13 129:15
  162:19 165:24
director 18:20
directors 21:18
disagree 173:22,24
disagreed 157:15
disagreement 109:21
disagreements 168:17
discharged 98:16
  103:7
disclose 121:18
disclosed 99:5 104:6
  120:11
disclosure 103:2 214:2
disclosures 102:20,22
  103:3,10 104:11
  120:18 122:12,14
  213:20
discovered 84:6
  138:20
discovery 206:14
discrepancy 134:17
discretion 88:4
discretions 73:19
discuss 22:7,8 30:20
  30:23 76:24 77:6,17

82:13,16,19 84:7
  85:3 107:12,15
  109:21 127:7 166:7
  166:10 167:8 172:4,6
  179:15 180:13
  181:13 185:2 205:23
discussed 35:11 57:25
  77:14 82:17 104:6
  107:8 110:1 148:15
  162:25 166:13,17
  167:10,11 168:20
  169:16 170:16
  171:15 172:2 173:18
  179:5,19 187:10
discussing 148:16
discussion 52:17,25
  53:7,21 84:10 116:14
  127:5 129:15 146:2,4
  147:12,15 150:2,8
  203:10
discussions 28:1 34:10
  51:11,15 111:25
  120:15 121:25 166:1
  173:14,16 203:3,4
  214:4,6,11
dispute 48:16 99:15
  124:6 145:22,23
  148:5 156:23 183:18
  186:15 197:2 199:14
  210:13
distinguishing 154:24
distribute 125:5
distributed 125:23
  126:1,22
District 1:1,1 10:24,24
division 16:9 18:9
divulge 121:18
docket 6:20,25 112:4
document 6:21 8:7,11
  8:15 47:13,19,24
  48:9,11,17,20,22
  68:15 97:13,18,22,23
  98:17 99:14,16,20
  100:16 101:17 102:1

102:2,9,10,16 103:10
  104:11,13 122:25
  123:10,17,20,21
  124:7,10 134:10,11
  142:4,5,11 145:16,24
  147:17,20 148:6,9
  150:13 151:2 156:11
  156:14,18,20,24
  169:17 176:25
  177:12 182:12,16,23
  183:19,23 184:4
  185:21,25 186:3,16
  196:9,13,18,19 197:2
  197:7,8,19,22 198:24
  199:4,7,14,16 208:7
  208:10,18 209:3,4,7
  209:11,16,18 210:13
documentation 127:20
  128:18 131:17
  132:18 135:1 213:1
documents 98:12 99:5
  105:20 113:25
  128:12 132:15 156:1
  188:2 189:13 209:21
  209:22 213:5,14,17
doing 25:6 30:2 43:5
  54:22 63:10 78:12
  80:2 88:3 91:19 99:9
  104:4 105:16 108:25
  122:17 128:2,3
  138:21 139:14 141:7
  141:13 151:17
  155:19 157:8 158:10
  164:7,11 172:3 178:6
  198:7 206:3
dotted 26:15,20
doubt 102:12
draft 8:12 112:23
  113:14,18 166:12
  169:5,13,15,18 170:9
  170:12,17,17
drafts 113:13 169:14
driven 27:2
drives 170:11

www.merrillcorp.com/law

OPTIMAL_BERLAMONT-000063